McCARTER & ENGLISH, LLP
245 Park Avenue
27th Floor
New York, New York 10167
(212) 609-6800 - Telephone
(212) 609-6921 - Facsimile
David J. Adler (DA-0048)
dadler@mccarter.com
Attorneys for Development Specialists, Inc.,
Plan Administrator for Coudert Brothers LLP

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| COUDERT BROTHERS LLP, | : | Case No. 06-12226 (RDD) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| DEVELOPMENT SPECIALISTS, INC., | : |  |
| in its capacity as Plan Administrator for | : |  |
| Coudert Brothers LLP, | : | Adv Pro. No.: 09-1150 (RDD) |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| BAKER & McKENZIE LLP, | : |  |
|  | : |  |
| Defendant. | : |  |
|  | : |  |

**AMENDED COMPLAINT FOR: (1) BREACH OF CONTRACT;
(2) BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING;
(3) TURNOVER OF PROPERTY OF THE ESTATE; (4) CONVERSION;
(5) ACCOUNTING AND TURNOVER OF UNFINISHED BUSINESS;
(6) AVOIDANCE AND RECOVERY OF FRAUDULENT TRANSFERS;
AND (7) RELATED RELIEF AGAINST BAKER & McKENZIE LLP**

Plaintiff Development Specialists, Inc. (the "<u>Plan Administrator</u>" or "<u>Plaintiff</u>"), in its

capacity as Plan Administrator for Coudert Brothers LLP (the "<u>Debtor</u>"), brings this amended

complaint against Baker & McKenzie LLP ("<u>Defendant</u>" or "<u>Baker</u>") and alleges as follows:

## INTRODUCTORY STATEMENT

1. This is an action to: (a) recover against Defendant for breach of contract in

connection with the Baker Transaction (defined herein); (b) recover against Defendant for breach

of the duty of good faith and fair dealing; (c) recover against Defendant for conversion;

(d) provide an accounting of the Unfinished Business (defined herein) it received from the

Debtor; (e) compel Defendant to turnover any profit received on account of Unfinished Business

or the Coudert Contingency Payment (defined herein); (f) compel Defendant to disgorge any

sums by which it has been unjustly enriched on account of Unfinished Business transferred from

the Debtor; and (g) avoid and recover certain constructive fraudulent transfers made to

Defendant.

## PROCEDURAL BACKGROUND

2. On September 22, 2006 (the "<u>Petition Date</u>"), the Debtor filed in this Court a

voluntary petition for relief under chapter 11 of title of the United States Code (the "<u>Bankruptcy</u>

<u>Code</u>").

3. By Order dated August 27, 2008 (ECF Doc. #878), this Court confirmed the First

Amended Plan of Liquidation of Coudert Brothers LLP dated May 9, 2008 (as modified) (the

"<u>Plan</u>"; ECF Doc. #693).

4. The Effective Date of the Plan occurred on September 8, 2008 (ECF Doc. #894).

Pursuant to Section 5.2 of the Plan, on the Effective Date, the Plan Administrator is the exclusive

representative of the estate under Section 1123(b)(3)(B) of the Bankruptcy Code and is

ME1 8348571v.3

authorized to "assert, prosecute, pursue … all Claims, Causes of Action and actions to collect the

Receivables, including against Non-Participating Partners, and assert and enforce all legal and

equitable remedies and defenses belonging to the Debtor or its Estate …"

5.     Under Section 1.16 of the Plan, Claim means:

(a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed undisputed, secured, or unsecured.

6.     Under Section 1.14 of the Plan, "Causes of Action" means

any and all Claims, rights, actions, chose in action, suits, causes of action, liens, judgments and damages belonging to the Debtor or its Estate and any and all liabilities, obligations, covenants, undertakings and debts owing to the Estate, whether arising prior to or after the Petition Date and in each case whether known or unknown, in law, equity or otherwise, including without limitation Receivables, Recourse Claims, actions to collect Reconciliation Amounts and those Claims and actions to avoid or recover pre-petition or post-petition transfers of money or property pursuant to applicable bankruptcy and nonbankruptcy law (including rights and remedies arising under Chapter 5 of the Bankruptcy Code).

7.     Under Section 5.2 of the Plan, the Plan Administrator is authorized to assert the

Claims and Causes of Action set forth herein.

## PARTIES

8.     The Plan Administrator is Development Specialists, Inc. with an office at Three

First National Plaza, 70 West Madison Street, Suite 2300, Chicago, Illinois 60602-4250.

9.     Defendant Baker & McKenzie LLP is a law firm with offices at 1114 Avenue of

Americas, New York, New York 10036.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this proceeding under chapter 11 of the Bankruptcy Code, pursuant to 28 U.S.C. §§151, 157 and 1334.

11.     Plaintiff commences this adversary proceeding pursuant to Rule 7001, et seq. of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Sections 541, 542, 544, 548 and 550 of the Bankruptcy Code and NYDCL §§273-75, 277-78.

12.     Venue in this Court is proper, pursuant to 28 U.S.C. §§ 1408 and 1409, because this adversary proceeding arises under and in connection with a case pending in this District under the Bankruptcy Code.

13.     This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(H).

## GENERAL FACTUAL ALLEGATIONS

### a.     History Of The Debtor

14.     The Debtor was an international law firm founded in 1853.  At its peak in 2000, the Debtor maintained 28 offices in 15 countries and employed over 1,350 persons (exclusive of partners).  Prior to determining to wind down its operations on August 16, 2005, Coudert had approximately ninety-three (93) "Equity Partners," twenty-two (22) "Contract Partners," and seventy (70) "Retired Partners," all as defined in the firm's Partnership Agreement.

15.     Prior to the Dissolution (defined herein), the Debtor provided a full range of legal services for its clients pursuant to the terms and conditions set forth in the client engagement letters.

16.     The Debtor had a partnership agreement dated December 30, 2004 as amended (the "Partnership Agreement") which governed its affairs.

ME1 8348571v.3

17.     Article 10 of the Partnership Agreement addresses dissolution of the Debtor and provides that:

**Article 10.     DISSOLUTION AND LIQUIDATION**

**a.     Dissolution**:  The Partnership may only be dissolved and wound up by an affirmative vote of a Super Majority of the Executive Board then serving and an affirmative vote of the Equity Partners in accordance with Article 3(a)(ii).  Such dissolution and winding up, and the rights of the Partners in connection therewith shall be governed by the provisions of the [Partnership Law of the State of New York].

18.     The Partnership Agreement did not address allocation of fees in the event of the Debtor's dissolution.

19.     As a result of the decline in profits per partner, in or about 2004, the Debtor began considering potential strategic alternatives.

20.     At some point in 2005, the Executive Board of the Debtor requested that an orderly dissolution analysis be prepared.  On or about June 9, 2005, the Executive Board received the orderly dissolution analysis which projected a deficit of approximately $30.4 million.

21.     Upon information and belief, as of June 9, 2005, the Debtor owed approximately $24.5 million to its secured creditors (Citibank and JP Morgan) and approximately $3 million in unsecured bank loans.

22.     On August 16, 2005 (the "Dissolution Date"), the partners of the Debtor (the "Partners") voted to wind down and dissolve the Debtor (the "Dissolution").

23.     The Debtor was insolvent prior to the Dissolution.

**b.     The Baker Transaction**

24.     On or about April 25, 2005, Coudert retained Hildebrandt International, Inc. ("Hildebrandt") to assist it in connection with finding a merger partner.  Upon information and

5

belief, Hildebrandt, at that time, was or had provided consulting services to Baker on other matters.

25. Upon information and belief, Hildebrandt shopped Coudert to Baker. In June of 2005, Baker ostensibly indicated a willingness to proceed with a firmwide merger. Baker conducted due diligence which included reviewing the Partnership Agreement, reviewing the financial statements and interviewing partners in different offices.

26. As a result of this due diligence, Baker learned confidential information concerning, inter alia, Coudert, its financial structure, the profitability of the firm, its partners and its offices.

27. On August 3, 2005, Baker notified the Debtor that it would not proceed with a firmwide merger and would only consider acquiring offices/practices after Coudert had dissolved.

28. In an August 4, 2005 email, Hildebrandt advised his partner, Lisa Smith, that: "Coudert NY office may want to go to Baker. Baker cannot ask directly so we are the go between. [John Conroy (the Chairman of Baker)] may get what he wanted after all."

29. Lisa Smith thereafter wrote back: "Well that's probably good news for both of them. Certainly good for Baker. Won't Coudert have to dissolve to do that?"

30. Baker's decision not to proceed with a firm wide merger led to the Dissolution.

31. Following the Dissolution, Baker indicated a desire to acquire virtually all of the lawyers, equipment and space at Coudert's New York Office.

   **i.    The Baker Asset Purchase Agreement**

32. On or about September 7, 2005, the Debtor and Baker entered into an agreement, as amended on September 23, 2005 and June 30, 2006 (collectively, the "APA"). A copy of the

APA is attached hereto as <u>Exhibit "A"</u>.  Under the APA, Baker purchased the following assets

of the Debtor (the "<u>Baker Transaction</u>"): (i) certain accounts receivable and work in process (the

"<u>Inventory</u>"); (ii) certain contingency fee receivables; (iii) the Debtor's leasehold interests at

1114 Avenue of the Americas (the "<u>Leasehold Interests</u>"); (iv) leasehold improvements; and (v)

certain fixed assets (collectively, the "<u>APA Transfers</u>").

33.    Section 2.1 of the APA identifies the assets that were sold to Baker and provides

that:

> at the Closing, Coudert will sell, convey, assign, transfer and deliver to Baker, and
> Baker will purchase and acquire from Coudert, the following assets, rights and
> properties (the "<u>Assets</u>"):
>
> (a)    all of the Inventory, including all of the items of Inventory indicated on
> Schedule 2.1(a) …;
>
> (b)    all rights of Coudert under the client contingent fee arrangements relating
> to the Contingency Fee Cases …;
>
> (c)    all of the leasehold improvements relating to the Subleased Premises …;
>
> (d)    all of the fixed assets and other tangible personal property owned by
> Coudert and relating to the Subleased Premises …;
>
> (e)    all rights under office equipment contracts …;
>
> (f)    all of the Records;
>
> (g)    all rights of Coudert in and to copyrights …;
>
> (h)    to the extent legally assignable, all rights of Coudert in and to the owned
> licensed computer software and applications ...; and
>
> (i)    all rights, claims and defenses of Coudert relating to the Assets or
> Assumed Liabilities …

34.    Section 2.2 of the APA notes: "[a]ll assets, rights and properties of Coudert that

are not enumerated as Assets in Section 2.1 (collectively, the "<u>Excluded Assets</u>") **will be**

**excluded** from the sale and purchase contemplated by this Agreement and will remain the property of Coudert after the Closing." (emphasis supplied).

35.     Section 2.5 of the APA (Purchase Price) identifies the individual components of the Purchase Price paid by Baker.

36.     Section 2.6 of the APA reflects the allocation of the Purchase Price.  In connection with the Baker Transaction, the Debtor received the following: (i) $6.6 million on account of the Inventory; (ii) $2.6 million on account of the contingency fee receivables (paid in December, 2005); (iii) $4 million in exchange for the Leasehold Interests, (iv) $498,000 on account of leasehold improvements, and (v) $516,000 for the purchase of fixed assets.

**ii.     Asset Transferred - Inventory §2.1(a)**

37.     Under Section 1.1 of the APA, "Inventory" is defined as:

> accounts receivable (including client advances held in client escrow accounts) and work in process arising in connection with performance, on or prior to 11:59 p.m., New York City time, on the day prior to the Closing Date, of legal services for those clients billed from the New York City Office of Coudert for which any Lateral Attorney is designated as the 'Responsible Partner' for purposes of Coudert's client billing policies...

38.     Inventory does not include any right to received fees for work performed after the Closing Date (i.e. after September 7, 2005).

39.     As of the Closing Date, the Debtor's books and records reflect that the total amount of Inventory transferred to Baker was approximately $13.2 million.

40.     Upon information and belief, the Debtor received approximately $6.6 million from Baker in exchange for the Inventory.

41.     The Debtor received approximately 50% in exchange for the Inventory.

42.     In 2004, the realization rate for timekeepers in the Debtor's New York office was approximately 95.5%.

43.     In 2003, the realization rate for timekeepers in the Debtor's New York office was approximately 91.1%.

44.     In 2002, the realization rate for timekeepers in the Debtor's New York office was approximately 91.0%.

### iii.     Asset Transferred - The Contingency Cases

#### A.     Coudert's Contingency Cases on the Dissolution Date

45.     In addition to the Inventory, the APA set forth a formula to allocate fees received on account of certain contingency matters (the "Contingency Cases").   Pursuant to Schedule 2.5(c) of that Agreement, Coudert and Baker agreed to share proceeds received following the Closing Date on account of the Contingency Cases.

46.     Prior to the Dissolution, Steven A. Becker was the principal attorney involved in the Contingency Cases.  In general, the Contingency Cases centered around the constitutionality of various federal and state excise taxes and fees, as applied to the export of products from the United States, under the Export Clause of the United States Constitution.

47.     One particular set of the Contingency Cases prosecuted by Becker were the Black Lung Excise Tax cases ("Black Lung Cases").  These cases involve the constitutionality of a federal excise tax on exports of coal.

48.     In the Second Amendment to the APA, the Black Lung Cases are defined as:

> collectively, those actions brought on behalf of numerous US coal producers to obtain refunds of the Black Lung Excise Tax, imposed on the sale of coal for the export from the United States . . . .  In addition to refunds that have been and will likely be issued in response to filings with the IRS of administrative claims, the following court cases have been filed by Coudert in the United States Court of Federal Claims ….

See Second Amendment to APA dated June 30, 2006.

ME1 8348571v.3

49.     Pursuant to Schedule 2.5(c) of the APA, proceeds received on account of Black

Lung Cases were to be shared as follows:

> (a) first, each of Baker and Coudert will be entitled to recover on a dollar for dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Black Lung Cases;

> (b) second, each of Baker and Coudert will be entitled to recover on a dollar for dollar basis, 100% of the value of its fees recorded in the Black Lung Cases; and

> (c) third, (i) with respect to proceeds received in connection with Black Lung Cases that are designated in paragraph 1 above as "Administrative Refund Cases," Coudert will be entitled to receive all additional proceeds, and (ii) with respect to proceeds received in connection with the Black Lung Cases that are designated in paragraph 1 as "Tucker Act Cases", Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c)(ii) equals $7,000,000, after which Coudert will be entitled to all additional proceeds.

See Second Amendment to APA dated June 30, 2006.

50.     The APA sets forth allocations for the sharing of fees on account of Contingency

Cases other than the Black Lung Cases.

51.     Public Law 110-343 was passed on October 3, 2008 (An Act To Provide

Authority For The Federal Government To Purchase And Insure Certain Types Of Troubled

Assets For The Purposes Of Providing Stability To And Preventing Disruption In The Economy

And Financial System And Protecting Taxpayers, To Amend The Internal Revenue Code Of

1986 To Provide Incentives For Energy Production And Conservation, To Extend Certain

Expiring Provisions, To Provide Individual Income Tax Relief, And For Other Purposes).

52.     Included in that legislation was the The Energy Improvement and Extension Act

of 2008 ("EIEA").  Section 114 of EIEA is entitled "Special Rules For Refund Of The Coal

Excise Tax To Certain Coal Producers And Exporters" and authorizes, <u>inter alia</u>, exporters of coal to file refund tax claims for payment of these excise taxes dating back to 1990.

53.     Under EIEA, refund claims were to be determined on an accelerated basis. Specifically, Section 114(e) of EIEA provides that:

(e) Timing of Refund.—

With respect to any claim for refund filed pursuant to this section, the Secretary shall determine whether the requirements of this section are met not later than 180 days after such claim is filed. If the Secretary determines that the requirements of this section are met, the claim for refund shall be paid not later than 180 days after the Secretary makes such determination.

54.     Following the enactment of EIEA, Becker, on November 18, 2008 sent an email (the "<u>November 18th Email</u>") to counsel for the Plan Administrator which stated that:

As a result of the work this firm performed over the course of the past several years, and the resulting federal legislation signed into law recently, we are very pleased that the various coal producers and exporters represented by Baker have had the opportunity to file claims for refunds, with interest, of Black Lung Excise Taxes paid to the IRS.

These refund claims go as far back as the 4th quarter 1990. Assuming that the maximum amount of taxes are properly and timely claimed and refunded, and assuming, further, that the clients pay Baker all of the contingent fees that are due, such fees may total as much as approximately $17 million, subject, however, to the potential reduction described below. These fees could be received within the next year.

The Baker-Coudert agreement calls for the contingent fees to be allocated as follows:

1) Baker first receives payment for its time charges in the computer (approximately $2.2M, with additional amounts accruing), plus an additional $30,000 or so for disbursements (Estimate $2.5M total);

2) Baker and Coudert split equally the next $7 million;

3) Coudert receives all of the remaining proceeds, which may amount up to an additional $7.5 million.

ME1 8348571v.3

**Therefore, the net result could be that Baker receives approximately $6 million and Coudert receives approximately $11 million.**

(emphasis supplied).

55.     As of July 31, 2009, upon information and belief, Baker has received payments on account of the Contingency Cases in excess of $5.0 million. Although Baker is obligated to remit in excess of $1,500,000 to Coudert pursuant to the APA (the "<u>Coudert Contingency Payment</u>"), it has failed to do so to date.

**iv.     The Leasehold interests**

56.     On or about February 26, 1992, Coudert entered into a lease agreement with 1114 6th Avenue Co.'s predecessor-in-interest with respect to the entire 4th, 37th, and 40th through 45th floors of the Grace Building.

57.     The term of the lease expired on May 30, 2013 (the "<u>Lease Agreement</u>").

58.     In connection with the Lease Agreement, Coudert spent approximately $12.5 million to build out the space

59.     Thereafter, in 2003, Coudert spent an additional $2.6 million on tenant work in its space in the Grace Building.

60.     Coudert's space was well designed and completed at a level well above building standard for the Grace Building.

61.     As of August, 2005, Coudert's space remained very attractive, functional and in excellent condition with no sign of physical or functional obsolescence.

62.     The 4th Floor of Coudert's space was designed as a conference center and, as of August, 2005, Coudert was utilizing that space as part of its operations.

63.     As of August, 2005, Coudert was also utilizing its space on the 42nd through 44th Floors for its operations.

ME1 8348571v.3

64. As of August, 2005, approximately 10,591 square feet of Coudert's space on the 41st Floor was vacant.

65. Upon information and belief, as of July, 2005, the average asking rents for office space in Class A buildings within the comparable New York market was substantially greater than $64 per square foot.

66. The consideration received by Coudert in exchange for its interest in property was based on an assumption that the rental value of the leasehold was $60 per rentable square foot.

**v.    Asset Not Transferred Pursuant to APA - Unfinished Business**

67. Under Section 2.1 of the APA, the Debtor did not sell any of its rights to recover fees or profits generated on cases for Coudert's former clients that were transferred to Baker after the Closing Date ("Unfinished Business").  Because Baker was uncertain as to which clients would remain with Coudert, Baker attempted created a "client management protocol" (the "Protocol") pursuant to Section 10.9 of the APA to ensure that as many of Coudert's client as possible continued to use the services of Baker following the Closing Date. The Protocol required, among other things, that:

- "[a]s promptly as practicable after the Closing Date, the Coudert partners joining Baker will notify each of their respective clients using a letter in substantially the form attached."

- "[f]or a period of not more than six months after the Closing Date, Coudert will continue to make available to Baker the time entry and client billing systems and services presently in use to support the Coudert attorneys joining Baker…."

68. Schedule 10.9 of the APA includes a form letter **to be sent** from the Coudert partners to Coudert clients on Baker letterhead (the "Client Letter").  The Client Letter noted that:

- "We highly value our relationship and look forward to serving you at Baker & McKenzie.  We will be bringing your files with us to Baker & McKenzie, where we will

13

continue to discharge current assignments.  We understand, however, that the choice of who will represent you in the future is your decision and one that we respect. If you determine to transfer your representation to counsel other than Baker & McKenzie, we will work with you and the other lawyer you designate to ensure a smooth transition of your matters."

- "Naturally, the work we are presently doing will continued to be handled under the terms of our existing engagement letter.  As many professional services firms have done, Baker and McKenzie has adopted standard terms of engagement that cover all client assignments.  I have enclosed a copy of the Baker & McKenzie standard Terms for your review and files."

69.     Upon information and belief, following the Dissolution Date, certain former Partners of the Debtor (the "<u>Withdrawing Partners</u>") along with Baker caused the transfer of the Debtor's Unfinished Business to Baker.

70.     Unfinished Business was not included in Section 2.1 of the APA and therefore was an Excluded Asset under the APA.

71.     The Debtor's books and records reflect that the Withdrawing Partners who joined Baker were the "responsible partners" for over 64,000 billable hours with a value in excess of $24.5 million from January 1, 2005 through the Dissolution Date as follows:

| **Partner** | | **Office** | | **Value** | **Hours** |
| --- | --- | --- | --- | --- | --- |
| Becker | Steven | New York | $ | 1,571,843.00 | 4,202 |
| Berry | Dean | New York | $ | 799,535.00 | 2,439 |
| Cahn | Jonathan | Washington | $ | 1,216,310.00 | 3,958 |
| Church | Pamela | New York | $ | 1,948,776.00 | 5,430 |
| Cohen | Jeffrey | New York | $ | 2,290,252.00 | 5,259 |
| Colihan | James | New York | $ | 1,488,167.00 | 3,683 |
| Critchlow | Charles | New York | $ | 849,677.00 | 2,175 |
| De Palma | Richard | New York | $ | 185,259.00 | 561 |
| Dean | Richard | Washington | $ | 1,258,612.00 | 4,076 |
| Eisen | Robert | New York | $ | 2,295,966.00 | 5,276 |
| Erulkar | Eliab | New York | $ | 184,014.00 | 500 |
| Farris | Theodore | New York | $ | 105,220.00 | 261 |
| Hannon | Gerard | New York | $ | 105,220.00 | 261 |
| Hedden | Andrew | New York | $ | 1,317,623.00 | 3,357 |
| Horowitz | Paul | New York | | | |
| Konta | Frederick | New York | $ | 990,743.00 | 2,243 |
| Metzger | Barry | New York | $ | 1,569,738.00 | 3,033 |
| Page | Kenneth | New York | $ | 1,269,831.00 | 4,792 |

14

| Prescott | Darrell | New York | $ | 639,921.00 | 1,739 |
|----------|---------|----------|---|-----------|-------|
| Rankin, III | Clyde | New York | $ | 1,445,305.00 | 3,871 |
| Reilly | Richard | New York | $ | 150,567.00 | 335 |
| Rice | Thomas | New York | $ | 60,246.00 | 152 |
| Stubblefield | Carol | New York | | | |
| Tween | Douglas | New York | - | | - |
| Wagner | Charles | New York | $ | 290,932.00 | 646 |
| Williams | Anthony | New York | $ | 2,509,520.00 | 6,491 |
| Total | | | $ | 24,543,277.00 | 64,740 |

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT - COUDERT CONTINGENCY PAYMENT

72.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

73.     The APA is a valid, binding and enforceable contract by and between Baker and Coudert.

74.     Baker has breached the APA with the Debtor by, inter alia, not remitting the Coudert Contingency Payment.

75.     As a result of Baker's breach of the APA, Plaintiff is entitled to compensatory, consequential, exemplary and other damages with prejudgment interest thereon at the legal rate, attorneys' fees, expenses and costs along with such other and further relief as may be deemed just and proper.

## SECOND CLAIM FOR RELIEF
## BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

76.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

ME1 8348571v.3

77.     The APA is a valid, binding and enforceable contract by and between Baker and Coudert.  Implied in the APA is a covenant by all parties not to take actions intended to or that have the effect of depriving any of the other parties to the benefits of the contract.

78.     Plaintiff has fulfilled all obligations on its part to be performed pursuant to the APA and there are no conditions to or legal excuses for the breaches of the APA as alleged herein.

79.     By the conduct alleged herein, including by wrongfully depriving the Debtor of the Coudert Contingency Payment, Baker has breached the covenant of good faith and fair dealing.

80.     As a proximate result of Baker's breach of the covenant of good faith and fair dealing, Plaintiff is entitled to compensatory, consequential, exemplary and other damages with prejudgment interest thereon at the legal rate, attorneys' fees, expenses and costs along with such other and further relief as may be deemed just and proper.

**THIRD CLAIM FOR RELIEF**
**TURNOVER OF PROPERTY OF ESTATE -**
**COUDERT CONTINGENCY PAYMENT**

81.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

82.     The Coudert Contingency Payment is property of the Debtor's Estate.

83.     Plaintiff is entitled to an order, pursuant to Sections 541 and 542 of the Bankruptcy Code, compelling Baker to turnover the Coudert Contingency Payment with prejudgment interest thereon at the legal rate, attorneys' fees, expenses and costs along with such other and further relief as may be deemed just and proper.

ME1 8348571v.3

## FOURTH CLAIM FOR RELIEF
## CONVERSION - COUDERT CONTINGENCY PAYMENT

84.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

85.     Baker is presently holding the Coudert Contingency Payment.

86.     Baker has unlawfully and without authorization exercised dominion and control over the Coudert Contingency Payment.

87.     Plaintiff is entitled to judgment against Baker in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, attorneys' fees along with such other and further relief as may be deemed just and proper.

## FIFTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT - COUDERT CONTINGENCY PAYMENT

88.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

89.     In the event that there is a determination that Schedule 2.5(c) does not cover the fees received by Baker on account of the Contingency Cases, the Plan Administrator seeks to recover against Baker under the doctrine of unjust enrichment.

90.     It is inequitable and unjust for Baker to have received, been enriched by, and retain the benefits of the fees it received on account of the Contingency Cases.

91.     Equity and good conscience require that Baker disgorge the Coudert Contingency Payment and/or benefits improperly obtained as described above.

92.     Plaintiff is entitled to judgment against Baker in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, attorneys' fees along with such other and further relief as may be deemed just and proper.

ME1 8348571v.3

## SIXTH CLAIM FOR RELIEF
## <u>ACCOUNTING FOR UNFINISHED BUSINESS (11 U.S.C. § 542)</u>

93.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

94.     Upon information and belief, at the time the Withdrawing Partners withdrew from the Debtor or thereafter, the Withdrawing Partners transferred or caused the transfer of Unfinished Business to Baker (the "<u>Transfers of Unfinished Business</u>").

95.     Such Transfers of Unfinished Business include hourly rate cases that were unfinished as of the Dissolution Date and, to the extent not covered by the APA, the Contingency Cases.

96.     Upon information and belief, Baker has collected revenues in the past and will collect revenues in the future relating to the Transfers of Unfinished Business.  Pursuant to NYPL §§ 40(6), 43(1), the profits generated from the Transfers of Unfinished Business are to be held in trust for the Debtor and are to be paid over to Plaintiff for the benefit of the estate.

97.     The amount of profits received by Baker on account of the Transfers of Unfinished Business is unknown and cannot be ascertained without an accounting.

98.     Baker has information (including books, records and other information) which will reveal the profits generated on account of the Transfers of Unfinished Business.

99.     Pursuant to Section 542 of the Bankruptcy Code, Plaintiff is entitled to judgment against Baker compelling Baker to produce an accounting along with such other and further relief as may be deemed just and proper.

ME1 8348571v.3

## SEVENTH CLAIM FOR RELIEF
## TURNOVER OF PROFITS RELATED TO UNFINISHED BUSINESS

100.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

101.    Upon information and belief, at the time the Withdrawing Partners withdrew from the Debtor or thereafter, the Withdrawing Partners caused and effectuated the Transfers of Unfinished Business to Baker.

102.    Such Transfers of Unfinished Business include hourly rate cases that were unfinished as of the Dissolution Date and, to the extent not covered by the APA, the Contingency Cases.

103.    Upon information and belief, Baker has collected revenues in the past and will collect revenues in the future on account of the Transfers of Unfinished Business.  Pursuant to NYPL §§ 40(6) and 43(1), the profits generated on account of the Transfers of Unfinished Business are property of the Debtor's estate.

104.    The profits collected on account of the Transfers of Unfinished Business are to be paid over to Plaintiff for the benefit of the estate.

105.    Plaintiff is entitled to an order, pursuant to Sections 541 and 542 of the Bankruptcy Code, compelling Baker to turnover the profits received on account of the Transfers of Unfinished Business, with prejudgment interest thereon at the legal rate, attorneys' fees, expenses and costs along with such other and further relief as may be deemed just and proper.

## EIGHTH CLAIM FOR RELIEF
## UNJUST ENRICHMENT - UNFINISHED BUSINESS

106.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

ME1 8348571v.3

107.     Upon information and belief, at the time the Withdrawing Partners withdrew from the Debtor or thereafter, the Withdrawing Partners caused the Transfers of Unfinished Business to be made to Baker.

108.     Such Transfers of Unfinished Business include hourly rate cases that were unfinished as of the Dissolution Date and, to the extent not covered by the APA, the Contingency Cases.

109.     Upon information and belief, Baker has collected revenues in the past and will collect revenues in the future relating to the Transfers of Unfinished Business.

110.     Baker received a benefit from the Transfers of Unfinished Business.

111.     It is inequitable and unjust for Baker to have received, been enriched by, and retain the benefits of the Transfers of Unfinished Business.

112.     Equity and good conscience require that Baker disgorge monies and/or benefits improperly obtained as a result of the Transfers of Unfinished Business.

113.     Plaintiff is entitled to judgment against Baker in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, attorneys' fees along with such other and further relief as may be deemed just and proper.

## NINTH CLAIM FOR RELIEF
## CONVERSION - UNFINISHED BUSINESS

114.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

115.     Upon information and belief, at the time the Withdrawing Partners withdrew from the Debtor or thereafter, the Withdrawing Partner caused the Transfer of Unfinished Business to Baker.

ME1 8348571v.3

116.    Such Transfers of Unfinished Business include hourly rate cases that were unfinished as of the Dissolution Date and, to the extent not covered by the APA, the Contingency Cases.

117.    Upon information and belief, Baker has collected revenues in the past and will collect revenues in the future relating to the Transfers of Unfinished Business.

118.    Baker has unlawfully and without authorization exercised dominion and control over the profits received on account of the Transfers of Unfinished Business.

119.    Plaintiff is entitled to judgment against Baker in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, attorneys' fees along with such other and further relief as may be deemed just and proper.

**TENTH CLAIM FOR RELIEF**
**EQUITABLE ACCOUNTING - UNFINISHED BUSINESS**

120.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

121.    At the time the Withdrawing Partners withdrew from the Debtor and thereafter, the Withdrawing Partners had a duty to account for and turnover any profit generated on account of Unfinished Business pursuant to NYPL §§ 40(6) and 43(1).

122.    The Withdrawing Partners are subject to a fiduciary and confidential relationship with the Debtor.

123.    Baker was subject to a fiduciary and confidential relationship with the Debtor.

124.    Upon information and belief, at the time the Withdrawing Partners withdrew from the Debtor or thereafter, the Withdrawing Partners caused the Transfers of Unfinished Business to Baker.

ME1 8348571v.3

125. Upon information and belief, Baker has collected revenues in the past and will collect revenues in the future relating to the Transfers of Unfinished Business.

126. The amount of profits is unknown to Plaintiff and cannot be ascertained without an accounting of profits from Baker on account of the Transfers of Unfinished Business.

127. Baker has information (including books, records and documents) which will enable the Plaintiff to determine the fees collected and the profits generated on account of the Transfers of Unfinished Business.

128. As a result of the Transfers -- which the Withdrawing Partners and Baker were responsible for -- an accounting of the fees collected on the profits generated on the Transfers must be provided by Baker.

129. Plaintiff does not have an adequate remedy at law.

130. Plaintiff is entitled to judgment against Baker compelling Baker to produce an accounting along with such other and further relief as may be deemed just and proper.

**ELEVENTH CLAIM FOR RELIEF**
**FRAUDULENT TRANSFER (11 U.S.C. § 548(a)(1)(B))**

131. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

132. The Debtor had an interest in the APA Transfers and the UB Transfers (collectively, the "Transfers") and such property was property of the Debtor's estate.

133. Pursuant to Section 101(54)(D) of the Bankruptcy Code, transfer means "each mode, direct or indirect, absolute or conditional, voluntary or involuntary of disposing of or parting with (i) property; or (ii) an interest in property."

134. The Transfers are transfers under section 101(54)(D) of the Bankruptcy Code.

135. Baker received the Transfers within two years prior to the Petition Date.

22

136.     The Debtor received less than reasonably equivalent value in exchange for the Transfers.

137.     At the time the Transfers were made, the Debtor: (i) was insolvent, or rendered insolvent; (ii) was engaged in business or a transaction, or was about to engage in such business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital, or (iii) intended to incur debts that would be beyond the ability of the Debtor to pay as such debts matured.

138.     Plaintiff is entitled to judgment against Baker avoiding the Transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code along with such other and further relief as may be deemed just and proper.

## TWELFTH CLAIM FOR RELIEF
## FRAUDULENT TRANSFER (NYDCL §§ 273-75, 277-78)

139.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

140.     The Debtor had an interest in the Transfers which is property of the Debtor's estate.

141.     The Transfers took place on or within four years before the Petition Date.

142.     The Debtor did not receive fair consideration in exchange for the Transfers.

143.     At the time the Transfers were made, the Debtor: (i) was insolvent, or rendered insolvent; (ii) was engaged in business or a transaction, or was about to engage in such business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital, or (iii) intended to incur debts that would be beyond the ability of the Debtor to pay as such debts matured.

ME1 8348571v.3

144. Certain of the Debtor's landlords (including the Cannery Corporation and Equity Office Properties) were creditors at the time that the Transfers were made and each holds an unsecured claim that is allowable under Section 502 of the Bankruptcy Code.

145. Plaintiff is entitled to judgment against Baker avoiding the Transfers pursuant to NYDCL §§ 273-75, 277-78 et al. and Section 544 of the Bankruptcy Code along with such other and further relief as may be deemed just and proper.

**THIRTEENTH CLAIM FOR RELIEF**
**RECOVERY OF PROPERTY (11 U.S.C. § 550)**

146. Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

147. Baker is the initial transferee of the Transfers or the entity for whose benefit the Transfers were made, or the immediate transferee of the initial transferee receiving the Transfers and exercised legal dominion and control over the Transfers.

148. The Transfers consisted of property of the Debtor's estate.

149. The Transfers, or the value thereof, are and should be preserved for the benefit of the Debtor's estate.

150. Pursuant to Section 550(a) of the Bankruptcy Code, Plaintiff is entitled to judgment against Baker in an amount to be determined at trial, with prejudgment interest thereon at the legal rate, attorneys' fees, expenses and costs along with such other and further relief as may be deemed just and proper.

**RESERVATION OF RIGHTS**

Plaintiff hereby specifically reserves the right to bring any and all other causes of action that it may maintain against Baker including, without limitation, causes of action arising out of

the same transaction(s) set forth herein, to the extent discovery in this action or further

investigation by the Plaintiff reveals such further causes of action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests entry of judgment in favor of Plaintiff and

against Baker as follows:

a.     On the First Claim for Relief, for recovery on account of Baker's breach of contract in an

amount to be determined at trial;

b.     On the Second Claim for Relief, for recovery on account of Baker's violation of the duty

of good faith and fair dealing in an amount to be determined at trial;

c.     On the Third Claim for Relief, for turnover of property in an amount to be determined at

trial;

d.     On the Fourth Claim for Relief, for recovery against Baker on account of any amounts

that Baker has misappropriated in an amount to be determined at trial;

e.     On the Fifth Claim for Relief, for recovery against Baker on account of any amounts by

which Baker have been unjustly enriched in an amount to be determined at trial;

f.     On the Sixth Claim for Relief, for an accounting by Baker with respect to fees and profits

received on account of the Debtor's Unfinished Business;

g.     On the Seventh Claim for Relief, for turnover of the profits received on account of the

unfinished business which was transferred to Baker;

h.     On the Eighth Claim for Relief, for recovery against Baker on account of the profits

received on account of the unfinished business any amounts by which Baker have been unjustly

enriched in an amount to be determined at trial;

ME1 8348571v.3

i.	On the Ninth Claim for Relief, for turnover of property determined to have been misappropriated by Baker;

j.	On the Tenth Claim for Relief, for an equitable accounting of the fees and profits received on account of unfinished business;

k.	On the Eleventh Claim for Relief, avoidance of transfers received by Baker in an amount to be determined at trial;

l.	On the Twelfth Claim for Relief, avoidance of transfers received by Baker in an amount to be determined at trial;

m.	On the Thirteenth Claim for Relief, for recovery against Baker for the transfers avoided under Section 550 of the Bankruptcy Code in an amount to be determined at trial;

n.	Disallowing any claims of Baker against the Debtor if Baker fails or refuses to turn over any avoided transfer to the Plaintiff;

o.	Awarding the Plaintiff any and all pre-judgment interest at the legal rate;

p.	Awarding the Plaintiff reasonable attorneys' fees, expenses and costs; and

q.	Granting such other and further relief deemed appropriate under the circumstances.

Dated:  New York, New York
        November 11, 2009

McCARTER & ENGLISH, LLP

Attorneys for Development Specialists, Inc.,
Plan Administrator for Coudert Brothers
LLP

/s/ David J. Adler
David J. Adler  (DA-0048)
245 Park Avenue
27th Floor
New York, New York 10167
(212) 609-6800 – Telephone
(212) 609-6921 – Facsimile

ME1 8348571v.3

# EXHIBIT "A"

EXECUTION COPY

ASSET PURCHASE AGREEMENT

by and between

BAKER & MCKENZIE LLP

and

COUDERT BROTHERS LLP

———————————————

September 7, 2005

ARTICLE 1 DEFINITIONS.................................................................- 1 -

 1.1 DEFINITIONS.................................................................- 1 -

ARTICLE 2 SALE AND TRANSFER OF ASSETS; CLOSING ...................- 4 -

 2.1 ASSETS TO BE SOLD ...............................................- 4 -

 2.2 EXCLUDED ASSETS...................................................- 5 -

 2.3 ASSUMED LIABILITIES.............................................- 5 -

 2.4 RETAINED LIABILITIES.............................................- 5 -

 2.5 PURCHASE PRICE .....................................................- 6 -

 2.6 PAYMENT OF THE PURCHASE PRICE ....................- 7 -

 2.7 CLOSING .....................................................................- 8 -

 2.8 CLOSING DELIVERIES .............................................- 9 -

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF COUDERT..........- 10 -

 3.1 ORGANIZATION AND GOOD STANDING ................- 10 -

 3.2 DUE AUTHORIZATION .............................................- 10 -

 3.3 ENFORCEABILITY; NO CONFLICT..........................- 10 -

 3.4 CONSENTS ..................................................................- 11 -

 3.5 TITLE TO ASSETS.....................................................- 11 -

 3.6 CONTRACTS; NO DEFAULTS ..................................- 11 -

 3.7 COMPLIANCE WITH LAWS; GOVERNMENTAL AUTHORIZATIONS .................................................- 11 -

 3.8 LEGAL PROCEEDINGS.............................................- 12 -

 3.9 INSURANCE. .............................................................- 12 -

 3.10 BROKERS OR FINDERS...........................................- 12 -

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF BAKER ...............- 12 -

 4.1 ORGANIZATION AND GOOD STANDING ................- 12 -

 4.2 DUE AUTHORIZATION .............................................- 12 -

 4.3 ENFORCEABILITY; NO CONFLICT..........................- 13 -

 4.4 LEGAL PROCEEDINGS.............................................- 13 -

 4.5 BROKERS OR FINDERS...........................................- 13 -

ARTICLE 5 COVENANTS OF COUDERT BEFORE CLOSING....................- 13 -

 5.1 OPERATION OF THE NEW YORK CITY OFFICE .....- 13 -

 5.2 NEGATIVE COVENANT ...........................................- 14 -

 5.3 CONSENTS ..................................................................- 14 -

| | | |
|---|---|---|
| 5.4 | NOTIFICATION | - 14 - |
| ARTICLE 6 | CONDITIONS PRECEDENT TO BAKER'S OBLIGATION TO CLOSE | - 14 - |
| 6.1 | ACCURACY OF REPRESENTATIONS | 14 - |
| 6.2 | PERFORMANCE | - 14 - |
| 6.3 | CONSENTS | - 15 - |
| 6.4 | OPINION OF COUNSEL | - 15 - |
| 6.5 | LATERAL ATTORNEYS | - 15 - |
| 6.6 | NO MATERIAL ADVERSE EFFECT | - 15 - |
| 6.7 | NO PROCEEDINGS | - 15 - |
| 6.8 | NO PROHIBITION | - 15 - |
| ARTICLE 7 | CONDITIONS PRECEDENT TO COUDERT'S OBLIGATION TO CLOSE | - 15 - |
| 7.1 | ACCURACY OF REPRESENTATIONS | - 16 - |
| 7.2 | PERFORMANCE | - 16 - |
| 7.3 | NO PROHIBITION | - 16 - |
| ARTICLE 8 | TERMINATION | - 16 - |
| 8.1 | TERMINATION EVENTS | - 16 - |
| 8.2 | EFFECT OF TERMINATION | - 16 - |
| ARTICLE 9 | INDEMNIFICATION; REMEDIES | - 17 - |
| 9.1 | SURVIVAL | - 17 - |
| 9.2 | INDEMNIFICATION BY COUDERT | - 17 - |
| 9.3 | INDEMNIFICATION BY BAKER | 17 - |
| 9.4 | LIMITATIONS | 18 |
| 9.5 | PROCEDURE FOR INDEMNIFICATION | 18 - |
| 9.6 | RIGHTS AS TO PAYMENTS | - 19 - |
| ARTICLE 10 | ADDITIONAL COVENANTS | - 20 - |
| 10.1 | PAYMENT OF TAXES AND OTHER RETAINED LIABILITIES BY COUDERT | - 20 - |
| 10.2 | POST-CLOSING CONSENTS; NON-ASSIGNABLE CONTRACTS | - 20 - |
| 10.3 | RECEIPT OF FUNDS | - 20 - |
| 10.4 | ASSISTANCE RELATING TO PROCEEDINGS | - 21 - |
| 10.5 | CONFIDENTIAL INFORMATION | - 21 - |

ii

|       | 10.6  | TRANSITION ASSISTANCE | - 22 - |
|-------|-------|------------------------|--------|
|       | 10.7  | INSURANCE | - 22 - |
|       | 10.8  | NO ENCUMBRANCES | - 23 - |
|       | 10.9  | CLIENT MANAGEMENT PROTOCOL | - 23 - |
|       | 10.10 | FURTHER ASSURANCES | - 23 - |
| ARTICLE 11 | | EMPLOYEES AND EMPLOYEE BENEFITS | - 23 - |
|       | 11.1  | HIRED EMPLOYEES | - 23 - |
|       | 11.2  | EMPLOYMENT AND EMPLOYEE BENEFIT LIABILITIES | - 24 - |
|       | 11.3  | OTHER ACTIONS | - 25 - |
| ARTICLE 12 | | GENERAL PROVISIONS | - 25 - |
|       | 12.1  | EXPENSES | - 25 - |
|       | 12.2  | PUBLIC ANNOUNCEMENTS | - 25 - |
|       | 12.3  | CONFIDENTIALITY | - 26 - |
|       | 12.4  | NOTICES | - 26 - |
|       | 12.5  | FURTHER ACTIONS | - 27 - |
|       | 12.6  | INCORPORATION OF SCHEDULES AND EXHIBITS | - 27 - |
|       | 12.7  | ENTIRE AGREEMENT AND MODIFICATION | - 27 - |
|       | 12.8  | DRAFTING AND REPRESENTATION | - 28 - |
|       | 12.9  | SEVERABILITY | - 28 - |
|       | 12.10 | ASSIGNMENT AND SUCCESSORS | - 28 - |
|       | 12.11 | NO THIRD-PARTY RIGHTS | - 28 - |
|       | 12.12 | WAIVER | - 28 - |
|       | 12.13 | GOVERNING LAW | - 29 - |
|       | 12.14 | DISPUTE RESOLUTION | - 29 - |
|       | 12.15 | COUNTERPARTS | - 29 - |

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of September 7, 2005 by and between Baker & McKenzie LLP, an Illinois limited liability partnership ("Baker"), and Coudert Brothers LLP, a New York limited liability partnership ("Coudert").

## PRELIMINARY STATEMENT

On August 16, 2005, the partners of Coudert approved amendments to Coudert's partnership agreement to effect an orderly winding up of the firm's business and to authorize Coudert's attorneys to seek and accept offers of partnership and employment from other law firms.

Following approval of these amendments, certain attorneys practicing in the New York City office of Coudert have determined to discontinue their association with Coudert and to join Baker as lateral partners, of counsel and associates. In connection with these arrangements, Coudert desires to sell, and Baker desires to purchase, for fair value certain specified assets relating to Coudert's New York City office on the terms and subject to the conditions set forth in this Agreement

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

## ARTICLE 1

## DEFINITIONS

### 1.1 DEFINITIONS

For the purposes of this Agreement, the following terms and variations on them have the meanings specified in this Section 1.1:

"Adverse Consequence" means any Liability, loss, damage, claim, cost, deficiency, diminution of value, or expense (including costs of investigation and defense, penalties and reasonable legal fees and costs), whether or not involving a third-party claim.

"Assets" is defined in Section 2.1.

"Assumed Liabilities" is defined in Section 2.3.

"Baker" is defined in the first paragraph of this Agreement.

"Baker Information" is defined in Section 10.5.

"Closing" means the consummation and completion of the purchase and sale of the Assets.

"Closing Date" means the date on which the Closing actually takes place.

Confidentiality Agreement" is defined in Section 12.3.

"Contemplated Transactions" means all of the transactions to be carried out in accordance with this Agreement, including the purchase and sale of the Assets, the assumption of the Assumed Liabilities, the performance by the parties of their other obligations under this Agreement, and the execution, delivery and performance of the documents and agreements contemplated by this Agreement.

"Coudert" is defined in the first paragraph of this Agreement.

"Coudert Information" is defined in Section 10.5.

"Encumbrance" means any charge, claim, mortgage, servitude, easement, right of way, community or other marital property interest, covenant, equitable interest, license, lease or other possessory interest, lien, option, pledge, security interest, preference, priority, right of first refusal or similar restriction.

"Excluded Assets" is defined in Section 2.2.

"Fee Agreements" is defined in Section 2.1(b).

"Fixed Assets" is defined in Section 2.1(d).

"Hired Employees" is defined in Section 11.1(a).

"Indemnified Person" is defined in Section 9.5(a).

"Indemnifying Person" is defined in Section 9.5(a).

"Initial Inventory Amount" is defined in Section 2.5(a).

"Inventory" means the accounts receivable (including client advances and amounts held in client escrow accounts) and work-in-process arising in connection with performance, on or prior to 11:59 p.m., New York City time, on the day prior to the Closing Date, of legal services for those clients billed from the New York City office of Coudert for which any Lateral Attorney is designated as the "Responsible Partner" for purposes of Coudert's client billing policies. For the avoidance of doubt, accounts receivable will be included in the Inventory only if the related client invoices include payment instructions for bank accounts owned and controlled by Coudert's New York City office.

"Landlord" means Robert H. Arnow, in his capacity as landlord under the Lease.

"Lateral Attorneys" means, collectively, those attorneys resident in the New York City office of Coudert prior to the Closing Date who become partners of, or attorneys employed by, Baker on or after the Closing Date. The names and titles of the individuals anticipated to become Lateral Attorneys are indicated on Schedule 1.1.

"Law" means any constitution, law, statute, treaty, rule, regulation, ordinance, code, binding case law or notice of any governmental authority.

"Lease" means the lease dated as of February 26, 1992 between the Landlord, as landlord, and Coudert, as tenant, under which Coudert presently leases the Leased Premises.

"Leased Premises" means the office premises located at 1114 Avenue of the Americas, New York, New York, which are presently leased by Coudert pursuant to the Lease.

"Leasehold Improvements" is defined in Section 2.1(c).

"Liabilities" includes liabilities or obligations of any nature, whether known or unknown, whether absolute, accrued, contingent, choate, inchoate or otherwise, whether due or to become due.

"Post-Closing Inventory Amount" is defined in Section 2.5(b).

"Proceeding" means any action, arbitration, audit, examination, investigation, hearing, voluntary or involuntary bankruptcy or insolvency proceeding, litigation or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, and whether public or private) commenced, brought, conducted or heard by or before, or otherwise involving, any governmental authority or arbitrator.

"Purchase Price" is defined in Section 2.5.

"Records" means all books, records and other information, in whatever form or medium, including all client files, correspondence, billing, financial and accounting records, electronic mail archives and personnel and employee benefits records, relating to or associated with the Assets, Assumed Liabilities, Lateral Attorneys or Hired Employees.

"Retained Liabilities" is defined in Section 2.4.

"Sublease" means the Sublease in substantially the form attached as Exhibit A to be entered into on the Closing Date between Coudert, as sublandlord, and Baker, as subtenant, under which Baker will lease the Subleased Premises.

"Subleased Premises" means Floors 4, 42, 43 and 44 of the Leased Premises, which will be subleased by Coudert to Baker pursuant to the Sublease.

"Tax" or "Taxes" means all federal, state, local, foreign and other taxes, charges, fees, duties (including customs duties), levies or assessments, including income, gross receipts, net proceeds, alternative or add-on minimum, ad valorem, turnover, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, severance, license, payroll, environmental, capital stock, disability, employee's income withholding, other withholding, unemployment and social security taxes, that are imposed by any governmental authority, and including any interest, penalties or additions to tax attributable thereto.

"Transferred Contracts" is defined in Section 2.1(e).

"WARN Act" means the Worker Adjustment and Retraining Notification Act, as amended.

## ARTICLE 2

## SALE AND TRANSFER OF ASSETS; CLOSING

### 2.1 ASSETS TO BE SOLD

Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Coudert will sell, convey, assign, transfer and deliver to Baker, and Baker will purchase and acquire from Coudert, the following assets, rights and properties (collectively, the "Assets"):

(a) all of the Inventory, including all of the items of Inventory indicated on Schedule 2.1(a) (subject to changes in such scheduled items of Inventory arising from Coudert's client billing and collection activities in the ordinary course of business following the date of this Agreement);

(b) all rights of Coudert under the client contingent fee agreements relating to the Contingency Fee Cases (as defined in Schedule 2.5(c)) and any other contingency fee cases for which any of the Lateral Attorneys is designated as the "Responsible Partner" for purposes of Coudert's client billing policies (collectively, the "Fee Agreements"), subject in each case to Coudert's retained rights with respect to the Contingency Fee Cases as set forth on Schedule 2.5(c);

(c) all of the leasehold improvements relating to the Subleased Premises, including all structural alterations, walls, doors, office partitions, security systems, carpeting, stairwells and any other permanent or temporary improvements (collectively, the "Leasehold Improvements");

(d) all of the fixed assets and other tangible personal property owned by Coudert and relating to the Subleased Premises, including all partner, associate and staff tables, chairs, desks, credenzas, secretarial and other office work stations, partitions, conference tables and chairs, reception stations, cupboards, bookshelves, library shelving, filing cabinets, lamps and all other electrical fittings (collectively, the "Fixed Assets");

(e) all rights of Coudert under office equipment leases and other contracts and agreements to the extent pertaining to office equipment and other property actively used by Coudert within the Subleased Premises as of the Closing Date, excluding such leases, contracts and agreements to the extent that they pertain to office equipment or other property used primarily in connection with Coudert's firm-wide accounting and administrative functions (collectively, "Transferred Contracts"), including all rights of Coudert to any related deposits or refunds;

(f) all of the Records;

(g) all rights of Coudert in and to all copyrights (both registered and unregistered) and other intellectual property rights relating to any precedent documents, promotional and marketing materials, legal publications or other works created or contributed to by any of the Lateral Attorneys or Hired Employees, subject to the rights of other attorneys or employees of Coudert who have created or contributed to the same;

(h) to the extent legally assignable, all rights of Coudert in and to the owned and licensed computer software programs and applications (and related documentation and other materials) used by the Lateral Attorneys and Hired Employees in connection with Coudert's operations prior to the Closing Date, excluding programs, applications and documentation used primarily in connection with Coudert's firm-wide accounting and administrative functions; and

(i) all rights, claims and defenses of Coudert relating to any of the Assets or Assumed Liabilities, whether choate or inchoate, known or unknown, contingent or non-contingent, including all attorney work-product protections, attorney-client privileges and other legal protections and privileges to which Coudert or any of the Lateral Attorneys may be entitled on their own behalf or on behalf of the current or former clients of the Lateral Attorneys.

## 2.2 EXCLUDED ASSETS

All assets, rights or properties of Coudert that are not enumerated as Assets in Section 2.1 (collectively, the "Excluded Assets") will be excluded from the sale and purchase contemplated by this Agreement and will remain the property of Coudert after the Closing.

## 2.3 ASSUMED LIABILITIES

Effective as of the Closing, Baker will assume and agree to discharge only those performance obligations of Coudert arising after the Closing under the Transferred Contracts, excluding any Liability arising out of or relating to any breach, violation or failure to perform any Transferred Contract that occurred or existed before the Closing. The foregoing assumed performance obligations are referred to in this Agreement collectively as the "Assumed Liabilities."

## 2.4 RETAINED LIABILITIES

Except for the Assumed Liabilities, all other Liabilities of Coudert or of any related or affiliated partnership or other entity will remain the sole responsibility of and will be retained, paid, performed and discharged solely by Coudert. The foregoing retained Liabilities are referred to in this Agreement collectively as the "Retained Liabilities." Without limiting the generality of the foregoing, the Retained Liabilities will include:

(a) any Liability arising out of or relating to any Excluded Asset;

(b) any Liability arising under any Transferred Contract assumed by Baker pursuant to Section 2.3 that arises out of or relates to any breach, violation or failure to perform thereunder that occurred or existed before the Closing;

(c)    any Liability (including any professional liability) arising out of or relating to legal services rendered by Coudert attorneys or paralegal staff, including any Lateral Attorney or any paralegal staff included in the Hired Employees, prior to the Closing Date;

(d)    other than the post-Closing performance obligations arising under the Transferred Contracts assumed by Baker pursuant to Section 2.3, any Liability of Coudert or any related or affiliated partnership or other entity to any secured or unsecured lender, landlord, lessor, vendor, supplier, trade creditor or other person, including any Liability arising under the Lease (or any related sublease other than the Sublease), whether arising prior to, on or after the Closing Date;

(e)    any Liability for which Coudert has retained responsibility in accordance with Article 11 and any Liability for any distribution of past or future profits, return of capital, retirement payments or benefits, health or welfare benefits, severance, termination or redundancy payments or benefits, incentive compensation, fringe benefit or attorney benefit plans, programs or arrangements, or any other compensation or benefits for which Coudert or any related or affiliated partnership or other entity may be or may become responsible with respect to any current or former partner, associate attorney or employee, including any compensation, benefits or other amounts that may be owed by Coudert to any of the Lateral Attorneys or Hired Employees, whether arising prior to, on or after the Closing Date;

(f)    any Liability to any law firm or other person that has acquired or may acquire any assets, properties or rights from Coudert or any related or affiliated partnership or other entity;

(g)    any Liability for Taxes arising as a result of the business or operations of Coudert or any related or affiliated partnership or other entity, whether arising prior to, on or after the Closing Date, including any Taxes that arise as a result of the sale of the Assets pursuant to this Agreement; and

(h)    any Liability arising out of or relating to the acts or omissions of Coudert or any related or affiliated partnership or other entity occurring after the Closing Date.

### 2.5    PURCHASE PRICE

The purchase price to be paid by Baker to Coudert for the Assets (the "Purchase Price") will consist of the following amounts:

(a)    an amount (the "Initial Inventory Amount") equal to the sum of (i) 75% of the aggregate dollar amount of all accounts receivable included in the Inventory that have an age of 90 days or less as of the Closing Date, (ii) 25% of the aggregate dollar amount all accounts receivable included in the Inventory that have an age of 91 to 180 days as of the Closing Date, (iii) 50% of the aggregate dollar amount of all work-in-process included in the Inventory that has an age of 90 days or less as of the Closing Date and (iv) 25% of the aggregate dollar amount of all work-in-process included in the Inventory that has an age of 91 to 180 days as of the Closing Date; *provided* that for purposes of

determining the Initial Inventory Amount, all work-in-process included in the Inventory relating to the Contingency Fee Cases will be excluded;

(b)    an amount (the "Post-Closing Inventory Amount") equal to 75% of the excess of (i) the aggregate amount actually collected by Baker after the Closing Date with respect to the Inventory, excluding for this purpose amounts collected with respect to the Contingency Fee Cases, over (ii) the Initial Inventory Amount;

(c)    an amount determined in accordance with Schedule 2.5(c) with respect to those amounts actually collected by Baker after the Closing Date in connection with the Contingency Fee Cases;

(d)    $8,000,000 in consideration of Coudert's entry into the Sublease;

(e)    $996,795 in consideration of the purchase of the Leasehold Improvements; and

(f)    an amount equal to the fair market value of the Fixed Assets, as mutually determined by the parties prior to the Closing Date.

Coudert acknowledges and agrees that the payment by Baker of the Purchase Price, including the assumption by Baker of the Assumed Liabilities, will result in Coudert receiving fair consideration and reasonably equivalent value for each of the Assets. Each of the parties, subject to the requirements of any applicable Tax Law or election, agrees to file all Tax returns and reports consistent with the foregoing allocation of the Purchase Price.

2.6    PAYMENT OF THE PURCHASE PRICE

(a)    The Purchase Price will be payable by Baker to Coudert as follows:

(i)    the Initial Inventory Amount will be payable on the Closing Date;

(ii)    the Post-Closing Inventory Amount will be payable in installments on the 10th business day following the end of each calendar quarter after the Closing Date, beginning with the calendar quarter ending December 31, 2005;

(iii)    the amount set forth in Section 2.5(c) will be payable in accordance with Schedule 2.5(c);

(v)    $6,000,000 of the amount set forth in Section 2.5(d) will be paid on the Closing Date;

(vi)    $2,000,000 of the amount set forth in Section 2.5(d) will be paid on the second anniversary of the Closing Date if, as of such date, the condition set forth on Schedule 2.6(a) is satisfied; and

(vii)    the amounts set forth in Sections 2.5(e) and 2.5(f) will be paid on the Closing Date.

(b)    All payments required to be made by Baker to Coudert at the Closing pursuant to Section 2.6(a) will be made at the direction of Coudert by wire transfer of immediately available funds to a bank account in the United States which has been authorized in writing by Coudert's principal secured lenders.  Coudert will provide such account information to Baker at least one business day prior to the Closing Date. All payments required to be made by Baker to Coudert after the Closing pursuant to Section 2.6(a) will be made by wire transfer of immediately available funds to a bank account in the United States designated by Coudert in writing (which will be the bank account designated as of the Closing Date unless Baker is provided with a written authorization from Coudert's principal secured lenders permitting payment to be made to another account).

(c)    Baker will use its commercially reasonable efforts to collect the Inventory in the ordinary course of its business after the Closing Date and will consult with Coudert from time to time on the status of its collection efforts and any material adverse changes in the expected collection of the Inventory. The parties, however, do not intend that Baker will be responsible as a guarantor or surety with respect to the collection of the Inventory. Coudert acknowledges that Baker, similar to Coudert and other major law firms, from time to time may determine to compromise or defer collection of certain client accounts in the ordinary course of its business. Coudert further acknowledges that the sharing arrangements with respect to the collection of the Inventory set forth in this Agreement provide Baker with an appropriate financial incentive to maximize the overall collection of the Inventory and that it would accordingly not be reasonable for Coudert to challenge or object to individual decisions that may be made by Baker with respect to the collection of specific client accounts. Coudert further agrees that Baker, in connection with the collection of the Inventory, will not be required to threaten or commence legal proceedings, refer any account to an outside collection firm, withhold or threaten to withhold future legal services or take any other action that may harm the interests of any client or violate the professional responsibility of any Baker attorney.

## 2.7    CLOSING

The Closing will take place at the offices of Baker & McKenzie LLP, 805 Third Avenue, New York, New York 10022, at 10:00 a.m., local time, on the later of (a) September 9, 2005 or (b) the date that is two business days following the satisfaction or waiver of all of the conditions set forth in Articles 6 and 7, unless Baker and Coudert agree otherwise. Subject to Article 8, failure to consummate the purchase and sale provided for in this Agreement at the place and on the date determined by the preceding sentence will not result in the termination of this Agreement and will not relieve any party of any obligation under this Agreement.    All agreements, documents and instruments to be delivered at the Closing, including for this purpose all agreements relating to the employment of the Lateral Attorneys and Hired Employees by Baker on and after the Closing Date, will be deemed to have been delivered and accepted simultaneously, and no such agreement, document or instrument will be deemed to be effective unless and until all of such agreements, documents and instruments are delivered and accepted.

- 8 -

## 2.8    CLOSING DELIVERIES

(a)    At the Closing, Coudert will deliver to Baker the following documents, in each case in form and substance reasonably acceptable to both parties and executed, where applicable, on behalf of Coudert by a duly authorized partner or officer:

(i)    a bill of sale with respect to the Assets;

(ii)    an assignment and assumption agreement with respect to the Assumed Liabilities;

(iii)    executed releases of any Encumbrances to which any of the Assets may be subject, including UCC-3 termination statements or other appropriate documents or instruments evidencing the release of such Encumbrances;

(iv)    the Sublease, including non-disturbance agreements in substantially the form attached as exhibits to the Sublease executed by the Landlord, ground lease lessor and fee mortgagee;

(v)    copies of any third party or governmental consents or approvals required to be obtained by Coudert on or prior to the Closing Date in accordance with Section 6.3;

(vi)    a certificate as to the accuracy of the representations and warranties of Coudert as of the date of this Agreement and as of the Closing Date in accordance with Section 6.1 and as to Coudert's compliance with and performance of its covenants and obligations to be performed or complied with on or before the Closing Date in accordance with Section 6.2; and

(vi)    such other documents and instruments of transfer and conveyance as may reasonably be requested by Baker to give effect to the transactions contemplated hereby.

(b)    At the Closing, Baker will deliver to Coudert the following documents, in each case in form and substance reasonably acceptable to both parties and executed on behalf of Baker by a duly authorized partner or officer:

(i)    an assignment and assumption agreement with respect to the Assumed Liabilities;

(ii)    the Sublease;

(iii)    a certificate as to the accuracy of the representations and warranties of Baker as of the date of this Agreement and as of the Closing Date in accordance with Section 7.1 and as to Baker's compliance with and performance of its covenants and obligations to be performed or complied with on or before the Closing Date in accordance with Section 7.2; and

(iv)　such other documents and instruments of assignment and assumption as may reasonably be requested by Coudert to give effect to the transactions contemplated hereby.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF COUDERT

Coudert represents and warrants to Baker that, except as set forth in the disclosure letter delivered by Coudert to Baker as of the date of this Agreement (such disclosures being deemed to modify the following representations and warranties):

### 3.1　ORGANIZATION AND GOOD STANDING

Coudert is a limited liability partnership duly organized, validly existing and in good standing under the laws of the State of New York, with full power and authority to conduct its business as presently conducted.

### 3.2　DUE AUTHORIZATION

Coudert has taken all required partnership action and has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and each of the agreements contemplated hereby and to perform its obligations under this Agreement and each of such other agreements. The Special Situation Committee of Coudert that has been responsible for the negotiation, execution and delivery of this Agreement and the other agreements contemplated hereby has been duly authorized to take all such actions pursuant to the resolution of Coudert's partners adopted as of August 16, 2005, and no other partnership action is required by Coudert to authorize the execution and delivery of this Agreement and such other agreements by Coudert or the performance by Coudert of its obligations under this Agreement and each of such other agreements.

### 3.3　ENFORCEABILITY; NO CONFLICT

Assuming due authorization, execution and delivery of this Agreement by Baker, this Agreement constitutes the legal, valid and binding obligation of Coudert, enforceable against Coudert in accordance with its terms. Assuming due authorization, execution and delivery by the other parties thereto, each of the other agreements contemplated by this Agreement to which Coudert becomes a party will, upon execution and delivery, constitute the legal, valid and binding obligation of Coudert, enforceable against Coudert in accordance with its terms. Neither the execution and delivery of this Agreement or any of the other agreements contemplated hereby, nor the consummation or performance of any of the Contemplated Transactions, will directly or indirectly (with or without notice or lapse of time) (a) result in any breach, violation or default under or otherwise contravene any provision of the partnership agreement of Coudert or any resolution adopted by Coudert's partners, (b) result in any breach, violation or default under or otherwise contravene any agreement, lease or other contract or commitment to which Coudert is a party or otherwise bound or to which any of the Assets may be subject, except for such agreements pursuant to which the Contemplated Transactions will require consents as contemplated in Sections 5.3 and 6.3, and (c) result in the violation of or otherwise contravene

- 10 -

any Law, governmental license, permit or authorization, or judicial, administrative or other judgment, order or decree applicable to Coudert or any of the Assets or (d) result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

### 3.4 CONSENTS

As of the Closing Date, Coudert will have given all required notices and obtained all licenses, permits, consents, approvals, authorizations, qualifications and orders of governmental authorities and, subject to the proviso set forth below, parties to contracts as are required in order to enable Coudert to perform its obligations under this Agreement and each of other agreements contemplated hereby, including all consents and approvals required to permit it to transfer the Assets to Baker as contemplated by this Agreement and to enable Baker to enjoy after the Closing Date all rights and benefits presently enjoyed by Coudert with respect to the Assets; *provided* that so long as Coudert has used its commercially reasonable efforts to obtain any third party consent required in connection with the Contemplated Transactions, Coudert will have no liability for the failure of any third party to grant any such consent nor for the effect of such failure on Baker's enjoyment of the Assets. No contract or agreement included in the Assets has been amended to increase the amount payable thereunder or to provide any other benefit to any other party thereto in order to obtain any such consent, approval or authorization.

### 3.5 TITLE TO ASSETS

Coudert now has and on the Closing Date will have and convey to Baker good and marketable title to all the Assets, free and clear of all Encumbrances.

### 3.6 CONTRACTS; NO DEFAULTS

Coudert has made available to Baker correct and complete copies of each Transferred Contract, as amended to date. Each Transferred Contract is a valid, binding and enforceable obligation of Coudert and, to Coudert's knowledge, the other party or parties thereto (subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject as to enforceability to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing) and is in full force and effect. Neither Coudert nor any other party thereto is in material breach of any material term of any Transferred Contract or has repudiated any material term thereof. No event, occurrence or condition exists that, with the lapse of time, the giving of notice, or both, would become a material default under any Transferred Contract by Coudert or, to Coudert's knowledge, any other party thereto. Coudert has not waived or released any of its material rights under any Transferred Contract other than in the ordinary course of business.

### 3.7 COMPLIANCE WITH LAWS; GOVERNMENTAL AUTHORIZATIONS

Coudert has complied in all material respects with all Laws that are applicable to its business conducted at the Leased Premises or its ownership and use of the Assets. Without limiting the generality of the foregoing, Coudert has complied in all material respects with all Laws relating to employment practices, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours and benefits. Coudert is not liable for the payment of any fines, penalties or other amounts, however designated, for failure to

comply with any of the foregoing Laws. Each material governmental license, permit or other authorization that is held by Coudert and that relates to its business operations conducted at the Leased Premise is valid and in full force and effect and will remain so following the Closing Date.

## 3.8    LEGAL PROCEEDINGS

No Proceeding exists or, to Coudert's knowledge, has been threatened (a) by or against Coudert that relates to or may affect the operations conducted by Coudert at the Leased Premises or any of the Assets or Assumed Liabilities, (b) that involves any Lateral Attorney or any Hired Employee in his or her capacity as a partner, attorney or employee of Coudert or (c) that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.

## 3.9    INSURANCE

Coudert presently maintains the professional liability insurance coverage described in the letter dated as of the date of this Agreement delivered by Coudert to Baker. Except as described in such letter, Coudert has not reported to any professional liability insurance carrier any claim or potential claim involving any Lateral Attorney.

## 3.10    BROKERS OR FINDERS

Coudert has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Contemplated Transactions for which Baker is or may become responsible.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF BAKER

Baker represents and warrants to Coudert that:

## 4.1    ORGANIZATION AND GOOD STANDING

Baker is a limited liability partnership duly organized, validly existing and in good standing under the laws of the State of Illinois, with full power and authority to conduct its business as presently conducted.

## 4.2    DUE AUTHORIZATION

Baker has taken all required partnership action and has the absolute and unrestricted right, power, authority and capacity to execute and deliver this Agreement and each of the agreements contemplated hereby and to perform its obligations under this Agreement and each of such other agreements.

- 12 -

### 4.3 ENFORCEABILITY; NO CONFLICT

Assuming due authorization, execution and delivery of this Agreement by Coudert, this Agreement constitutes the legal, valid and binding obligation of Baker, enforceable against Baker in accordance with its terms. Assuming due authorization, execution and delivery by the other parties thereto, each of the other agreements contemplated by this Agreement to which Baker becomes a party will, upon execution and delivery, constitute the legal, valid and binding obligation of Baker, enforceable against Baker in accordance with its terms. Neither the execution and delivery of this Agreement or any of the other agreements contemplated hereby, nor the consummation or performance of any of the Contemplated Transactions, will directly or indirectly (with or without notice or lapse of time) (a) result in any breach, violation or default under or otherwise contravene any provision of the partnership agreement of Baker or any resolution adopted by Baker's partners, (b) result in any breach, violation or default under or otherwise contravene any agreement, lease or other contract or commitment to which Baker is a party or otherwise bound or (c) result in the violation of or otherwise contravene any Law, governmental license, permit or authorization, or judicial, administrative or other judgment, order or decree applicable to Baker.

### 4.4 LEGAL PROCEEDINGS

No Proceeding exists or, to Baker's knowledge, has been threatened that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.

### 4.5 BROKERS OR FINDERS

Baker has not incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Contemplated Transactions for which Coudert is or may become responsible.

### ARTICLE 5

### COVENANTS OF COUDERT BEFORE CLOSING

### 5.1 OPERATION OF THE NEW YORK CITY OFFICE

Between the date of this Agreement and the Closing Date, Coudert with respect to the operations of its New York City office that relate to the Lateral Attorneys and Hired Employees will (a) conduct its operations in all material respects in the ordinary course of business, (b) use its commercially reasonable efforts to preserve intact its current business organization, keep available the services of its current partners, attorneys and employees, and maintain relations and goodwill with its clients, suppliers, landlords, creditors, employees and others with which it has business relationships, (c) confer with Baker concerning operational matters of a material nature and (d) otherwise report periodically to Baker concerning the status of the business, operations and finances of its New York City office.

## 5.2 NEGATIVE COVENANT

Except as otherwise permitted by this Agreement, between the date of this Agreement and the Closing Date, Coudert will not take any affirmative action, or fail to take any reasonable action within its control, as a result of which any of the representations and warranties set forth in Article 3 would cease to be accurate in all material respects as of the Closing Date.

## 5.3 CONSENTS

Coudert will use its commercially reasonable efforts prior to the Closing Date to obtain at its expense all third party consents that are required in connection with the Contemplated Transactions, including any consents from clients required to be obtained under applicable Law or attorney conduct rules to transfer to Baker the client files included in the Records.

## 5.4 NOTIFICATION

Between the date of this Agreement and the Closing Date, Coudert will promptly notify Baker in writing if Coudert becomes aware of (a) any fact or condition that causes or constitutes a breach of any of Coudert's representations and warranties as of the date of this Agreement or (b) the occurrence after the date of this Agreement of any fact or condition that would (except as contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation or warranty been made as of the time of the occurrence or discovery of such fact or condition. During the same period, Coudert will promptly notify Baker of the occurrence of any breach of any covenant of Coudert in this Article 5 or of the occurrence of any event that may make the satisfaction of the conditions in Article 6 impossible or unlikely.

## ARTICLE 6

## CONDITIONS PRECEDENT TO BAKER'S OBLIGATION TO CLOSE

Baker's obligation to purchase the Assets and to take the other actions required to be taken by Baker at the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Baker, in whole or in part):

## 6.1 ACCURACY OF REPRESENTATIONS

All of Coudert's representations and warranties in this Agreement must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if then made, without giving effect to any notice or disclosure by Coudert pursuant to Section 5.4.

## 6.2 PERFORMANCE

All of the covenants and obligations that Coudert is required to perform or to comply with under this Agreement on or before the Closing Date must have been duly performed and complied with in all material respects. Coudert must have delivered all of the documents and instruments contemplated under Section 2.8(a).

- 14 -

### 6.3 CONSENTS

Coudert must have obtained and provided to Baker an executed written consent with respect to the Contemplated Transactions, in form and substance reasonably acceptable to Baker, from each of the parties set forth on Schedule 6.3;

### 6.4 OPINION OF COUNSEL

Coudert must have obtained and provided to Baker a written opinion of outside legal counsel reasonably acceptable to Baker, dated as of the Closing Date and in form and substance reasonably acceptable to Baker, confirming the organization and good standing of Coudert and the due authorization by Coudert of the execution, delivery and performance of this Agreement and each of the agreements contemplated hereby.

### 6.5 LATERAL ATTORNEYS

Baker must have completed its client conflict of interest clearance and client registration procedures with respect to the Lateral Attorneys and such procedures must not have identified client conflicts resulting in a material reduction in the number of Lateral Attorneys accepting offers of partnership or employment from Baker or otherwise having a material adverse effect on the client base of the Lateral Attorneys, considered as a whole. Each of the Lateral Attorneys set forth on Schedule 6.5 must have accepted an offer of partnership from Baker and each such acceptance must be in full force and effect.

### 6.6 NO MATERIAL ADVERSE EFFECT

There must not have occurred any event or condition, including with respect to the failure of the Lateral Attorneys to accept offers of partnership or employment from Baker, that has had or is reasonably likely to have a material adverse effect on the Assets or the Assumed Liabilities taken as a whole or on Baker's right to own and use the Assets taken as a whole, continue its quite enjoyment of the Subleased Premises or pay and discharge the Assumed Liabilities after the Closing Date.

### 6.7 NO PROCEEDINGS

There must not have been commenced or threatened any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, (b) that may have the effect of preventing, delaying, making illegal or otherwise interfering with any of the Contemplated Transactions or (c) that would have a material adverse effect on Baker's right to own and use the Assets taken as a whole, continue its quite enjoyment of the Subleased Premises or pay and discharge the Assumed Liabilities after the Closing Date.

### 6.8 NO PROHIBITION

There must not be in effect any Law or judicial or administrative judgment, order or decree that prohibits the consummation of the Contemplated Transactions.

## ARTICLE 7

## CONDITIONS PRECEDENT TO COUDERT'S OBLIGATION TO CLOSE

Coudert's obligation to sell the Assets and to take the other actions required to be taken by Coudert at the Closing is subject to the satisfaction, on or before the Closing Date, of each of the following conditions (any of which may be waived by Coudert, in whole or in part):

### 7.1    ACCURACY OF REPRESENTATIONS

All of Baker's representations and warranties in this Agreement must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if then made.

### 7.2    PERFORMANCE

All of the covenants and obligations that Baker is required to perform or to comply with under this Agreement on or before the Closing Date must have been performed and complied with in all material respects. Baker must have delivered all of the documents and instruments contemplated under Section 2.8(b) and paid the cash portion of the Purchase Price required to be paid on the Closing Date as contemplated under Section 2.6.

### 7.3    NO PROHIBITION

There must not be in effect any Law or judicial or administrative judgment, order or decree that prohibits the consummation of the Contemplated Transactions.

## ARTICLE 8

## TERMINATION

### 8.1    TERMINATION EVENTS

Subject to Section 8.2, this Agreement may, by notice given before or at the Closing, be terminated:

(a)    by mutual consent of Baker and Coudert;

(b)    by Baker if Coudert has committed a material breach of any provision of this Agreement, has failed to cure such breach within a reasonable period of time and Baker has not waived such breach;

(c)    by Coudert if Baker has committed a material breach of any provision of this Agreement, has failed to cure such breach within a reasonable period of time and Coudert has not waived such breach; and

(d)    by either Baker or Coudert if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with

its obligations under this Agreement) on or before September 30, 2005, or such later date as Baker and Coudert may agree upon.

## 8.2   EFFECT OF TERMINATION

Each party's right of termination under Section 8.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of such right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 8.1, all obligations of the parties under this Agreement will terminate, except as otherwise provided in Section 12.3 and except for the Liability of any party whose material breach of its obligations under this Agreement gave rise to such termination.

## ARTICLE 9

## INDEMNIFICATION; REMEDIES

## 9.1   SURVIVAL

All representations, warranties, covenants and obligations in this Agreement and any certificate or document delivered pursuant to this Agreement will survive the Closing and the consummation of the Contemplated Transactions, subject to the limitations set forth in this Article 9.

## 9.2   INDEMNIFICATION BY COUDERT

Coudert will indemnify and hold harmless Baker and its partners, employees and representatives for, and will pay to Baker and such other persons the monetary value of, any Adverse Consequences arising from or in connection with:

(a)   any breach of any representation or warranty made by Coudert in this Agreement or any certificate or document delivered by Coudert pursuant to this Agreement;

(b)   any breach by Coudert of any covenant or obligation in this Agreement;

(c)   any of the Retained Liabilities;

(d)   any Liability under the WARN Act or any similar state or local Law that may result from an "employment loss," as defined by 29 U.S.C. § 2101(a)(6), resulting from any action by Coudert or any Liability under applicable Law resulting from Baker's decision not to hire any individual employed by or affiliated with Coudert;

(e)   any claim by any person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such person with Coudert (or any person acting on its behalf) in connection with any of the Contemplated Transactions; and

(f) any Proceedings, demands or assessments reasonably incidental to any of the matters set forth in Sections 9.2(a) through (e).

## 9.3 INDEMNIFICATION BY BAKER

Baker will indemnify and hold harmless Coudert and its partners, employees and representatives for, and will pay to Coudert and such other persons the monetary value of, any Adverse Consequences arising from or in connection with:

(a) any breach of any representation or warranty made by Baker in this Agreement or in any certificate or document delivered by Baker pursuant to this Agreement;

(b) any breach by Baker of any covenant or obligation in this Agreement;

(c) any of the Assumed Liabilities;

(d) any claim by any person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such person with Baker (or any person acting on its behalf) in connection with any of the Contemplated Transactions; and

(e) any Proceedings, demands or assessments reasonably incidental to any of the matters set forth in Section 9.3(a) through (d).

## 9.4 LIMITATIONS

(a) If the Closing occurs, neither party will have any Liability (for indemnification or otherwise) for breach of (i) a covenant or obligation to be performed or complied with before the Closing Date or (ii) a representation or warranty, unless on or before the second anniversary of the Closing Date written notice specifying the factual basis of such claim is delivered to such party. A claim with respect to a claim for indemnification or reimbursement based upon any covenant or obligation to be performed or complied with after the Closing Date may be made at any time.

(b) Notwithstanding any provision of this Agreement to the contrary, neither party will be entitled in connection with any breach or violation of this Agreement to recover any punitive, exemplary or other special damages. Each party, as a material inducement to the other party to enter into and perform its obligations under this Agreement, hereby expressly waives its right to assert any claim relating to such damages and agrees not to seek to recover such damages in connection with any claim, action, suit or proceeding relating to this Agreement.

## 9.5 PROCEDURE FOR INDEMNIFICATION

(a) Promptly after receipt by a person entitled to indemnification under Section 9.2 or 9.3 (an "Indemnified Person") of notice of the assertion of a third-party claim against it, the Indemnified Person will, if a claim is to be made against the party obligated to indemnify under

such Section (an "Indemnifying Person"), give notice to the Indemnifying Person of the assertion of such claim. An Indemnified Person's failure to notify an Indemnifying Person will not relieve the Indemnifying Person of any Liability that it may have to the Indemnified Person, except to the extent that the Indemnifying Person demonstrates that the resolution of such claim is prejudiced by the Indemnified Person's failure to give such notice.

(b) If any claim referred to in Section 9.5(a) is brought against an Indemnified Person by means of a Proceeding and the Indemnified Person gives notice to the Indemnifying Person of the commencement of such Proceeding, the Indemnifying Person will be entitled to participate in such Proceeding and, to the extent that it wishes, to assume the defense of such Proceeding with counsel satisfactory to the Indemnified Person (unless (i) the Indemnifying Person is also a party to such Proceeding and the Indemnified Person determines in good faith that joint representation would be inappropriate or (ii) the Indemnifying Person fails to provide reasonable assurance to the Indemnified Person of its financial capacity to defend such Proceeding and provide indemnification with respect to such Proceeding). After notice from the Indemnifying Person to the Indemnified Person of its election to assume the defense of such Proceeding, the Indemnifying Person will not, as long as it diligently conducts such defense, be liable to the Indemnified Person under this Article for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the Indemnified Person in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the Indemnifying Person assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification, (ii) no compromise or settlement of such claims may be effected by the Indemnifying Person without the Indemnified Person's consent unless there is no finding or admission of any violation of Laws or any violation of the rights of any person and no effect on any other claims that may be made against the Indemnified Person, and the sole relief provided is monetary damages that are paid in full by the Indemnifying Person, and (iii) the Indemnified Person will have no Liability with respect to any compromise or settlement of such claims effected without its consent (which may not be unreasonably withheld, delayed or conditioned).

(c) If notice is given to an Indemnifying Person of the commencement of any Proceeding and the Indemnifying Person does not, within 15 days after the Indemnified Person's notice is given, give notice to the Indemnified Person of its election to assume the defense of such Proceeding, the Indemnifying Person will be bound by any determination made in such Proceeding or any compromise or settlement effected by the Indemnified Person.

(d) Notwithstanding the foregoing, if an Indemnified Person determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the Indemnified Person may, by notice to the Indemnifying Person, assume the exclusive right to defend, compromise or settle such Proceeding, but the Indemnifying Person will not be bound by any determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld, delayed or conditioned).

- 19 -

(c)     A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party obligated to indemnify and will be paid promptly after such notice.

## 9.6     RIGHTS AS TO PAYMENTS

In addition to any other rights it may have under this Agreement or applicable Law, Baker will be permitted, but not obligated, to offset against any payment required to be made by Baker to Coudert after the Closing Date any amounts to which Baker is entitled in accordance with this Article 9.

## ARTICLE 10

## ADDITIONAL COVENANTS

## 10.1     PAYMENT OF TAXES AND OTHER RETAINED LIABILITIES BY COUDERT

Coudert will pay in full, or make adequate provision for the payment in full of, all of the Retained Liabilities and other Liabilities of Coudert under this Agreement, including any sales, use, documentary or other Taxes or recording and filing fees payable in connection with the sale of the Assets or assumption of the Assumed Liabilities pursuant to this Agreement.

## 10.2     POST-CLOSING CONSENTS; NON-ASSIGNABLE CONTRACTS

(a)     To the extent that any Transferred Contract or other Asset (including any client files included in the Records) is not capable of being transferred by Coudert to Baker pursuant to this Agreement without the consent of a third party and such consent is not obtained prior to the Closing Date, or if such transfer or attempted transfer would constitute a breach or a violation of any applicable Law or attorney conduct rule, nothing in this Agreement will constitute a transfer or an attempted transfer thereof.

(b)     Coudert will use its commercially reasonable efforts after the Closing Date to obtain at its expense all third party consents that are not obtained prior to the Closing Date and that are required in connection with the Contemplated Transactions, including any consents from clients required to be obtained under applicable Law or attorney conduct rules to transfer to Baker the client files included in the Records.

(c)     If any such required consent is not obtained on or prior to the Closing Date, Coudert will use its commercially reasonable efforts to (i) provide Baker with the benefits of the applicable Transferred Contract or other Asset, (ii) cooperate in any reasonable and lawful arrangement designed to provide such benefits to Baker and (iii) enforce at the request of Baker and for the account of Baker any rights of Coudert arising from any such Transferred Contract or other Asset (including the right to elect to terminate such Transferred Contract in accordance with the terms thereof upon the request of Baker).

(d)     Baker will perform the obligations arising under all Transferred Contracts referred to in Section 10.6(c) for the benefit of Coudert and the other party or parties thereto, except for any obligation under such Transferred Contract that constitutes an Excluded Liability.

## 10.3   RECEIPT OF FUNDS

(a)     If Coudert or Baker after the Closing Date receives any funds properly belonging to the other party in accordance with the terms of this Agreement (including, in the case of Coudert, payments received with respect to the Inventory), the receiving party will promptly so advise such other party, will segregate and hold such funds in trust for the benefit of such other party and will promptly (and within five business days after the date requested by such other party) deliver such funds, together with any interest earned thereon, to an account or accounts designated in writing by such other party.

(b)     Coudert will provide a written report to Baker on a weekly basis after the Closing Date with respect to any funds received by Coudert with respect to the Inventory.  Coudert acknowledges and agrees that Baker may, at its discretion, request that payments by clients with respect to the Inventory be directed to a bank account or accounts owned and controlled by Baker.

## 10.4   ASSISTANCE RELATING TO PROCEEDINGS

(a)  Coudert, at its expense, will cooperate with Baker and its counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and records in connection with, any Proceeding involving or relating to any Contemplated Transaction or any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving Coudert or any related or affiliated partnership or other entity.

(a)  Baker, at its expense, will cooperate with Coudert and its counsel in the contest or defense of, and make available the Lateral Attorneys and Hired Employees and provide any testimony and access to the Records in connection with, any Proceeding involving or relating to any Contemplated Transaction or any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction on or before the Closing Date involving any of the Lateral Attorneys or Hired Employees.

## 10.5   CONFIDENTIAL INFORMATION

For a period of ten years after the Closing Date, except as otherwise expressly permitted in accordance with this Section 10.5, Coudert will treat and hold as such, and will not use for the benefit of itself or others, any information or data (a) included in the Records or otherwise relating to the legal practices or clients of the Lateral Attorneys prior to the Closing Date, including any information regarding the compensation arrangements relating to the Lateral Attorneys prior to the Closing Date (collectively, the "Coudert Information") or (b) included in the information provided or made available by Baker to Coudert pursuant to the Confidentiality Agreement or otherwise in connection with the transactions contemplated by this Agreement (collectively, the "Baker Information").  In the event (a) Coudert is requested or required (by oral

request or written request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand or similar process) to disclose any Coudert Information or Baker Information or (b) Coudert reasonably believes it is required to use or disclose any Coudert Information in order to defend itself any Proceeding, then Coudert will notify Baker promptly in writing of the request or requirement so that Baker may seek an appropriate protective order or waive compliance with this Section 10.5. If, in the absence of a protective order or receipt of a waiver hereunder (i) Coudert is, on the advice of outside counsel, legally compelled to disclose any such Coudert Information or Baker Information or (ii) Coudert reasonably determines that its defense of such Proceeding would be materially prejudiced by its inability to use or disclose such Coudert Information in connection with such Proceeding, then Coudert may disclose such Coudert Information or Baker Information, as applicable, *provided* that Coudert will use its commercially reasonable efforts to obtain at the request and expense of Baker an order or other assurance that confidential treatment will be accorded to such Coudert Information and Baker Information. Nothing herein will prevent Coudert from using any Coudert Information in connection with any Proceeding brought pursuant to Section 12.14.

## 10.6  TRANSITION ASSISTANCE.

(a)  For a period of six months after the Closing Date, Coudert will provide such transition assistance with respect to the operations conducted by Baker at the Subleased Premises as may be reasonably be requested by Baker, including with respect to financial reporting, time entry and client billing, and continuing access to electronic mail, voice mail, phone and other information technology and telecommunications systems. The parties will enter into mutually acceptable arrangements to ensure the confidentiality of information of each party will be protected during the foregoing transition period.

(b)  At the end of the foregoing transition period or at such earlier date or dates as may be reasonably requested by Baker, Coudert will cooperate with Baker in connection with the transfer to the corresponding Baker systems of all electronic data and information included in the Records or relating to Baker's operations conducted at the Subleased Premises after the Closing Date.

(c)  The parties will each designate appropriately qualified representatives to establish a joint technology transition working group for the purpose of developing a mutually acceptable plan to separate and relocate the information technology and telecommunications systems and assets associated with Coudert's firm-wide accounting and administrative functions from those systems and assets associated with the local functions of Coudert's New York City office. Such plan will provide for the relocation of the systems and assets associated with Coudert's firm-wide accounting and administrative function not more than 45 days after the Closing Date. Prior to the Closing Date, Baker and its technical consultants, to be engaged at Baker's expense, will be permitted to review and confirm the feasibility of Coudert's relocation plan.

(d)  Each party will reimburse other party for its reasonable internal (including employee salary costs) and out-of-pocket costs and expenses (determined in accordance with the providing party's normal cost accounting policies) incurred in connection with

providing the foregoing transition assistance. The providing party will not be entitled to any profit with respect to providing the foregoing transition assistance.

## 10.7 INSURANCE

Unless otherwise prohibited by Law or a judgment, order or decree of a court of competent jurisdiction, Coudert will ensure that all policy premiums required to extend to at least April 2008 the claims reporting period under Coudert's current primary professional liability insurance policies are paid in full when due. If Coudert determines not to purchase additional coverage under its excess professional liability insurance policies for any corresponding period, it will promptly so advise Baker in writing.

## 10.8 NO ENCUMBRANCES

Coudert will not assert or take any action to perfect any attorneys lien or similar Encumbrance on any of the client files included in the Records or any of the other Assets.

## 10.9 CLIENT MANAGEMENT PROTOCOL

Coudert will comply with the procedures with respect to the notification to clients and the handling of client files set forth in the client management protocol attached as Schedule 10.9. Coudert will use its commercially reasonable efforts to include in its agreements with other law firms acquiring assets from Coudert provisions relating to client notification and the handling of client files consistent with the client management protocol.

## 10.10 FURTHER ASSURANCES

The parties will cooperate reasonably with each other in connection with any steps required to be taken as part of their respective obligations under this Agreement, and the parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Contemplated Transactions.

## ARTICLE 11

## EMPLOYEES AND EMPLOYEE BENEFITS

## 11.1 HIRED EMPLOYEES

(a) On or prior to the Closing Date, Baker will extend offers of employment to the associate attorneys listed on Schedule 1.1 and the non-attorney employees of Coudert's New York City office listed on Schedule 11.1(a). Each offer will provide for an annual salary equal to the current annual salary of the associate attorney or employee and other compensation and benefit arrangements substantially comparable to the compensation and benefit arrangements provided by Baker to associate attorneys and non-attorney employees of its New York City office with job titles, periods of service and levels of training, experience and responsibility substantially comparable to the Coudert associate attorney or employee to whom the offer is

extended, subject to any provisions of Baker's employee benefit plans, programs or arrangements limiting participation by new employees and Baker's reserved power to amend, modify, suspend or terminate its compensation and benefit arrangements at any time at its sole discretion. Baker will be entitled to complete customary background reviews of all such Coudert associate attorneys and non-attorney employees prior to, and as a condition of, the effectiveness of their employment with Baker. Those Coudert associate attorneys and non-attorney employees who accept such offers of employment and become employees of Baker are referred to in this Agreement collectively as the "Hired Employees."

(b) It is understood and agreed that (i) Baker's expressed intention to extend offers of employment as set forth in this Section 11.1 will not constitute a contract or commitment, express or implied, on the part of Baker with respect to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Baker may establish pursuant to individual written offers of employment and (ii) employment offered by Baker is "at will" and may be terminated by Baker or by an employee at any time, with or without cause, for any reason or no reason, except as otherwise expressly agreed in writing by Baker. Nothing in this Agreement will be deemed to prevent or restrict in any way the right of Baker to terminate, reassign, promote or demote any of the Hired Employees after the Closing, or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such Hired Employees. Nothing in this Agreement will create any Liability on the part of Coudert with respect to any act or omission of any of the Hired Employees after their date of first employment by Baker

## 11.2 EMPLOYMENT AND EMPLOYEE BENEFIT LIABILITIES

(a) Coudert will continue to be responsible for (i) the payment of all wages and other remuneration and benefits due at any time to all current and former partners, associate attorneys and non-attorney employees who are not Lateral Attorneys or Hired Employees and (ii) the payment of all wages and other remuneration and benefits due to all Lateral Attorneys and Hired Employees with respect to their services as partners, associate attorneys or employees of Coudert prior to their commencement of their partnership or employment with Baker.

(b) Coudert will be responsible for all claims made or incurred by the Lateral Attorneys or the Hired Employees and their beneficiaries or dependents through the Closing, whether asserted before or after the Closing, under Coudert's benefit plans, programs and arrangements. For this purpose, a claim will be deemed incurred, in the case of hospital, medical or dental benefits, when the services that are the subject of the claim are performed and, in the case of other benefits (such as disability, life insurance, workers' compensation or unemployment benefits), when an event has occurred or when a condition has been diagnosed which entitles the attorney, employee, beneficiary or dependent to the benefit

(c) Coudert will retain all assets of and Liabilities under its defined benefit retirement plans and any other incentive compensation, fringe benefit or attorney or employee benefit plan, program or arrangement maintained, adopted or contributed to by Coudert. Baker will not acquire any rights or interests of Coudert in, or assume any obligations or Liabilities of

Coudert under, any of Coudert's defined benefit retirement plans or any other incentive compensation, fringe benefit or attorney or employee benefit plan, program or arrangement maintained, adopted or contributed to by Coudert.

(d)   Coudert will be responsible for making continuation coverage under Section 4980B of the Internal Revenue Code of 1986 and Sections 601 through 608 of the Employee Retirement Income Security Act of 1974, as amended, available to its current and former partners, associate attorneys and non-attorney employees and their eligible spouses and dependents, including to the Lateral Attorneys and Hired Employees and their eligible spouses and dependents.

(e)   Baker will credit service with Coudert for all Lateral Attorneys and Hired Employees for vacation benefits and other employee welfare benefits under plans maintained by Baker for which Lateral Attorneys and Hired Employees are eligible to the extent such service was credited under comparable Coudert plans; *provided* that Baker may require (i) a wait until the first of the month following one complete month of Baker service to permit elective coverages (*e.g.*, a different medical plan than the initial 80-100 PPO coverage or eligibility for dental, EAP, long term care, AFLAC, medical or dependent care spending accounts) and (ii) eligibility and waiting periods consistent with all its plan terms for any employees regularly scheduled to work less than 35 hours per week. Baker will waive pre-existing conditions exclusions to the extent required under applicable Law (*e.g.*, HIPAA for its medical plan), but not otherwise (*e.g.*, for disability coverage).

## 11.3   OTHER ACTIONS

Coudert will give any notices required by Law and take whatever other actions as may be necessary to carry out the arrangements described in this Article 11. Coudert and Baker will provide each other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Article 11. Coudert will provide Baker with completed I-9 forms and attachments with respect to all Hired Employees, except for such employees as Coudert certifies in writing to Baker are exempt from such requirement.

## ARTICLE 12

## GENERAL PROVISIONS

## 12.1   EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of its representatives and professional advisors. If this Agreement is terminated, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

## 12.2   PUBLIC ANNOUNCEMENTS

Any public announcement or similar publicity with respect to this Agreement or the Contemplated Transactions will be issued at such time and in such manner as Baker may determine after consultation with Coudert.   In addition to the complying with the client management protocol referred to in Section 10.9, Coudert will consult with Baker concerning the means by which Coudert's attorneys and employees in the Coudert New York offices, and suppliers to and others having dealings with the Coudert New York offices will be informed of the Contemplated Transactions, and Baker will have the right to approve and be present for any such communication.

## 12.3   CONFIDENTIALITY

This Agreement is not intended to supersede or replace the Master Agreement dated as of June 2, 2005 between Coudert and Baker (the "Confidentiality Agreement").   The Confidentiality Agreement will remain in full force and effect in accordance with its terms (subject to the waiver of certain terms thereof by Coudert provided in the letter dated August 11, 2005 from Coudert to Baker) and Baker and Coudert will continue to be obligated to perform and comply with their respective obligations under the Confidentiality Agreement until the Closing.  Following the Closing (a) the provisions of Section 1 of the Confidentiality Agreement relating to information provided or made available by Baker to Coudert will terminate and will be superseded and replaced by the provisions of Section 10.5, (b) the provisions of Section 1 of the Confidentiality Agreement relating to information provided or made available by Coudert to Baker will continue in effect (subject to the partial waiver of such provisions provided in the letter dated August 11, 2005 from Coudert to Baker) except as to information included in the Records or otherwise related to the Assets, Assumed Liabilities, Lateral Attorneys or Hired Employees, (c) the provisions of Sections 5(c) and 5(d) of the Confidentiality Agreement will continue in full force and effect and (d) all other rights and obligations of the parties under the Confidentiality Agreement will terminate and be of no further force or effect.   Coudert, on its own behalf and on behalf of its successor and assigns and its current and former partners, hereby releases and discharges Baker from, and agrees to defend, indemnify and hold Baker harmless against, any and all Liabilities arising under or in connection with the mutual determination by Baker and Coudert not to consummate a Possible Combination (as defined in the Confidentiality Agreement).

## 12.4   NOTICES

All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), (b) sent by facsimile or e-mail with confirmation of transmission by the transmitting equipment, or (c) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the individual (by name or title) designated below (or to such other address, facsimile number, e-mail address or individual as a party may designate by notice to the other parties):

If to Coudert:

Special Situation Committee of Coudert Brothers LLP
Attention:  Patricia Kane – Executive Director
Address:  1114 Avenue of the Americas
                  New York, New York  10036
Facsimile No.: (212) 626-4224
E-mail Address:  kanep@coudert.com

with a copy (which will not constitute notice) to:

Bruce F. Smith
Jager Smith P.C.
One Financial Center
Boston, Massachusetts 02111
Facsimile No.:  (617) 951-2414
E-mail Address: bsmith@jagersmith.com

If to Baker:

Baker & McKenzie LLP
Attention:  John J. Conroy, Jr.
130 East Randolph Drive
Chicago, Illinois 60601
Facsimile No.: (312) 861-2899
E-mail Address: john.j.conroy@bakernet.com

with a copy (which will not constitute notice) to:

Edward J. Zulkey
General Counsel
Baker & McKenzie LLP
130 East Randolph Drive
Chicago, Illinois 60601
Facsimile No.: (312) 861-2899
E-mail Address: edward.j.zulkey@bakernet.com

## 12.5   FURTHER ACTIONS

Upon the request of any party to this Agreement, the other party will (a) furnish to the requesting party any additional information, (b) execute and deliver, at their own expense, any other documents and (c) take any other actions as the requesting party may reasonably require to more effectively carry out the intent of this Agreement and the Contemplated Transactions.

## 12.6   INCORPORATION OF SCHEDULES AND EXHIBITS

The Schedules and Exhibits identified in this Agreement are incorporated herein by reference and made a part of this Agreement.

## 12.7 ENTIRE AGREEMENT AND MODIFICATION

Subject to Section 12.3, this Agreement supersedes all prior agreements among the parties with respect to its subject matter and constitutes (along with the documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter. This Agreement may not be amended, supplemented or otherwise modified except in a written document executed by the party against whose interest the modification will operate.

## 12.8 DRAFTING AND REPRESENTATION

The parties have participated jointly in the negotiation and drafting of this Agreement. No provision of this Agreement will be interpreted for or against any party because that party or its legal representative drafted the provision.

## 12.9 SEVERABILITY

If a court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## 12.10 ASSIGNMENT AND SUCCESSORS

No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the respective successors and permitted assigns of each party.

## 12.11 NO THIRD-PARTY RIGHTS

Nothing expressed or referred to in this Agreement will be construed to give any person, other than the parties to this Agreement, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, except any rights as may inure to any person entitled to indemnification in accordance with Article 9 or to a successor or permitted assignee under Section 12.10.

## 12.12 WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable Law, (a) no claim or right arising out of this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in a written document signed by the other

party, (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given, and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

### 12.13 GOVERNING LAW

This Agreement will be governed by and construed under the Laws of the State of New York without regard to conflict of laws principles that would require the application of any other Law.

### 12.14 DISPUTE RESOLUTION

The parties agree that any dispute or controversy arising out of, relating to or in connection with this Agreement, or the validity, enforceability, construction, performance or breach hereof, that can not be resolved through good faith negotiations between the parties will be settled exclusively through binding arbitration under the then current Commercial Arbitration Rules of the American Arbitration Association. Any such arbitration will be conducted in the English language, and the venue of such arbitration will be New York, New York. The arbitration will be conducted of a single arbitrator appointed in accordance with such rules. All decisions and awards rendered by the arbitrator will be written, final and non-appealable and may be entered in any court of competent jurisdiction. The parties agree that, any provision of applicable Law notwithstanding, they will not request, and the arbitrator will have no authority to award, punitive or exemplary damages against either party. The costs of any arbitration proceedings, including administrative fees and fees of the arbitrator, will be shared equally by the parties, unless otherwise specified by the arbitrator. Each party will bear the cost of its own attorneys' and expert fees, provided that the arbitrator may in its discretion award to the prevailing party the costs and expenses incurred by the prevailing party in connection with the arbitration proceeding. The parties agree that all information regarding any dispute or controversy related to this Agreement or to the Contemplated Transactions, including the existence of such dispute or controversy and the terms of any arbitration decision or award, will, except as otherwise required by Law, be kept strictly confidential by each of the parties and that neither party will, directly or indirectly, disclose, use or exploit such information for any purpose other than the enforcement of its rights under this Agreement. Notwithstanding the foregoing, each party will have the right to initiate litigation to seek injunctive relief or similar equitable remedy, if in such party's good faith judgment, such action is necessary to avoid irreparable damage or to protect the status quo pending arbitration. In such case, the parties agree to submit to the exclusive jurisdiction of the courts of the State of New York, Borough of Manhattan, or, if it has or can acquire jurisdiction, the United States District Court for the Southern District of New York.

### 12.15 COUNTERPARTS

This Agreement may be executed in two or more counterparts.

- 29 -

The parties have executed and delivered this Agreement as of the date indicated in the first sentence of this Agreement.

BAKER & MCKENZIE LLP

By: _____

COUDERT BROTHERS LLP

By: _____

## SCHEDULE 1.1
## LATERAL ATTORNEYS

Principals

Steven H. Becker
Pamela T. Church
Jeffrey E. Cohen
James C. Colihan
Charles H. Critchlow
Richard A. De Palma
Robert L. Eisen
Eliab S. Erulkar
Theodore N. Farris
Gerald V. Hannon
Andrew S. Hedden
Kenneth R. Page
Darrell Prescott
Clyde E. Rankin III
Richard R. Reilly
Thomas J. Rice
Anthony Williams

National Partners

Paul Horowitz
Frederick Konta
Carol Stubblefield
Douglas Tween

Of Counsel

J. Ross Macdonald
Edwin Matthews, Jr.
James Sitrick

## Associates

James D. Bailey
Brian T. Belowich
Lindsay Bush
Alessandra Chichi
Angele Fischer
Pia Flanagan
Kathleen Johnson
Andrea G. Lauletta
Alexandra Lauvaux
Lisa Lewis
Lan Lou
Suzanne Offerman
Vasilis F. L. Pappas
Dane Peacock
Christopher E. Pey
Stephan Rapaglia
Lisa A. Rindler
Predrag Rogic
Kathryn Ryan
Eileen Shin
David G. Taylor
Virginia F. Tent
Eileen Visco
Alan F. Zoccolillo

## Fall 2005 Associates

Grant Caldis
Iciar Garcia
Vinny Lucibello
Deppa Nayini
Eric Waters
Jinfei Zhang

## Other Timekeepers

Jesse Gardner Ainlay
Danielle Atteritano
Angela Beaumier
Michale Giglio
Alice McNally
Lynn Michaelson
Jurate Nemickas
Stephen Paul Smith

See Attached.

1.    Definitions.  For purposes of this Schedule 2.5(c), the following terms and variations on them have the meanings specified in this paragraph:

"Black Lung Cases" means, collectively, the following matters:*

"Contingency Fee Cases" means, collectively, the Black Lung Cases, Harbor Maintenance Cases, Park B. Smith Case, Reclamation Fee Cases, Severance Tax Cases and Warrens Cases.

"Harbor Maintenance Cases" means, collectively, the following matters:*

"Park B. Smith Case" means the following matter:*

"Reclamation Fee Cases" means, collectively, the following matters:*

"Severance Tax Cases" means, collectively, the following matters:*

"Warrens Cases" means, collectively, the following matters:*

All other capitalized terms used without definition in this Schedule 2.5(c) have the respective meanings set forth in the Agreement.

2.    Sharing Arrangements Regarding Black Lung Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with the Black Lung Cases will be shared between Baker and Coudert as follows:

(a)    first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Black Lung Cases;

(b)    second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Black Lung Cases; and

(c)    third, (i) with respect to proceeds received in connection with Black Lung Cases that are designated in paragraph 1 above as "Administrative Refunds Cases," Coudert will be entitled to receive all additional proceeds, and (ii) with respect to proceeds received in connection with Black Lung Cases that are designated in paragraph 1 above as "Tucker Act Cases," Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c)(ii) equals $7,000,000, after

which Coudert will be entitled to all additional proceeds.

\* To be completed prior to the Closing Date.

3. Sharing Arrangements Regarding Harbor Maintenance Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with the Harbor Maintenance Cases will be shared between Baker and Coudert as follows:

(a) first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Harbor Maintenance Cases;

(b) second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Harbor Maintenance Cases; and

(c) third, Coudert will be entitled to receive 100% of all additional proceeds

4. Sharing Arrangements Regarding Park B. Smith Case. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Park B. Smith Case will be shared between Baker and Coudert as follows:

(a) first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Park B. Smith;

(b) second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Park B. Smith Case; and

(c) third, Baker and Coudert will each be entitled to receive 50% of all additional proceeds.

5. Sharing Arrangements Regarding Reclamation Fee Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Reclamation Fee Cases will be shared between Baker and Coudert as follows:

(a) first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Reclamation Fee Cases;

(b) second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Reclamation Fee Cases; and

(c)    third, Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c) equals $7,000,000, after which Coudert will be entitled to receive 100% of all additional proceeds.

6.    <u>Sharing Arrangements Regarding Severance Tax Cases</u>. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Severance Tax Cases will be shared between Baker and Coudert as follows:

(a)    first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Severance Tax Cases;

(b)    second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Severance Tax Cases; and

(c)    third:

(i)    with respect to proceeds received in connection with Severance Tax Cases that are designated in paragraph 1 above as "2000-2001 Cases," Baker and Coudert will each be entitled to receive 50% of all additional proceeds; and

(ii)    with respect to proceeds received in connection with Severance Tax Cases that are designated in paragraph 1 above as "1996-1999 Cases," (A) Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c)(ii) equals $25,000,000, (B) to the extent such aggregate proceeds exceed $25,000,000 but are less than $30,000,000, Coudert will be entitled to receive 75% and Baker will be entitled to receive 25% of all such excess proceeds and (C) to the extent such a aggregate proceeds exceed $30,000,000, Coudert will be entitled to receive 100% of all excess proceeds.

7.    <u>Sharing Arrangements Regarding Warrens Cases</u>. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Warrens Cases will be shared between Baker and Coudert as follows:

(a)    first, each of Baker and Coudert will be entitled to recover, on a dollar-for dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Warrens Cases;

(b)    second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Warrens Cases; and

(c)    third, Coudert will be entitled to receive 100% of all additional proceeds.

8.    Additional Agreements Regarding Sharing of Fees.  If a law firm or other party other than Coudert or Baker is entitled to receive a portion of the proceeds of any judgment, settlement or other resolution in connection with any of the Contingency Fee Cases, such amount will be deducted before determining the respective shares of such proceeds to which Baker and Coudert are entitled in accordance with this Schedule 2.5(c). Notwithstanding the foregoing, if after the Closing Date Baker retains any co-counsel, local counsel, lobbying firm or similar party compensated on a contingent basis in connection with any of the Contingency Fee Cases and the terms of such retention entitle such party to a share of the proceeds in such Contingency Fee Case materially in excess of the share customarily provided under similar arrangements entered into by Coudert in connection with the Contingency Fee Cases prior to the Closing Date, then Baker will be required to absorb any such excess out of its share of the proceeds of any judgment, settlement or other resolution in connection with the applicable Contingency Fee Case.

9.    Value of Coudert Time.  For purposes of the foregoing sharing arrangements, the parties have agreed that the value of the time recorded by Coudert in connection with each of the Contingency Fee Cases through the Closing Date is as follows:

| Black Lung Cases | .... | $ | 0 |
| Harbor Maintenance Cases | | $ 2,109,773 | |
| Park B. Smith Case | .... | $ 1,238,060 | |
| Reclamation Fee Cases | — | $ 2,352,734 | |
| Severance Tax Cases | .. | $ 2,758,565 | |
| Warrens Cases | --- | $ 1,268,618 | |

10.    Reporting.  Baker will provide Coudert with a quarterly report in reasonable detail itemizing with respect to each of the Contingency Fee Cases the value of all time recorded by Baker attorneys, the amount of all client advances and other out-of-pocket expenditures by Baker, and the amount of all proceeds received by Baker. If requested by Coudert and consented to by the applicable client, Baker will provide Coudert with a report showing the individual attorney time entries recorded in connection with the Contingency Fee Cases.

11.    Payments.  A party receiving proceeds in connection with the resolution of any Contingency Fee Case will remit any portion thereof due to the other party in accordance with this Schedule 2.5(c) promptly and in any event not more than 30 days after the date of receipt. Pending payment to the other party, the receiving party will segregate and hold such proceeds in trust for the benefit of the other party.

12.    Compensation of Attorneys.  Coudert will be solely responsible for any compensation payable in connection with the resolution of the Contingency Fee Cases under any agreements or commitments between Coudert and its current or former attorneys, including under its compensation agreements with certain of the Lateral Attorneys.  Baker will be solely responsible for any compensation payable in connection with the resolution of the Contingency

Fee Cases under any agreements or commitments between Baker and any of its attorneys, including any of the Lateral Attorneys. Each party agrees to defend, indemnify and hold harmless the other party in accordance with Article 9 of the Agreement from and against any Liability arising in connection with any claim for compensation as to which the indemnifying party has agreed to assume responsibility pursuant to this paragraph.

13. **Settlement.** If Baker receives a material written settlement offer, or proposes to make a material written settlement offer, in connection with a Contingency Fee Case, then Baker will seek the consent of its client to disclose the existence and terms of such offer, and if applicable Baker's recommended response thereto, to Coudert. Baker will also advise Coudert promptly that it has sought such consent from its client. Coudert may provide Baker with a written statement of its position with respect to the course of action recommended by Baker in connection with any such settlement offer, which Baker will provide to its client promptly after receipt from Coudert. Notwithstanding the foregoing, Baker will have the sole right and responsibility to represent and advise its clients in connection with any potential settlement or other compromise involving the Contingent Fee Cases. Coudert acknowledges that the right to settle or compromise any Contingent Fee Case belongs to the client and agrees that, subject to Baker complying with its notice obligations under this Section 11, Coudert will not be entitled to object to or contest any settlement or compromise that may be agreed to in connection with any Contingent Fee Case.

14. **Termination of Representation.** At any time after the Closing Date, Baker may elect to terminate its representation in connection with any of the Contingency Fee Cases. Prior to terminating its representation in connection with a Contingency Fee Case, Baker will provide Coudert with not less than 30 days prior written notice. If requested by Coudert, Baker will cooperate with Coudert and any successor counsel designated by the client in the applicable Contingency Fee Case with respect to the transfer of client files and related matters. If Baker notifies Coudert of its decision to terminate its representation in connection with a Contingency Fee Case, Baker will be deemed to have forfeited its right to any proceeds to be received with respect that Contingency Fee Case and, as between Coudert and Baker, Coudert will be entitled to all such proceeds.

15. **No Other Rights or Obligations.** Except for the rights and obligations expressly provided in this Schedule 2.5(c), Coudert will not have any rights or obligations, including any rights to payments from Baker, with respect to any matters subject to Fee Agreements.

16. **Dispute Resolution.** Any dispute or controversy arising out of the arrangements provided in this Schedule 2.5(c) will be resolved exclusively in accordance with the dispute resolution procedures set forth in Section 12.14 of the Agreement.

## SCHEDULE 2.6(a)
## CONDITIONS TO PAYMENT

At least three of the following four individuals joining Baker as a principal will be actively practicing as a Baker principal as of the second anniversary of the Closing Date:

Jeffrey E. Cohen
James C. Colihan
Clyde E. Rankin III
Anthony Williams

## SCHEDULE 6.3
## REQUIRED CONSENTS

1.   Consent of Coudert's secured creditors under its principal credit facility.

2.   Consent of the Landlord under the Lease.

3.   If required under the terms of the ground lease for the building property subject to the Lease, consent of the ground lease holder.

4.   If required under the terms of any fee mortgage affecting the building property subject to the Lease, consent of the mortgage holder.

## SCHEDULE 6.5
## REQUIRED LATERAL ATTORNEYS

Jeffrey E. Cohen
James C. Colihan
Clyde E. Rankin III
Anthony Williams

## SCHEDULE 10.9
## CLIENT MANAGEMENT PROTOCOL

1.  As promptly as practicable after the Closing Date, the Coudert partners joining Baker will notify each of their respective clients using a letter in substantially the form attached.

2.  For a period of not more than six months after the Closing Date, Coudert will continue to make available to Baker the time entry and client billing systems and services presently in use to support the Coudert attorneys joining Baker. During this transition period, if requested by Baker, client invoices may continue to be sent out on Coudert letterhead. The payment instructions on such invoices will be modified as reasonably requested by Baker to facilitate Baker's ability to collect the Inventory after the Closing Date.

3.  If any current Coudert attorneys as of the date of the Agreement, other than the Lateral Attorneys, have files in their possession relating to matters for which a Lateral Attorney is designed as the "Responsible Partner" for purposes of Coudert's client billing policies, then Coudert, at the request of Baker, will use its commercially reasonable efforts to cause such files to be delivered to Baker.

4.  If any client of the Coudert partners joining Baker requests that their files held by Coudert be transferred to a law firm other than Baker, Coudert will cooperate with the reasonable requests of Baker with respect to the transfer of such files as requested by such client.

5.  Baker will reimburse Coudert for its reasonable costs and expenses incurred in connection with the foregoing arrangements in accordance with Section 10.6(e) of the Agreement

## FORM OF CLIENT NOTIFICATION LETTER

[On Baker & McKenzie LLP Letterhead]

[Client Name and Address]

Dear [Client],

As of September __, 2005, approximately __ of my colleagues and I have joined Baker & McKenzie LLP, a member of Baker & McKenzie International, a Swiss Verein, with member law firms in 69 locations around the world. Now that we are part of Baker & McKenzie, we will be able to continue to provide the high quality legal services you have come to expect over an even greater range of jurisdictions.

This change has been made with the full support and agreement of my former partners at Coudert Brothers LLP. During a transition period, you may receive invoices for past unbilled legal services on Coudert Brothers stationery. Please note the new payment instructions on these invoices, which are different from previous payment instructions.

We highly value our relationship and look forward to serving you at Baker & McKenzie. We will be bringing your files with us to Baker & McKenzie, where we will continue to discharge current assignments. We understand, however, that the choice of who will represent you in the future is your decision and one that we will respect. If you determine to transfer your representation to counsel other than Baker & McKenzie, we will work with you and the other lawyer you designate to ensure a smooth transition of your matters.

Naturally, the work we are presently doing will continue to be handled under the terms of our existing engagement letter. As many professional services firms have done, Baker & McKenzie has adopted standard terms of engagement that cover all client assignments. I have enclosed a copy of the Baker & McKenzie Standard Terms for your review and files. This document enables us to continue to provide services to you in a seamless manner worldwide. The Standard Terms will apply to all future assignments we receive from you.

I want to assure you that you will continue to receive the highest quality representation from us in all matters. My new colleagues at Baker & McKenzie, my colleagues from Coudert Brothers and I will work together to ensure that you receive the best possible representation, especially during this transition period.

My mailing address, phone number and email address are on this letterhead. If you have any questions, please contact me.

Accounting

| | |
|---|---|
| Michelle Perazzo | A/P Supervisor |
| Fiasalie Maglasang | Accounting Manager |
| Nicholas Caswell | Billing Supervisor |
| Paul Eady | Billing |
| Claire Withy | Cash Receipts |
| Annette Jordan | Time Entries, Cash Receipts |
| Ramon Castillo | Data Entry |

Administration

| | |
|---|---|
| Barbara May | Admin Asst. Legal Personnel |

Information Technology

| | |
|---|---|
| Dominick Lauricella | UNIX Administrator/ Help Desk |
| Ronald Lubin | Database Administrator |
| Paul Sherman | Help Desk |
| Kenneth Kahn | Exchange Administrator |

Library

| | |
|---|---|
| Vija Doks | Asst. Librarian - Reference Database |
| Edward Hoover | Library Assistant |
| Brian McMains | Library Assistant |
| Rebecca Wright | Asst. Librarian - Reference Database |

Marketing

| | |
|---|---|
| Amanda Goldberg | Marketing |

Office Services

| | |
|---|---|
| Cecil Budhram | Office Services Manager |
| Helen Berthel | Conference Center Staff |
| Margarita Rochez | Conference Center Staff |
| Frank Calomino | Supervisor Mail Room/Page |
| Gladys Moran, | Mail Room/Page |
| Delano Beckford | Page |
| David Feijoo | Page |
| Christopher Goetz | Page |

| | |
|---|---|
| Ricardo Grenade | Page Dispatcher |
| Nicholas Massoni | Page |
| Larry McNeil | Page |
| Katie Hicks | Receptionist |
| Paulette McDonald | Receptionist |
| Patricia Valentino | Receptionist |
| Christine Gallagher | Records Manager |
| Gopal Gossai | Records - Corporate & Litigation |
| Derric Howard | Records - Corporate |
| Ian McLarty | Records - Warehouse |
| Faye McNaught | Records Supervisor- Real Estate & T&E |
| Trevor Stewart | Records Assistant Supervisor |
| Denise DiLeo | Repro/Fax |
| Donald Farrell | Repro/Fax |
| Sajid Hussain | Repro/Fax |
| Robert McCarthy | Repro/Fax Supervisor |
| Charles White | Repro/Fax |
| Sterling Richards | Security/ Maintenance |
| Dalton Samuels | Security/ Maintenance |
| Annette Caggiano | Switchboard |
| Leonard Howes | Switchboard |
| Barbara Mangine | Switchboard |
| Janet DeLeon | WP - Evening Supervisor |
| Faser Hardin | WP Day Coordinator |
| Lili Moy | WP - Evening |
| Joseph Russo | WP Manager |

Secretaries

| | |
|---|---|
| Amelia Abad | Secretary |
| Joan Asmundo | Secretary |
| Yelena Baturina | Secretary |
| Maureen Cafferty | Secretary |
| Mary Carroll | Secretary |
| Pearl Chin | Secretary |
| Sharren Davis | Secretary |
| Patryce Ercolano | Secretary |
| Sandra Espinal | Secretary |
| Virginia Fedus | Secretary |
| Christine Gellard | Secretary |
| Kathy Gesualdi | Secretary |
| Madeline Gonzalez | Secretary |
| Millie Gonzalez | Secretary (job share and floater) |
| Deborah Hernandez | Secretary |
| Alma Montes | Secretary |
| Theresa Noto | Secretary |

| | |
|---|---|
| Denise Oquendo | Secretary |
| Andrea Pearlstein | Secretary |
| Claude Sasson | Secretary |
| Catherine Warwick | Secretary |

## AMENDMENT TO ASSET PURCHASE AGREEMENT

This Amendment to Asset Purchase Agreement (this "Amendment") is made as of September 23, 2005 by and between Baker & McKenzie LLP, an Illinois limited liability partnership ("Baker"), and Coudert Brothers LLP, a New York limited liability partnership ("Coudert").

### PRELIMINARY STATEMENT

Baker and Coudert are parties to an Asset Purchase Agreement dated as of September 7, 2005 (the "Agreement") pursuant to which Coudert agreed to sell, and Baker agreed to purchase, for fair value certain specified assets relating to Coudert's New York City office. All capitalized terms used without definition in this Amendment have the respective meanings set forth in the Agreement.

In connection with the consummation of the transactions contemplated by the Agreement, the parties have agreed to amend certain provisions of the Agreement as set forth herein.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.    Definitions.  Section 1.1 of the Agreement is hereby amended as follows:

(a)    the definitions of the terms "Lease," "Leased Premises," "Sublease" and "Subleased Premises" are deleted in their entirety.

(b)    the definition of the term "Landlord" is deleted in its entirety and replaced with the following:

""Landlord" means 1114 TrizecHahn-Swig, L.L.C."

(c)    the following new definitions are added:

""Baker Lease" means the Lease dated as of September 23, 2005 between Baker and the Landlord."

""Baker Leased Premises" means the office premises subject to the Baker Lease."

(d)    All references in the Agreement to the "Subleased Premises" will be deemed to be references to the "Baker Leased Premises."

2.    Assets to be Sold.  For the avoidance of doubt, the Fixed Assets will not include the art work owned by Coudert located within the Baker Leased Premise. After the Closing

Date, the parties will discuss the terms pursuant to which Baker may purchase all or a portion of such art work, but neither party will be obligated to purchase or sell any such art work.

3.    Purchase Price. Section 2.5 of the Agreement is hereby amended as follows:

(a)    Section 2.5(b) is deleted in its entirety and replaced with the following:

"(b)    an amount (the "Post-Closing Inventory Amount") equal to 85% of the excess of (i) the aggregate amount actually collected by Baker after the Closing Date with respect to the Inventory, excluding for this purpose amounts collected with respect to the Contingency Fee Cases, over (ii) the sum of (A) the Initial Inventory Amount plus (B) $1,000,000;"

(b)    Section 2.5(d) is deleted in its entirety and replaced with the following:

"(d)    $8,000,000 in consideration of Coudert's surrender to the Landlord of its rights as the tenant of the Leased Premises;"

(b)    Section 2.5(f) is deleted in its entirety and replaced with the following:

"(f)    $1,000,000, as consideration of the purchase of the Fixed Assets."

4.    Payment of the Purchase Price. Section 2.6(a) of the Agreement is hereby amended as follows:

(a)    the figure "$6,000,000" in Section 2.6(a)(v) is deleted and replaced with "$7,000,000,"

(b)    the figure "$2,000,000" in Section 2.6(a)(vi) is deleted and replaced with "$1,000,000;" and

(c)    a new paragraph is added at the end of Section 2.6(a) as follows:

"Coudert agrees that with respect to that portion of the Purchase Price to be paid on the Closing Date (a) $4,897,836 will be paid by Baker to the Landlord on behalf of Coudert in accordance with the terms of Coudert's existing lease for the Leased Premises and (b) $85,000 will be remitted by Baker to the applicable Tax authorities on behalf Coudert in respect of the estimated sales, use and similar Taxes required to be paid by Coudert in connection with the Contemplated Transactions in accordance with Section 10.1."

5.    Closing Deliveries. Sections 2.8(a)(iv) and 2.8(b)(ii) of the Agreement are hereby deleted in their entirety

6.    Representations and Warranties of Coudert. The introductory paragraph of Article 3 is hereby amended by deleting the phrase "except as set forth in the disclosure letter delivered by Coudert to Baker as of the date of this Agreement (such disclosures being deemed to modify the following representations and warranties)."

7. <u>Schedules</u>. Schedules 1.1, 2.1(a), 2.5(c) and 11.1(a) to the Agreement are hereby each deleted in their entirety and replaced with the corresponding Schedules attached to this Amendment.

8. <u>Proration</u>. Following the Closing, the parties will agree in good faith on an appropriate proration as of the Closing Date of expenses, including pre-paid rents and other pre-paid expenses, relating to the Baker Leased Premises, the associates and other time keepers included in the Lateral Attorneys, and the Hired Employees.

9. <u>No Other Amendment or Waiver</u>. The amendments and waivers with respect to the Agreement set forth in this Amendment are limited to the matters expressly set forth herein and are not intended and will not be deemed to constitute an amendment or waiver of any other provision of the Agreement. Except as expressly amended hereby, the Agreement will continue in full force and effect in the form originally executed and delivered by the parties. All references to the Agreement contained in any other agreement or instrument will be deemed to be references to the Agreement as amended by this Amendment.

10. <u>Counterparts</u>. This Amendment may be executed in two or more counterparts.

The parties have executed and delivered this Amendment as of the date indicated in the first sentence of this Amendment.

BAKER & MCKENZIE LLP

By _____
     JOHN H. CONNERS, JR.
     CHAIRMAN OF THE EXECUTIVE COMMITTEE

COUDERT BROTHERS LLP

By _____

COUDERT BROTHERS LLP

By _____

7. Schedules. Schedules 1.1, 2.1(a), 2.5(c) and 11.1(a) to the Agreement are hereby each deleted in their entirety and replaced with the corresponding Schedules attached to this Amendment.

8. Proration. Following the Closing, the parties will agree in good faith on an appropriate proration as of the Closing Date of expenses, including pre-paid rents and other pre-paid expenses, relating to the Baker Leased Premises, the associates and other time-keepers included in the Lateral Attorneys, and the Hired Employees.

9. No Other Amendment or Waiver. The amendments and waivers with respect to the Agreement set forth in this Amendment are limited to the matters expressly set forth herein and are not intended and will not be deemed to constitute an amendment or waiver of any other provision of the Agreement. Except as expressly amended hereby, the Agreement will continue in full force and effect in the form originally executed and delivered by the parties. All references to the Agreement contained in any other agreement or instrument will be deemed to be references to the Agreement as amended by this Amendment.

10. Counterparts. This Amendment may be executed in two or more counterparts.

The parties have executed and delivered this Amendment as of the date indicated in the first sentence of this Amendment.

BAKER & MCKENZIE LLP

By _____

COUDERT BROTHERS LLP

By _____

COUDERT BROTHERS LLP

By _____

7. Schedules. Schedules 1.1, 2.1(a), 2.5(c) and 11.1(a) to the Agreement are hereby each deleted in their entirety and replaced with the corresponding Schedules attached to this Amendment.

8. Proration. Following the Closing, the parties will agree in good faith on an appropriate proration as of the Closing Date of expenses, including pre-paid rents and other pre-paid expenses, relating to the Baker Leased Premises, the associates and other time-keepers included in the Lateral Attorneys, and the Hired Employees.

9. No Other Amendment or Waiver. The amendments and waivers with respect to the Agreement set forth in this Amendment are limited to the matters expressly set forth herein and are not intended and will not be deemed to constitute an amendment or waiver of any other provision of the Agreement. Except as expressly amended hereby, the Agreement will continue in full force and effect in the form originally executed and delivered by the parties. All references to the Agreement contained in any other agreement or instrument will be deemed to be references to the Agreement as amended by this Amendment.

10. Counterparts. This Amendment may be executed in two or more counterparts.

The parties have executed and delivered this Amendment as of the date indicated in the first sentence of this Amendment.

BAKER & McKENZIE LLP

By_____

COUDERT BROTHERS LLP

By_____

COUDERT BROTHERS LLP

By_____

## Principals

Steven H. Becker
Pamela T. Church
Jeffrey E. Cohen
James C. Colihan
Charles H. Critchlow
Richard A. De Palma
Robert L. Eisen
Eliab S. Erulkar
Theodore N. Farris
Gerard V. Hannon
Andrew S. Hedden
Barry Metzger
Kenneth R. Page
Darrell Prescott
Clyde E. Rankin III
Richard R. Reilly
Thomas J. Rice
Charles H. Wagner
Anthony Williams

## National Partners

Dean Berry
Paul Horowitz
Frederick Konta
Carol Stubblefield
Douglas Tween

## Of Counsel

J. Ross Macdonald.
Edwin Matthews, Jr.
James Sitrick

<u>Associates</u>

James D. Bailey
Brian T. Belowich
Lindsay Bush
Alessandra Chichi
Angele Fischer
Pia Flanagan
Kathleen Johnson
Lidia M. Kidane
Andrea G. Lauletta
Alexandra Lauvaux
Lan Lou
Suzanne Offerman
Vasilis F. L. Pappas
Christopher E. Pey
Stephan Rapaglia
Lisa A. Rindler
Predrag Rogic
Kathryn Ryan
Eileen Shin
Virginia F. Tent
Eileen Visco
Alan F. Zoccolillo

<u>Fall 2005 Associates</u>

Grant Caldis
Iciar Garcia
Vinny Lucibello
Deppa Nayini
Eric Waters
Jinfei Zhang

<u>Other Timekeepers</u>

Jesse Gardner Ainlay
Danielle Atteritano
Michale Giglio
Alice McNally
Lynn Michaelson
Jurate Nemickas

See Attached.

## SCHEDULE 2.5(c)
## CONTINGENCY FEE ARRANGEMENTS

1.     **Definitions.**  For purposes of this Schedule 2.5(c), the following terms and variations on them have the meanings specified in this paragraph:

"Black Lung Cases" means, collectively, those actions brought on behalf of numerous US coal producers to obtain refunds of the Black Lung Excise Tax, imposed on the sale of coal for export from the United States, in violation of the Export Clause of the United States Constitution. In addition to refunds that have been and will likely be issued in response to filings with the IRS of administrative claims, the following court cases have been filed by Coudert in the United States Court of Federal Claims:

*Cyprus Amax Coal Company, et al. v. United States, No. 97-68T*

*Consol of Kentucky Inc., et al. v. United States, No. 97-310T*

*Colony Bay Coal Company, et al. v. United States, No. 97-311T*

*ANR Coal Company, et al. v. United States, No. 97-317T*

*Eagle Energy, et al. v. United States, No. 97-522T*

*Cyprus Plateau Mining Corporation, et al. v. United States, No. 98-200T*

*Cyprus Cumberland Resources Corporation, et al. v. United States, No. 98-557T*

*Usibelli Coal Mine, Inc. v. United States, No. 99-267T*

*Andalex Resources, Inc., et al. v. United States, No. 99-268T*

*Peabody Coal Company, et al. v. United States, No. 99-298T*

*Consol of Kentucky Inc., et al. v. United States, No. 99-299T*

*Cyprus Amax Coal Company, et al. v. United States, No. 99-300T*

*Mountain Coal Company, et al. v. United States, No. 99-301T*

*Greenbrier Coal Company, et al. v. United States, No. 99-302T*

*Knox Creek Coal Corporation, et al. v. United States, No. 00-216T*

*Hobet Mining Company, et al. v. United States, No. 00-218T*

*Pacific Coast Coal Company v. United States, No. 90-236T*

*Covenant Coal Corporation v. United States, No. 90-243T*

*Clintwood Elkhorn Mining Company, et al. v. United States, No. 00-249T*

*Riverton Coal Sales, Inc. v. United States, No. 00-761T (Riverton is third party plaintiff)*

*Powder River Coal Company v. United States, No. 01-422T*

*Omar Mining Company, et al. v. United States, No. 01-423T*

"Contingency Fee Cases" means, collectively, the Black Lung Cases, Harbor Maintenance Cases, Park B. Smith Case, Reclamation Fee Cases, Severance Tax Cases and Warrens Cases.

"Harbor Maintenance Cases" means, collectively, those actions brought in the United States Court of International Trade on behalf of approximately 200 US companies to obtain refunds of the "Harbor Maintenance Tax," imposed on exports of goods from the United States, in violation of the Export Clause of the United States Constitution.

"Park B. Smith Case" means *Park B. Smith, Ltd. v. United States Court of International Trade*, case number 96-00344, along with suspended cases as follows:

| 96-10810 | 96-02594 | 97-00936 |
| 98-00019 | 94-00546 | 95-00043 |
| 95-00184 | 95-00701 | 95-01180 |
| 99-00419 | 99-00749 | 01-00084 |
| 01-00952 | 04-00324 | 00-00411 |

"Reclamation Fee Cases" means, collectively, those actions brought on behalf of numerous US coal producers to obtain refunds of the "Reclamation Fee," imposed on the sale of coal for export from the United States, in violation of the Export Clause of the United States Constitution. The following cases have been filed by Coudert in the United States Court of Federal Claims:

*Consolidation Coal Co., et al. v. United States*, No. 01-254C

*Alex Energy, Inc. and Delbarton Mining Company v. United States*, No. 05-929T

"Severance Tax Cases" means, collectively, those actions brought before the West Virginia State Tax Commissioner's Office of Hearings and Appeals ("OHA")(now the West Virginia Office of Tax Appeals ("OTA")), and later in the Circuit Court of Kanawha County, West Virginia, to obtain refunds of the West Virginia coal severance tax, together with related taxes, which were imposed on coal, exported from the state, in violation of the Import-Export Clause of the United States Constitution. The following are cases filed by Coudert in the Circuit

Court of Kanawha County, following disposition by OHA or OTA of the relevant administrative refund claims:

*U.S. Steel Mining Company, LLC, et al. v. Craig,* Civil Action No. 03-AA-74

*U.S. Steel Mining Company, LLC, et al. v. Craig,* Civil Action No. 04-AA-16

*Steager v. Peabody Holding Company,* Civil Action No. 04-AA-77

*Elk Run Coal Company, Inc., et al. v. Steager,* Civil Action No. 04-AA-78

*Helton v. Reed, Administrative Law Judge, and Elk Run Coal Co., Inc.,* Civil Action No. 05-MISC-243

The following are administrative refund claims that are not yet the subject of a case filed in court:

*Arch Coal, Inc.:* West Virginia Office of Tax Appeals ("OTA") Docket Nos. 05-087RSV and 05-088 RK. Note: Claims not yet filed for 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; and 1/1/05 through 12/31/05.

*Consolidation Coal Company:* OTA Docket Nos. 05-091 RSV and 05-092 RK. Note: Claims not yet filed for 1/1/03 through 12/31/03; 1/1/04 through 12/31/04 and 1/1/05 through 12/31/05.

*Brooks Run Mining Company, LLC:* Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; 1/1/05 through 6/30/05. Note: Claims not yet filed for 7/1/05 through 12/31/05.

*Kingwood Mining Company, LLC:* Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; 1/1/05 through 6/30/05. Note: Claims not yet filed for 7/1/05 through 12/31/05.

*Riverside Energy Company, LLC:* Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03, 1/1/04 through 12/31/04; and 1/1/05 through 6/30/05. Note: Claims not yet filed for 7/1/05 through 12/31/05.

*Hernden Processing Company, LLC:* Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03 and 1/1/04 through 12/31/04. Note: Claims not yet filed for 1/1/05 through 12/31/05.

*Newhall Mining Company, LLC:* Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03 and 1/1/04 through 12/31/04. Note: Claims not yet filed for 1/1/05 through 12/31/05.

*Metcoal Sales*: Claims filed (but no OTA Docket Nos. yet assigned) for 1/1/03 through 12/31/03 and 1/1/04 through 12/31/04. Note: Claims not yet filed for 1/1/05 through 12/31/05.

*Kingston Resources, Inc.*: OTA Docket Nos. 05-085 RSV and 05-086 RK. Note: Claims not yet filed for 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; or 1/1/05 through 12/31/05.

*Paynter Branch Mining, Inc.*: Note: Claims not yet filed for 1/1/01 through 12/31/01; 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; or 1/1/05 through 12/31/05.

*Pioneer Fuel Corp.*: OTA Docket Nos. 05-089 RSV and 05-090 RK. Note: Claims not yet filed for 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; or 1/1/05 through 12/31/05.

*Mid-Vol Leasing, Inc. (AEI)*: OTA Docket Nos. 05-142 RSV and 05-465 RK. Note: Claims not yet filed for 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; or 1/1/05 through 12/31/05.

*Elk Run Coal Company, Inc.*: OTA Docket Nos. 04-466 RSV; 04-759 RK, 05-083 RSV, and 05-084 RK. Claims filed (but no OTA Docket Nos. yet assigned) for 11/1/98 through 10/31/99 (NOTE: THIS CLAIM WAS THE SUBJECT OF JUDGE BLOOM'S RECENT JURISDICTIONAL DECISION IN CIVIL ACTION NO. 05-MISC-243); 1/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04. Note: Claims not yet filed for 1/1/05 through 12/31/05.

*Peabody Holding Company, Inc.*: OTA Docket Nos. 05-060 RSV and 05-059 RK. Claims filed (but no OTA Docket Nos. yet assigned) for 4/1/02 through 12/31/02; 1/1/03 through 12/31/03; 1/1/04 through 12/31/04; and 1/1/05 through 6/30/05. Note: Claims not yet filed for 7/1/05 through 12/31/05.

"Warrens Cases" means, collectively, those cases filed in the United States Court of International Trade on behalf of George E. Warren Corp., Citgo Petroleum and Texaco (now ChevronTexaco), and various administrative claims filed on behalf of these clients with the United States Bureau of Customs and Border Protection, seeking to obtain drawback (refunds) of certain duties and taxes paid on the importation of petroleum and petroleum products.

All other capitalized terms used without definition in this Schedule 2.5(c) have the respective meanings set forth in the Agreement.

2.  Sharing Arrangements Regarding Black Lung Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with the Black Lung Cases will be shared between Baker and Coudert as follows:

(a)     first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Black Lung Cases;

(b)     second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Black Lung Cases; and

(c)     third, (i) with respect to proceeds received in connection with Black Lung Cases that are designated in paragraph 1 above as "Administrative Refunds Cases," Coudert will be entitled to receive all additional proceeds, and (ii) with respect to proceeds received in connection with Black Lung Cases that are designated in paragraph 1 above as "Tucker Act Cases," Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c)(ii) equals $7,000,000, after which Coudert will be entitled to all additional proceeds.

3.     Sharing Arrangements Regarding Harbor Maintenance Cases.     All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with the Harbor Maintenance Cases will be shared between Baker and Coudert as follows:

(a)     first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Harbor Maintenance Cases;

(b)     second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Harbor Maintenance Cases; and

(c)     third, Coudert will be entitled to receive 100% of all additional proceeds.

4.     Sharing Arrangements Regarding Park B. Smith Case. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Park B. Smith Case will be shared between Baker and Coudert as follows:

(a)     first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Park B. Smith;

(b)     second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Park B. Smith Case; and

(c)     third, Baker and Coudert will each be entitled to receive 50% of all additional proceeds.

5.    Sharing Arrangements Regarding Reclamation Fee Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Reclamation Fee Cases will be shared between Baker and Coudert as follows:

(a)    first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Reclamation Fee Cases;

(b)    second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Reclamation Fee Cases; and

(c)    third, Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c) equals $7,000,000, after which Coudert will be entitled to receive 100% of all additional proceeds.

6.    Sharing Arrangements Regarding Severance Tax Cases. All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Severance Tax Cases will be shared between Baker and Coudert as follows:

(a)    first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Severance Tax Cases;

(b)    second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Severance Tax Cases; and

(c)    third:

(i)    with respect to proceeds received in connection with Severance Tax Cases that are designated in paragraph 1 above as "2000-2001 Cases," Baker and Coudert will each be entitled to receive 50% of all additional proceeds; and

(ii)    with respect to proceeds received in connection with Severance Tax Cases that are designated in paragraph 1 above as "1996-1999 Cases," (A) Baker and Coudert will each be entitled to receive 50% of all additional proceeds until the aggregate proceeds to be allocated to the parties pursuant to this clause (c)(ii) equals $25,000,000, (B) to the extent such aggregate proceeds exceed $25,000,000 but are less than $30,000,000, Coudert will be entitled to receive 75% and Baker will be entitled to receive 25% of all such excess proceeds and (C) to the extent such a aggregate proceeds

exceed $30,000,000, Coudert will be entitled to receive 100% of all excess proceeds.

7. **Sharing Arrangements Regarding Warrens Cases.** All proceeds received by Baker or Coudert with respect to any judgment, settlement or other resolution in connection with any of the Warrens Cases will be shared between Baker and Coudert as follows:

(a) first, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of all client advances and other out-of-pocket expenditures made in connection with the Warrens Cases;

(b) second, each of Baker and Coudert will be entitled to recover, on a dollar-for-dollar basis, 100% of the value of its time recorded in connection with the Warrens Cases; and

(c) third, Coudert will be entitled to receive 100% of all additional proceeds.

8. **Additional Agreements Regarding Sharing of Fees.** If a law firm or other party other than Coudert or Baker is entitled to receive a portion of the proceeds of any judgment, settlement or other resolution in connection with any of the Contingency Fee Cases, such amount will be deducted before determining the respective shares of such proceeds to which Baker and Coudert are entitled in accordance with this Schedule 2.5(c). Notwithstanding the foregoing, if after the Closing Date Baker retains any co-counsel, local counsel, lobbying firm or similar party compensated on a contingent basis in connection with any of the Contingency Fee Cases and the terms of such retention entitle such party to a share of the proceeds in such Contingency Fee Case materially in excess of the share customarily provided under similar arrangements entered into by Coudert in connection with the Contingency Fee Cases prior to the Closing Date, then Baker will be required to absorb any such excess out of its share of the proceeds of any judgment, settlement or other resolution in connection with the applicable Contingency Fee Case.

9. **Value of Coudert Time.** For purposes of the foregoing sharing arrangements, the parties have agreed that the value of the time recorded by Coudert in connection with each of the Contingency Fee Cases through the Closing Date is as follows:

| | | |
|---|---|---|
| Black Lung Cases | ---- | $ 0 |
| Harbor Maintenance Cases | --- | $ 2,109,773 |
| Park B. Smith Case | --- | $ 1,238,060 |
| Reclamation Fee Cases | ---- | $ 2,352,734 |
| Severance Tax Cases | --- - | $ 2,758,565 |
| Warrens Cases | | $ 1,268,618 |

10. **Reporting.** Baker will provide Coudert with a quarterly report in reasonable detail itemizing with respect to each of the Contingency Fee Cases the value of all time recorded by Baker attorneys, the amount of all client advances and other out-of-pocket expenditures by Baker, and the amount of all proceeds received by Baker. If requested by Coudert and consented

to by the applicable client, Baker will provide Coudert with a report showing the individual attorney time entries recorded in connection with the Contingency Fee Cases.

11.     Payments.

(a)     Notwithstanding any provision of this Schedule 2.5(c) to the contrary, with respect to the period between the Closing Date and the second anniversary of the Closing Date, after such time as Coudert has received $2,000,000 in proceeds from the Contingency Fee Cases in accordance with this Schedule 2.5(c), Baker will be entitled, on a contingent basis as provided herein, to the next $1,000,000 of any proceeds received with respect to the Contingency Fee Cases to which Coudert would otherwise be entitled in accordance with this Schedule 2.5(c) but for the provisions of this Section 11(a). If the condition set forth on Schedule 2.6(a) of the Agreement is satisfied on the second anniversary of the Closing Date, Baker will promptly remit to Coudert any proceeds otherwise due to Coudert that have been retained by Baker pursuant to this Section 11(a), plus interest on such proceeds at a rate of 5% per annum. If the condition set forth on Schedule 2.6(a) of the Agreement is not satisfied on the second anniversary of the Closing Date, Baker will be entitled to retain up to $1,000,000 of the proceeds to which Coudert would have otherwise been entitled in accordance with this Schedule 2.5(c) but for the provisions of this Section 11(a), whether such proceeds are received prior to or after such anniversary date.

(b)     A party receiving proceeds in connection with the resolution of any Contingency Fee Case will remit any portion thereof due to the other party in accordance with this Schedule 2.5(c) promptly and in any event not more than 30 days after the date of receipt. Pending payment to the other party, the receiving party will segregate and hold such proceeds in trust for the benefit of the other party.

12.     Compensation of Attorneys. Coudert will be solely responsible for any compensation payable in connection with the resolution of the Contingency Fee Cases under any agreements or commitments between Coudert and its current or former attorneys, including under its compensation agreements with certain of the Lateral Attorneys. Baker will be solely responsible for any compensation payable in connection with the resolution of the Contingency Fee Cases under any agreements or commitments between Baker and any of its attorneys, including any of the Lateral Attorneys. Each party agrees to defend, indemnify and hold harmless the other party in accordance with Article 9 of the Agreement from and against any Liability arising in connection with any claim for compensation as to which the indemnifying party has agreed to assume responsibility pursuant to this paragraph.

13.     Settlement. If Baker receives a material written settlement offer, or proposes to make a material written settlement offer, in connection with a Contingency Fee Case, then Baker will seek the consent of its client to disclose the existence and terms of such offer, and if applicable Baker's recommended response thereto, to Coudert. Baker will also advise Coudert promptly that it has sought such consent from its client. Coudert may provide Baker with a written statement of its position with respect to the course of action recommended by Baker in connection with any such settlement offer, which Baker will provide to its client promptly after

- 8

receipt from Coudert. Notwithstanding the foregoing, Baker will have the sole right and responsibility to represent and advise its clients in connection with any potential settlement or other compromise involving the Contingent Fee Cases. Coudert acknowledges that the right to settle or compromise any Contingent Fee Case belongs to the client and agrees that, subject to Baker complying with its notice obligations under this Section 11, Coudert will not be entitled to object to or contest any settlement or compromise that may be agreed to in connection with any Contingent Fee Case.

14.    Termination of Representation.    At any time after the Closing Date, Baker may elect to terminate its representation in connection with any of the Contingency Fee Cases. Prior to terminating its representation in connection with a Contingency Fee Case, Baker will provide Coudert with not less than 30 days prior written notice. If requested by Coudert, Baker will cooperate with Coudert and any successor counsel designated by the client in the applicable Contingency Fee Case with respect to the transfer of client files and related matters. If Baker notifies Coudert of its decision to terminate its representation in connection with a Contingency Fee Case, Baker will be deemed to have forfeited its right to any proceeds to be received with respect that Contingency Fee Case and, as between Coudert and Baker, Coudert will be entitled to all such proceeds.

15.    No Other Rights or Obligations.    Except for the rights and obligations expressly provided in this Schedule 2.5(c), Coudert will not have any rights or obligations, including any rights to payments from Baker, with respect to any matters subject to Fee Agreements.

16.    Dispute Resolution.    Any dispute or controversy arising out of the arrangements provided in this Schedule 2.5(c) will be resolved exclusively in accordance with the dispute resolution procedures set forth in Section 12.14 of the Agreement.

Accounting

| | |
|---|---|
| Michelle Perazzo | A/P Supervisor |
| Nicholas Caswell | Billing Supervisor |
| Claire Withy | Cash Receipts |
| Annette Jordan | Time Entries, Cash Receipts |
| Ramon Castillo | Data Entry |

Information Technology

| | |
|---|---|
| Dominick Lauricella | UNIX Administrator/ Help Desk |
| Kenneth Kahn | Exchange Administrator |

Library

| | |
|---|---|
| Vija Doks | Asst. Librarian – Reference Database |
| Edward Hoover | Library Assistant |
| Brian McMains | Library Assistant |

Marketing

| | |
|---|---|
| Amanda Goldberg | Marketing |

Office Services

| | |
|---|---|
| Cecil Budhram | Office Services Manager |
| Helen Berthel | Conference Center Staff |
| Margarita Rochez | Conference Center Staff |
| Frank Calomino | Supervisor Mail Room/Page |
| Gladys Moran, | Mail Room/Page |
| Delano Beckford | Page |
| David Feijoo | Page |
| Christopher Goetz | Page |
| Ricardo Grenade | Page Dispatcher |
| Nicholas Massoni | Page |
| Larry McNeil | Page |
| Katie Hicks | Receptionist |
| Paulette McDonald | Receptionist |
| Patricia Valentino | Receptionist |
| Christine Gallagher | Records Manager |
| Gopal Gossai | Records – Corporate & Litigation |
| Derric Howard | Records – Corporate |
| Ian McLarty | Records – Warehouse |

| | |
|---|---|
| Faye McNaught | Records Supervisor- Real Estate & T&E |
| Trevor Stewart | Records Assistant Supervisor |
| Denise DiLeo | Repro/Fax |
| Donald Farrell | Repro/Fax |
| Said Hussain | Repro/Fax |
| Charles White | Repro/Fax |
| Sterling Richards | Security/ Maintenance |
| Dalton Samuels | Security/ Maintenance |
| Annette Caggiano | Switchboard |
| Barbara Mangine | Switchboard |
| Janet DeLeon | WP - Evening Supervisor |
| Faser Hardin | WP Day Coordinator |
| Lili Moy | WP - Evening |
| Joseph Russo | WP Manager |

Secretaries

| | |
|---|---|
| Amelia Abad | Secretary |
| Joan Asmundo | Secretary |
| Yelena Baturina | Secretary |
| Maureen Cafferty | Secretary |
| Mary Carroll | Secretary |
| Pearl Chin | Secretary |
| Sharren Davis | Secretary |
| Patryce Ercolano | Secretary |
| Sandra Espinal | Secretary |
| Virginia Fedus | Secretary |
| Christine Gellard | Secretary |
| Kathy Gesualdi | Secretary |
| Madeline Gonzalez | Secretary |
| Millie Gonzalez | Secretary (job share and floater) |
| Patricia Hugger | Secretary |
| Alma Montes | Secretary |
| Theresa Noto | Secretary |
| Denise Oquendo | Secretary |
| Andrea Pearlstein | Secretary |
| Claude Sasson | Secretary |
| Catherine Warwick | Secretary |

CHDMSF570815

# SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

This Second Amendment to Asset Purchase Agreement (this "Amendment") is made as of June 30, 2006 by and between Baker & McKenzie LLP, an Illinois limited liability partnership ("Baker"), and Coudert Brothers LLP, a New York limited liability partnership ("Coudert").

## PRELIMINARY STATEMENT

Baker and Coudert are parties to an Asset Purchase Agreement dated as of September 7, 2005, as amended as of September 23, 2005 (the "Agreement"), pursuant to which Coudert sold, and Baker purchased, for fair value certain specified assets relating to Coudert's New York City office. All capitalized terms used without definition in this Amendment have the respective meanings set forth in the Agreement.

The parties have agreed to amend certain provisions of the Agreement as set forth herein.

## AGREEMENT

The parties, intending to be legally bound, agree as follows:

1.    Amendment of Section 2.6(a)(vi). Section 2.6(a)(vi) of the Agreement is hereby deleted in its entirety and replaced with the following:

> "(vi)    $1,000,000 of the amount set forth in Section 2.5(d) will be paid on June 30, 2006; and"

2.    Amendment of Schedule 2.5(c). Section 11(a) of Schedule 2.5(c) to the Agreement is hereby deleted in its entirety and replaced with the following:

> "(a)    Notwithstanding any provision of this Schedule 2.5(c) to the contrary, Baker will be entitled, on a contingent basis as provided herein, to retain an amount equal to the sum of (i) $2,000,000 plus (ii) the Interest Amount (as defined below) from the first proceeds received with respect to the Contingency Fee Cases after June 30, 2006 to which Coudert would otherwise be entitled in accordance with this Schedule 2.5(c) but for the provisions of this Section 11(a).

> If the condition set forth on Schedule 2.6(a) of the Agreement is satisfied on the second anniversary of the Closing Date, Baker will promptly remit to Coudert any proceeds otherwise due to Coudert that have been retained by Baker pursuant to this Section 11(a), including any portion of the Interest Amount that has been retained. If the condition set

forth on Schedule 2.6(a) of the Agreement is not satisfied on the second anniversary of the Closing Date, Baker will be entitled to retain an amount equal to the sum of (i) $2,000,000 plus (ii) the Interest Amount from the proceeds to which Coudert would have otherwise been entitled in accordance with this Schedule 2.5(c) but for the provisions of this Section 11(a), whether such proceeds are received prior to or after such anniversary date.

The "Interest Amount" means an amount determined by applying simple interest at an annual rate of 7% to a principal balance, as determined as of the first day of each calendar month, equal to $2,000,000 minus the amount of any proceeds from the Contingency Fee Cases retained by Baker pursuant to this Section 11(a). The Interest Amount will be determined with respect to the period commencing on June 30, 2006 and ending on the date on which Baker shall have retained proceeds in the amount of $2,000,000."

3.    Computer Lease and Other Costs.

(a)    Baker agrees to pay $50,000 to Coudert as reimbursement for certain payments made by Coudert on behalf of Baker in connection with computer equipment leased by Coudert from CSI Leasing, Inc. and Bank of America, N.A. (the "Leased Equipment"). Coudert agrees to pay $10,000 to Baker as reimburse for certain payments and expenses made and incurred by Baker on behalf of Coudert. Baker agrees to pay the net amount of the foregoing obligations, or $40,000, to Coudert as of the date of this Amendment by wire transfer of immediately available funds.

(b)    Coudert agrees to execute promptly, without additional compensation, all documents reasonably requested by Baker in order to give effect to the settlement between CSI Leasing, Inc., Bank of America, N.A. and Baker with respect to the Leased Equipment.

(c)    Subject to Baker's completion of the foregoing settlement, Coudert acknowledges and agrees that no additional amounts are owed by Baker to Coudert with respect to the Leased Equipment or otherwise in connection with Coudert's lease agreements with CSI Leasing, Inc. and Bank of America, N.A. Baker acknowledges and agrees that no additional amounts are owed by Coudert to Baker with respect to payments or expenses made or incurred by Baker on behalf of Coudert on or prior to the date of this Agreement.

4.     No Other Amendment or Waiver.   The amendments with respect to the Agreement set forth in this Amendment are limited to the matters expressly set forth herein and are not intended and will not be deemed to constitute an amendment or waiver of any other provision of the Agreement.   Except as expressly amended hereby, the Agreement will continue in full force and effect in the form originally executed and delivered by the parties.   All references to the Agreement contained in any other agreement or instrument will be deemed to be references to the Agreement as amended by this Amendment.

5.     Counterparts. This Amendment may be executed in two or more counterparts.

*  *  *  *  *

The parties have executed and delivered this Amendment as of the date indicated in the first sentence of this Amendment.

BAKER & MCKENZIE LLP

By

COUDERT BROTHERS LLP

By

CHIDMS1/2429432.6