```
1   -----------------------------------------X
    In Re:                                   :Case No.06-12226(rdd)
2                                            :
         COUDERT BROTHERS LLP,               :
3                                            :  Chapter 11
                   Debtor.                   :
4                                            :
    -----------------------------------------X
5   DEVELOPMENT SPECIALISTS, INC.,           :
                                             :
6                       Plaintiff,           : Adv. P. No. 08-1490
                                             :
7       -against-                            :
                                             :
8   AKIN GUMP STRAUSS HAUER & FELD, LLP,     :
                                             :
9                       Defendant.           :
    -----------------------------------------X
10  DEVELOPMENT SPECIALISTS, INC.,           :
                                             :
11                      Plaintiff,           : Adv. P. No. 08-01491
                                             :
12      -against-                            :
                                             :
13  ARENT FOX LLP,                           :
                                             :
14                      Defendant.           :
    -----------------------------------------X
15  DEVELOPMENT SPECIALISTS, INC.            :
                                             :
16                      Plaintiff,           : Adv. P. No. 08-01492
                                             :
17      -against-                            :
                                             :
18  DORSEY & WHITNEY LLP,                    :
                                             :
19                      Defendant.           :
    -----------------------------------------X
20  DEVELOPMENT SPECIALISTS, INC.,           :
                                             :
21                      Plaintiff,           : Adv. P. No. 08-1494
                                             :
22      -against-                            :
                                             :
23  JONES DAY,                               :
                                             :
24                      Defendant.           :
    -----------------------------------------X
25  DEVELOPMENT SPECIALISTS, INC.,           :
                                             :
                        Plaintiff,           : Adv. P. No. 08-01495
                                             :
        -against-                            :
                                             :
    K&L GATES LLP,                           :
```

```
 1                                          :
                            Defendant.     :
 2  ---------------------------------------X
    DEVELOPMENT SPECIALISTS, INC.,          :
 3                                          :
                            Plaintiff,     :  Adv. P. No. 08-01496
 4                                          :
         -against-                          :
 5                                          :
    MORRISON & FOERESTER LLP,               :
 6                                          :
                            Defendant.     :
 7  ---------------------------------------X
    DEVELOPMENT SPECIALISTS, INC.           :
 8                                          :
                            Plaintiff,     :  Adv. P. No. 08-01500
 9       -against-                          :
                                            :
10  SHEPPARD MULLIN RICHTER & HAMPTON LLP,  :
                                            :
11                          Defendant.     :
    ---------------------------------------X
12                                          :
    DEVELOPMENT SPECIALISTS, INC.,          :
13                                          :
                            Plaintiff,     :
14                                          :
         -against-                          :  Adv.P.No.08-01493
15                                          :
    DUANE MORRIS, LLP,                       :
16                                          :
                            Defendant.     :
17  ---------------------------------------X
    DEVEMOPMENT SPECIALISTS, INC.,          :
18                                          :
                            Plaintiff,     :  Adv. P. No. 09-1148
19                                          :
         -against-                          :
20                                          :
    DLA PIPER RUDNICK GRAY CARY             :
21  (SINGAPORE)PTE LTD., et al.,            :
                                            :
22                          Defendants.    :
    ---------------------------------------X
23                                          :
    DEVELOPMENT SPECIALISTS, INC.,          :
24                                          :
                            Plaintiff,     :
25                                          :
         -against-                          :  Adv. P. No. 09-1149
                                            :
    DECHERT LLP,                            :
                            Defendant.     :
    ---------------------------------------X
```

```
 1                                        :
      DEVELOPMENT SPECIALISTS, INC.,      :
 2                                        :
                            Plaintiff,    :
 3                                        :   Adv. P. No. 09-1150
            -against-                     :
 4                                        :
      BAKER & MCKENZIE LLP,               :
 5                                        :
                            Defendant.    :
 6    ------------------------------------X
```

 7              MODIFIED BENCH RULING ON MOTIONS TO DISMISS
                 BEFORE THE HONORABLE ROBERT D. DRAIN
 8                 UNITED STATES BANKRUPTCY JUDGE

 9            One Bowling Green, New York, New York

10                         August 7, 2009

11
      APPEARANCES:
12
      For Plan Administrator:   DAVID J. ADLER, ESQ.
13                              JOE BOCCASSINI, ESQ.
                                McCarter & English, LLP
14                              245 Park Avenue, 27th Floor
                                New York, New York 10167
15
      For All 2008 Law         GEOFFREY S. STEWART, ESQ.
16    Firm Defendants:         PATRICIA M. CARROLL, ESQ.
                                Jones Day
17                              222 East 41st Street
                                New York, New York 10017
18
                                PATRICK MCLAUGHLIN, ESQ.
19                              Dorsey & Whitney LLP
                                60 South Sixth Street, Suite 1500
20                              Minneapolis, Minnesota 55402

21    For Defendant Sheppard    D. RONALD RYLAND, ESQ. (Telephonic)
      Mullin:                   Sheppard Mullin Richter & Hampton
22                              Four Embarcadero Center
                                Seventeenth Floor
23                              San Francisco, CA 94111

24
      For Defendant             BRETT MILLER, ESQ.
25    Morrison & Forester       Morrison Foerster LLP
      LLP:                      1290 Avenue of the Americas
                                New York, New York 10104


      For Defendant Baker       ANTHONY C. DeCINQUE, ESQ.
      McKenzie:                 Meyer Brown LLP

5

```
                              1675 Broadway
                              New York, New York 10019

For Defendant Duane           JOSEPH H. LEMKIN, ESQ.
Morris LLP:                   MICHAEL SILVERMAN, ESQ.
                              Duane Morris LLP
                              744 Broad Street, Suite 1200
                              Newark, New Jersey 07102

For Defendant Arent           MATTHEW M. WRIGHT, ESQ.
Fox LLP:                      Arent Fox LLP
                              1050 Connecticut Avenue, N.W.
                              Washington, D.C.  20036

For Defendant K&L             ERIC T. MOSER, ESQ.
Gates LLP:                    K&L Gates LLP
                              599 Lexington Avenue
                              New York, New York 10022

                              ERIC M. KAY, ESQ.
                              Quinn Emanuel Urquhart Oliver &
                               Hedges, LLP
                              51 Madison Avenue, 22nd Floor
                              New York, New York 10010
```

This is the Chapter 11 case of Coudert Brothers LLP, one of New York's oldest law firms.  The Plan Administrator under Coudert Brothers' Chapter 11 plan, which has been confirmed and has gone effective, is Development Specialists Inc., or DSI.  DSI has brought, pursuant to its authority under the plan, a number of adversary proceedings against other law firms that retained Coudert partners after or around the time that Coudert dissolved. DSI has asserted several different types of claims against the defendants, including for constructive fraudulent transfer under both section 548(a)(1)(B) of the Bankruptcy Code and the New York Debtor-Creditor Law's constructive fraudulent transfer provisions

6

incorporated by Bankruptcy Code section 544(b)(1), for turnover
of property of the estate under Bankruptcy Code section 542,
for unjust enrichment, and also for recovery of property
fraudulently transferred under section 550 of the Bankruptcy
Code.

In addition, DSI's complaints have asserted a claim
to property (namely, a right to collections on post-dissolution
work as well as pre-dissolution accounts receivable and
collections on pre-dissolution work-in-process) in connection
with former Coudert matters that DSI contends is owed Coudert
by the defendants because they allegedly retained such fees
that properly should have been paid over to Coudert under the
"unfinished business doctrine" by the former Coudert partners
that they hired.

Presently before the Court are motions to dismiss the
"unfinished business" claims by the law firm defendants, as
well as certain other motions to dismiss.  The motions have
been fully briefed, and, after oral argument, the Court told
the parties an oral bench ruling would be forthcoming.  This is
that ruling.

As with all of my oral rulings, however, I may review
and revise the transcript, certainly to correct typos and
miscitations and the like, but also for stylistic and
substantive reasons.  If I do that, and it's more than just to
correct typos, I will separately file the corrected version,

7

and that will become my ruling.  I do this because, even though
this may be only one step in a longer litigation process, I
believe it's important in bankruptcy cases for the litigants to
get results quickly from the bankruptcy court.  That's always
important in bankruptcy cases; here, it's important both for the
defendant law firms' planning purposes as well as for the
plaintiff, who has represented to the Court on numerous
occasions that the likelihood of unsecured creditors receiving
a meaningful recovery in this Chapter 11 case depends upon its
success in pursuing its litigation claims, including the ones
before me today.

        The motions to dismiss are all under Bankruptcy Rule
7012(b), which incorporates Fed.R.Civ.P. 12(b)(6), for failure
to state a claim, with the exception of a motion by various DLA
Piper entities under Fed.R.Civ.P. 12(b)(2) based on this
Court's asserted lack of personal jurisdiction over them.

        When considering a motion under Rule 12(b)(6), the
Court must assess the legal feasibility of the complaint, not
weigh the evidence that might be offered in its support.
Koppel v. 4987 Corp., 167 F.3d 125, 133 (2d Cir. 1999).  The
Court's consideration "is limited to facts stated on the face of
the complaint and the documents appended to the complaint or
incorporated in the complaint by reference, as well as to
matters of which judicial notice may be taken." Hertz Corp. v.
City of New York, 1 F.3d 121, 125 (2d Cir. 1993), cert. denied,

8

510 U.S. 1111(1993).

The Court accepts the complaint's factual allegations
as true and must draw all reasonable inferences in favor of the
plaintiff. <u>Tellabs Inc. v. Makor Issues & Rights, Ltd.</u>, 551
U.S. 308, 323 (2007). However, if a complaint's allegations are
clearly contradicted by documents incorporated into the
pleadings by reference, the Court need not accept them. <u>Labajo
v. Best Buy Stores, L.P.</u>, 478 F.Supp.2d 523, 528 (S.D.N.Y.
2007). Moreover, the Court is "not bound to accept as true a
legal conclusion couched as a factual allegation." <u>Papasan v.
Allain</u>, 478 U.S. 265, 286 (1986). Instead, the complaint must
state more than "labels and conclusions, and a formulaic
recitation of the elements of a cause of action will not do."
<u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).

Relatedly, while the Supreme Court has confirmed, in
light of the notice-pleading standard of Fed.R.Civ.P. 8(a),
that a complaint does not need detailed factual allegations to
survive a motion under Rule 12(b)(6), <u>Erikson v. Pardus</u>, 127
S.Ct. 2197, 2200 (2007); <u>Bell Atlantic v. Twombly</u>, 550 U.S. at
555, its "[f]actual allegations must be enough to raise a right
to relief above the speculative level." <u>Bell Atlantic v.
Twombly</u>, 550 U.S. at 555. The complaint must contain
sufficient facts, properly accepted as true, to state a claim
that is "plausible on its face," <u>id.</u> at 570; in other words, if
the claim would not otherwise be plausible on its face, the

9

plaintiff must allege sufficient facts to "nudge [the] claim across the line from conceivable to plausible." Id. Otherwise, the defendant should not be subjected to the burdens of discovery and the worry of overhanging litigation. Id.

Evaluating plausibility is "a context specific task that requires the . . . court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than mere possibility of misconduct, the complaint has alleged -- but it has not 'show[n]' -- 'that the pleader is entitled to relief'" under Rule 8. Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1950. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than shear possibility that a defendant has acted unlawfully." Id.

Rule 8(a) does not, however, require a claimant to set forth any legal theory justifying the relief sought on the facts alleged, requiring only sufficient factual allegations to show that the claimant may be entitled to some form of relief. Newman v. Silver, 713 F.2d 14, 15 (2d Cir. 1983); Tolle v. Carroll Touch Inc., 977 F.2d 1129, 1134 (7th Cir. 1992).

In sum, therefore, to determine the motions to dismiss, the Court must first identify the elements of the

10

applicable causes of action.  <u>Ashcroft v. Iqbal</u>, 129 S.Ct. at
1947.  Next, it must identify the allegations not entitled to
the "assumption of truth" because they are legal conclusions,
not factual allegations.  <u>id.</u> at 1951.  And, finally, it must
assess the factual allegations in the context of the elements
of the claim to determine whether they plausibly suggest an
entitlement to relief.  <u>Id.</u>

        The primary focus of the present motions to dismiss
is the defendants' contention that the complaints fail to state
a claim based on the "unfinished business doctrine."  This
issue is also the most complex among the issues raised by the
defendants.  However, I will not deal with it first, as the
question of the Court's personal jurisdiction raised by the DLA
Piper defendants' motion to dismiss under Rule 12(b)(2) is a
threshold issue.

        DSI is asserting causes of action on behalf of
Coudert's estate in a bankruptcy case.  The Court therefore
looks to federal law with regard to its personal jurisdiction,
more specifically to Bankruptcy Rule 7004(f), which provides
that "if the [Court's] exercise of jurisdiction is consistent
with the Constitution and laws of the United States, serving a
summons or filing a waiver of service in accordance with this
rule or the subdivisions of Rule 4 F.R.Civ.P. made applicable
by these rules is effective to establish personal jurisdiction
over the person of any defendant with respect to a case under

11

the [Bankruptcy] Code or civil proceeding arising under the [Bankruptcy] Code, or arising in or related to a case under the Code."

The Court's evaluation of whether it has in personam jurisdiction properly focuses, therefore, on whether the defendant has sufficient "minimum contacts" with the United States, not with any particular state, to satisfy Fifth Amendment due process, see North v. Winterthur Assurances (In re North), 279 B.R. 845, 852-53 (Bankr. D. Ariz. 2002) ("[T]he Bankruptcy Rules effectively provide for worldwide service of process, limited only by the due process clause of the Fifth Amendment . . . which requires only that the defendant have the requisite minimum contacts with the United States, rather than with the forum state"), and In re Deak & Co., 63 B.R. 422, 430 (Bankr. S.D.N.Y. 1986), as well as "traditional notions of fair play and substantial justice." Asahi Metal Indus. Co., Ltd. v. Super. Ct. Cal., 480 U.S. 102, 113 (1987); Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 B.R. 560, 567 (2d Cir. 1996).

As set forth in In re Deak & Co., 63 B.R. at 428-29, the Court therefore applies the minimum contacts analysis articulated in International Shoe v. Washington, 326 U.S. 310 (1945), and Hanson v. Denckla, 357 U.S. 235, 253 (1958). The factors discussed therein and in their progeny include the extent of the defendants' purposeful interjection into the forum

12

state, in this case, the United States; the burden on the

defendants of defending in the forum; the extent of conflict

with the sovereignty of defendants' respective states, the forum

state's (in this case, the United States') interest in

adjudicating the dispute; the most efficient judicial

resolution of the controversy; the importance of the forum to

the plaintiff's interest in convenient and effective relief; and

the existence of an alternative forum.  In re Deak & Co., 63

B.R. at 430.

        The burden ultimately remains on DSI to show that the

Court has personal jurisdiction over the defendants.  Kernan v.

Kurz-Hastings, Inc., 175 F.3d 236, 240 (2d Cir. 1999). Before

engaging in any discovery, however, the plaintiff need only

assert facts "through its own affidavits and supporting

materials" constituting a prima facie showing of personal

jurisdiction to defeat a motion to dismiss under Rule 12(b)(2).

Marine Midland Bank, N.A. v. Miller, 664 F.2d 8899, 904 (2d

Cir. 1981); PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108

(2d Cir. 1997).  The plaintiff may rely entirely on its

allegations of fact and may prevail even if the moving party

makes contrary allegations which controvert plaintiff's prima

facie case for in personam jurisdiction.  Hollins v. United

States Tennis Ass'n, 469 F.Supp.2d 67, 70 (E.D.N.Y. 2006).  As

summarized in Hollins, "District courts are afforded

considerable procedural leeway in deciding a motion to dismiss

13

for lack of personal jurisdiction, and, in determining whether
jurisdiction of the defendant has been established, the court
may consider matters outside the pleadings without converting
the motion to dismiss into a motion for summary judgment.
Because the court has not held a hearing or trial on the
merits, all pleadings and affidavits must be construed in the
light most favorable to plaintiff and all doubts must be
resolved in its favor." Id.  The foregoing is qualified,
however, by Iqbal, 129 S.Ct. at 1949, if the factual
allegations relevant to personal jurisdiction simply are not
plausible.

          Here, the complaint makes quite general and
conclusory allegations with regard to the contacts of two of
the DLA Piper defendants to the United States, and those
defendants have submitted affidavits stating that DLA Piper
Rudnick Gray Cary (Singapore) PTE Ltd. ("DLA Piper Singapore")
and DLA Piper UK LLP ("DLA Piper UK") do not have sufficient
contacts with the United States for the Court to exercise
general personal jurisdiction over them, and that, in light of
the transactions or transfers at issue, they also did not
involve themselves enough with the United States for the Court
to have specific personal jurisdiction over them.

          In response, DSI has asserted, first, that several
nominally independent "DLA Piper" firms, including DLA Piper
Singapore and DLA Piper UK, make up a worldwide business

14

organization generally or colloquially known as "DLA Piper" in a sufficiently integrated and commonly controlled way for the UK and Singapore firms to have sufficient contacts with the United States (through, among other things, controlling management located in the U.S. as well as a primary office, albeit of a different legal entity, DLA Piper Rudnick Gray Cary LLP, in the U.S. ("DLA Piper US")) to confer this Court with general in personam jurisdiction over the Singapore and UK firms.  In support of that allegation, DSI relies primarily upon a DLA Piper website from 2005, the date of the alleged avoidable transfers at issue.  In addition, DSI asserts that general personal jurisdiction can be premised upon the fact that, after the transfers at issue, "DLA Piper" through its German and UK offices represented Coudert, assisting it in the wind down of its European business and billing and receiving payment from Coudert's main office located in New York.

        Moreover, DSI asserts, the agreement providing for the transfer of Coudert's Singapore assets to DLA Piper Singapore was at least in part negotiated by that entity, or by DLA Piper US on its behalf, in the United States, giving rise to a basis for at least specific in personam jurisdiction over DLA Piper Singapore on the fraudulent transfer and unjust enrichment claims asserted against it. (The Court has specific personal jurisdiction over a foreign defendant where the defendant "purposefully direct[s] his activities at residents

15

of the forum," and the cause of action "arise[s] out of or
relate[s] to those activities," Burger King Corp. v. Rudzewicz,
471 U.S. 462, 472 (1985), even if the defendant's activity did
not take place within the forum. Id. at 476.  It is, however,
"essential . . . that there be some act by which the defendant
purposefully avails itself of the privilege of conducting
activities within the forum . . . thus invoking the benefits
and protections of its laws."  Hanson v. Denkla, 357 U.S. at
253.)

        The courts have been reluctant to find general in
personam jurisdiction on the basis of a shared associational
name or a loose business grouping of affiliated firms, however,
or based upon publicity materials such as a website describing
that loose association as an integrated worldwide business.
See Reingold v. DeLoitte Haskins & Sells, 599 F. Supp. 1241,
1254 (S.D.N.Y. 1984); Howard v. Klynveld Peat Marwick
Goerdeler, 977 F. Supp. 654, 662 (S.D.N.Y. 1997.  Nevertheless,
as articulated in the foregoing cases, DSI may establish the
Court's general in personam jurisdiction over an affiliate such
as DLA Piper Singapore or DLA Piper UK based on the presence of
the related entity in the United States if it can show the
foreign affiliate was a mere department or agency of the U.S.
entity or the U.S. entity was the foreign affiliate's agent.
See Reingold 599 F.Supp.2d at 1253-54 (stating that a
subsidiary relationship of common stock ownership is a

16

threshold minimum to [the former] finding); <u>Howard</u> 977 F. Supp
at 662.

I have reviewed the DLA Piper website introduced by
DSI, as well as considered DSI's other arguments, and I do not
believe that DSI has sufficiently alleged in either the
complaint or in its representations to the Court the degree of
an agency or control relationship involving DLA Piper US (or
"DLA Piper" controlling parties who are located in the U.S.)
with either DLA Piper Singapore or DLA Piper UK to give this
Court general personal jurisdiction over those two defendants.
<u>Id.</u>  I also do not believe that the mere provision of services
in Europe by DLA Piper UK to Coudert in winding down Coudert's
European affairs, and Coudert's payment for such services
having been made from Coudert's New York office, represents
sufficient contacts with the United States to confer general <u>in</u>
<u>personam</u> jurisdiction over it.

DSI's allegation that the Singapore asset transfer
was negotiated at least in part in New York by either the
Singapore office or U.S. representatives or agents was not made
in a sworn statement but only as a representation by DSI's
consultant during oral argument (albeit, however, that this
person had previously been a Coudert partner who was intimately
involved in the wind down of Coudert's affairs).  Consequently,
I also do not believe that there is a sufficient plausible
basis in this record to confer on the Court specific personal

17

jurisdiction over DLA Piper Singapore in respect of DSI's claims pertaining that transfer.

In addition, however, DSI has requested jurisdictional discovery to determine whether there are more facts that it can show to establish that the Court has personal jurisdiction (either general or specific) over DLA Piper UK and DLA Piper Singapore.  The standard for granting such discovery accords even more leeway to the plaintiff, and ultimately to the Court, than the <u>prima</u> <u>facie</u> showing standard that I've quoted earlier for purposes of a Rule 12(b)(2) motion. At least I believe that is where the courts in the Second Circuit have taken the law since the arguably more narrow holding of <u>Jazini by Jazini v. Nissan Motor Co.</u>, 148 F.3d. 181 (2d Cir. 1998), where, moreover, the plaintiff made only conclusory statements without <u>any</u> supporting facts that a foreign defendant was wholly controlled by a U.S. affiliate and the court upheld the denial of extensive jurisdictional discovery.

Courts will permit jurisdictional discovery where the "plaintiff made less than a <u>prima</u> <u>facie</u> showing but has 'made a sufficient start toward establishing personal jurisdiction.'" <u>Hollins v. United States Tennis Ass'n</u>, 469 F.Supp.2d at 71 (citing <u>Uebler v. Boss Media, AB</u>, 363 F.Supp.2d 499, 506-07 (S.D.N.Y. 2005)).  I believe that DSI has asserted a sufficient basis to establish that it is entitled to additional jurisdictional discovery, including the statement at oral

18

argument that DLA Piper negotiated the Singapore transfer at least partly in New York and by introducing the 2005 DLA Piper website materials. These show that the plaintiff has made a sufficient start towards establishing personal jurisdiction over DLA Piper Singapore and DLA Piper UK, i.e., that DSI's allegations are merely insufficiently developed as opposed to wholly conclusory. See generally Hollins v. United States Tennis Ass'n, 469 F.Supp.2d at 71-2; Uebler v. Boss Media, AB, 363 F.Supp.2d at 506-07.  In other words, I believe that, consistent with the latter holding, the materials submitted and DSI's representations have contained averments that, with additional proof, could suffice to establish personal jurisdiction.

The website describes DLA Piper's worldwide leadership as comprising a three person committee, two of whom are located in the United States; moreover, it states that this committee oversees the worldwide entity's activities and, in particular, focuses on growth through mergers with and acquisitions of other law firms and practices.  At least one DLA Piper website posting, from September 2005, describes that committee as having agreed to the acquisition of a firm in Brussels.  Therefore, it appears that further discovery is warranted to determine whether that management group (a) exerted sufficient control over DLA Piper Singapore and DLA Piper UK, at least in respect of the types of transfers

19

underlying the claims here asserted, i.e. the transfer of the
dissolving Coudert's assets in Singapore to DLA Piper Singapore
and the receipt by DLA Piper Singapore and DLA Piper UK of
unfinished business from former Coudert partners who migrated
to those firms.  Similarly, I believe the representation at
oral argument by DSI's consultant that the agreement regarding
the Singapore asset transfer was negotiated in part in the
United States was sufficiently concrete to justify further
discovery as to the Court's specific personal jurisdiction over
DLA Piper Singapore in connection with that transaction.

So I will grant dismissal as to DLA Piper Singapore
and DLA Piper UK without prejudice, and grant DIS the right to
take jurisdictional discovery whose fruits may be reflected in
an amended complaint with more focused, plausible
jurisdictional allegations.

Defendant Baker & McKenzie has sought to dismiss the
complaint against it on the theory that the unfinished business
claim asserted against it is not plausible under <u>Iqbal</u> and
<u>Twombly</u>.  It has also asserted that the examiner's report
attached to the disclosure statement for Coudert's confirmed
chapter 11 plan, in which the examiner reviewed and considered
causes of action against individual Coudert partners, so
clearly stated the examiner's position that Coudert's transfer
of assets to Baker & McKenzie was fair that allegations in the
complaint to the contrary regarding such transfer are not

20

plausible and, therefore, under <u>Iqbal</u> and <u>Twombly</u> should be dismissed.

I did not take away from Baker & McKenzie's motion or from its counsel's oral argument that Baker & McKenzie is also relying on a theory of judicial estoppel with respect to the incorporation of the examiner's report in Coudert's disclosure statement.  However, defendant Dechert LLP did raise such a judicial estoppel argument in its motion to dismiss, based on a similar discussion in the examiner's report regarding a transfer by Coudert to Dechert; therefore, I have also considered Baker & McKenzie's motion in the light of a possible judicial estoppel argument.  I will address that point in a moment, however, in the context of Dechert's motion to dismiss.

DSI's complaint asserts a claim against Baker & McKenzie based on the "unfinished business doctrine" in only the barest, most conclusory terms.  The complaint does not identify particular former Coudert partners who moved to Baker & McKenzie or matters upon which those partners were working at the time of Coudert's dissolution and, therefore, does not point out in sufficient detail which "unfinished business" DSI is seeking to recover from Baker & McKenzie.  Baker & McKenzie further contends that as a result of the Asset Purchase Agreement between it and Coudert dated September 7, 2005 (the "Baker & McKenzie APA") it specifically purchased Coudert's inventory, consisting of accounts receivable and work in

process, in addition to other assets of Coudert, and,
therefore, in light of the terms of the Baker & McKenzie APA,
which is referred to in the complaint, it is clear that Coudert
would have no further claim for "unfinished business" or an
accounting therefor from Baker & McKenzie.

Given the sparse, conclusory nature of the
complaint's allegations with regard to the "unfinished business
doctrine" claim against Baker & McKenzie, especially when
viewed in the context of the Baker & McKenzie APA and the
examiner's discussion of the nature of the sale under the Baker
& McKenzie APA, it appears to me that the complaint does not
set forth sufficient facts to withstand Baker & McKenzie's
motion to dismiss under <u>Iqbal</u>. (On the other hand, I believe
that I would entertain favorably a request to amend the
complaint, which DSI has stated it will be making, given the
status of this litigation.)

It is the Court's obligation to enforce the intention
of the parties with respect to their Asset Purchase Agreement,
and it's clear under New York law that the plain language of the
Agreement should govern the Court's determination of the
parties' intentions. <u>In re TL Admin. Corp.</u>, 337 B.R. 827, 829-
30 (Bankr. S.D.N.Y. 2006). I have reviewed the Baker &
McKenzie APA and, in particular, the description in the APA of
the Coudert assets to be sold. It is clear from that
description that, with one exception, there is no provision of

22

the APA that specifically identifies "unfinished business,"
that is, business, in addition to work in process, consisting
of matters that Coudert was handling at the time of its
dissolution that partners in Coudert would subsequently be
working on while at Baker & McKenzie.  (The exception relates
to the provision of the Baker & McKenzie APA dealing with
contingency fee cases, which is set forth in Section 2.1.b.,
which would defeat DSI's unfinished business claim as it
relates to such matters.) Section 2.1.i of the APA does state
that Baker & McKenzie is also acquiring "all rights, claims and
defenses of Coudert relating to any of the assets or assumed
liabilities whether choate or inchoate, known or unknown,
contingent or non-contingent;" however, Section 2.2 of the APA
states that "all assets, rights or properties of Coudert that
are not enumerated as Assets in Section 2.1 will be excluded
from the sale and purchase contemplated by the agreement and
will remain the property of Coudert after the closing."

          In light of the foregoing, I am not prepared to hold
that the plain terms of the Baker & McKenzie APA dictate that
Baker & McKenzie receive in return for the purchase price all
property that would otherwise be property of Coudert under the
"unfinished business doctrine," except insofar as it dealt with
contingency fee matters.  The term "relating to" in Section
2.1.i. could be read quite broadly.  On the other hand, it
could be read more narrowly, given that the APA did separately

23

deal with contingency fee matters.  Further, there may well have been restrictions on the ability of these two parties, as an ethical matter, to sell and purchase cases that were pending, in contrast with work in process and accounts receivable, which may have limited how they could document such a transfer with the exception of the general, catch-all language of Section 2.1.i.  On the other hand, there is no specific waiver in the APA by Coudert of its rights in respect of "unfinished business," and the doctrine really applies to Coudert's claims against its former partners and only indirectly, through turnover, unjust enrichment, or fraudulent transfer claims, against the law firms that hired them and received payment on their unfinished Coudert matters, including Baker & McKenzie; thus, it is possible that Coudert and Baker & McKenzie would have needed to add much more specific language to their agreement to protect Baker & McKenzie from such claims.

I don't believe, therefore, that the ambiguities in the Baker & McKenzie APA identified by DSI's counsel are contrived; it will require additional factual development for me to determine the parties' intent. Therefore, I do not believe that the APA itself precludes pursuit of claims premised upon an underlying right to unfinished business against Baker & McKenzie (except, again, to the extent the APA deals expressly with contingency fee matters).  That aspect of Baker &

24

McKenzie's motion to dismiss accordingly is denied, although,
if is fair to say, I remain skeptical of DSI's unfinished
business claim against Baker & McKenzie, in light of the APA,
even if DSI succeeds in amending the complaint to provide a
sufficient factual context for the claim, as discussed above,
to survive a motion to dismiss.

Dechert LLP has moved to dismiss the complaint
against it, which seeks to avoid the transfer of various assets
in Paris to Dechert, on two grounds in addition to raising the
same objections that the other movants have raised with respect
to DSI's "unfinished business doctrine" claims.  First, like
Baker & McKenzie, Dechert asserts that the complaint's
"unfinished business" claim is of such a bare bones nature and
so conclusory that it is not plausible under Rule 8 and Iqbal.
It also seeks to dismiss the fraudulent transfer claim in light
of, as did Baker & McKenzie's motion, the discussion in the
examiner's report of the transfer of the Paris assets to
Dechert, questioning how DSI can plausibly claim that such
transfer is avoidable given what the examiner had to say about
it.

In addition, Dechert asserts that judicial estoppel
precludes DSI's claim that the sale of Coudert's Paris assets
should be avoided as a constructive fraudulent transfer,
premised upon the incorporation of the examiner's report, which,
again, discussed the fairness of the Paris transfer, in the

25

Disclosure Statement for Coudert's confirmed chapter 11 plan.

Unlike the complaint against Baker & McKenzie, however, DSI's complaint against Dechert satisfies Fed.R.Civ.P. 8 both as to the fraudulent transfer claim and the claim premised upon the unfinished business doctrine.  It also is not barred by judicial estoppel.  Generally speaking, except with respect to intentional fraudulent transfers (which DSI does not assert against Dechert), the pleading of a fraudulent transfer claim is governed by Rule 8(a), incorporated by Bankruptcy Rule 7008, which requires, in addition to plausible allegations under Iqbal, only that the allegations give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  In re M. Fabrikant & Sons, Inc., 394 B.R. 721, 735 (Bankr. S.D.N.Y. 2008).  Generally speaking, the elements of a constructive fraudulent transfer claim may be satisfied for purposes of a motion to dismiss by identifying the transfer, by plausibly alleging that it was made at a time when the transferor was insolvent or its financial condition met one of the other financial tests of the relevant fraudulent transfer law, and by plausibly alleging that the transfer was for less than fair consideration or less than reasonably equivalent value.  I believe that has been sufficiently set forth in the complaint to apprise Dechert of the nature of DSI's claim and to permit it to mount a defense.  See In re M. Fabrikant & Sons, Inc., 394 B.R. at 736, as well as Loblaw, Inc. v. Wylie,

26

50 A.D.2d 4, 375 N.Y.S.2d 706, 709 (App. Div. 4th Dept. 1975).

 IDC Corp. v. Illuminating Experiences, Inc., 220 A.D.2d 337,
633 N.Y.S.2d 18 (App. Div. 1st Dept. 1995), cited by Dechert,
is not to the contrary.  That case in referring to "requisite
particularity" cited New York CPLR section 3016(b), which
pertains to intentional fraud, which, of course, would here be
governed also by Fed.R.Civ.P 9(b) if, in fact, DSI were
pleading an intentional fraudulent transfer claim, which it is
not.  (Moreover, to the extent IDC Corp. v. Illuminating
Experiences is relevant to DSI's constructive fraudulent
transfer claim against Dechert, it is distinguishable for the
reasons discussed below.)

        I'm also not persuaded by In re Global Link Telecom
Corp., 327 B.R. 711, 718 (Bankr. D. Del. 2005), cited by
Dechert, that DSI's fraudulent transfer claim against Dechert
is so conclusory that it fails to state a claim. Unlike the
claim asserted in Global Link, DSI's complaint against Dechert
identifies the specific transfers at issue, the consideration
therefor, and also, I believe, sufficiently pleads Coudert's
dire financial condition at the time of the transfer, as well
as the fact that Coudert was going out of business when it made
the transfers.  I believe, therefore, that Dechert's reliance on
Iqbal as it pertains to DSI's fraudulent transfer claim is
unavailing and Dechert's motion should be denied.

        With regard to DSI's unfinished business claim

27

against Dechert, I also believe that paragraphs 20 through 22 and 40 through 50 of the complaint satisfy Rule 8 and <u>Iqbal</u>. The complaint identifies partners in Coudert who subsequently, upon the transfer of the Paris office to Dechert, became partners in Dechert or went to work for Dechert.  It also identifies the matters upon which they were working when they went to work for Dechert and the amount on Coudert's books, in terms of accounts receivable and work in progress, at the time. One can readily infer from the foregoing that those former Coudert partners brought those matters with them to Dechert and continued to work on them and continued to be paid on them going forward, not only for accounts receivable and the work that was in process but also for new work on those matters that they subsequently performed after they moved to Dechert.  I believe that is sufficient for purposes of alerting Dechert to the nature of DSI's unfinished business claim and permitting it to mount a defense, as well as plausibly states an unfinished business claim, for the reasons that I will discuss at more length later.

        Additionally, as I noted, Dechert contends that the discussion of the Paris transfer in the examiner's report, which was incorporated into Coudert's disclosure statement for its chapter 11 plan, should judicially estop DSI from now attacking the sale of the Paris office as a fraudulent transfer.

        The doctrine of judicial estoppel protects the

28

integrity of the judicial process by prohibiting parties from
changing positions before tribunals according to the pressures
of the moment.  New Hampshire v. Maine, 532 U.S. 742, 749-50
(2001).  But it does not pertain to any change in position. The
Supreme Court has identified three additional factors that,
taken together with a change in position before a tribunal,
warrant a finding of judicial estoppel.  First, a party's later
position must be "clearly inconsistent with its earlier
position;" second, the party must have successfully persuaded a
court to adopt its earlier position and the subsequent adoption
of the later inconsistent position would "create the perception
that either the first or second court was misled;" third, it
must be found that the party "would derive an unfair advantage
or impose an unfair detriment on the opposing party if not
estopped."  Id. at 750-51 (although, as the Court noted at 751,
additional considerations may inform the doctrine's application
in a specific factual context).  The Second Circuit has taken a
fairly narrow view of the doctrine, stating that judicial
estoppel is limited "to situations where the risk of
inconsistent results with its impact on judicial integrity is
certain."  Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 148
(2d Cir. 2005) (citing Simon v. Safelite Glass Corp., 128 F.3d
68, 72 (2d Cir. 1997)).  See generally In re Oneida Ltd., 383
B.R. 29, 40-41 (Bankr. S.D.N.Y. 2008), rev'd on other grounds,
562 F.3d 154 (2d Cir. 2009); In re Allegiance Telecom, Inc.,

29

356 B.R. 93, 107 (Bankr. S.D.N.Y. 2006).

Also relevant to Dechert's judicial estoppel argument
is In re I. Appell Corp., 300 B.R. 564, 570 (S.D.N.Y. 2003),
where the court concluded that a discussion in a chapter 11
disclosure statement of the proposed retention and pursuit of
causes of action after confirmation of the proposed chapter 11
plan was not a basis for judicial estoppel.  As the I. Appell
court noted, "it is neither reasonable nor practical to expect
a debtor to identify in its plan of reorganization or
disclosure schedules every outstanding claim it intends to
pursue with the degree of specificity that the [defendants]
would require. As other courts reaching this conclusion have
noted, mandating a specific description of every claim the
debtor intends to pursue could entail months or years of
investigation and a corresponding delay in the confirmation of
the plan of reorganization."  300 B.R. at 569.

I have reviewed the examiner's report that was
incorporated into and discussed at length in Coudert's
Disclosure Statement and note, first, that the limited purpose
of that report is very clearly described therein: to evaluate
potential claims against Coudert partners, not transferee law
firms, in order to explain the examiner's recommendation of a
partner-by-partner contribution or payment program for the
chapter 11 plan.  The report expressly does not address claims
against third parties, such as the present law firm defendants.

30

Page 4 of the examiner's report states, "the examiner takes no
position as to the viability of any potential claims against
such third parties, including law firms that acquired Coudert's
practice groups or offices."  On the same page, the examiner
also states that "claims relating to the so-called unfinished
business doctrine, see Jewel v. Boxer, 156 Cal.App.3d 171
(Cal.App.1st.Dist. 1984), involve primarily the potential
liability of successor firms that bought assets of the firm and
are not addressed in this report." (Emphasis added.)

        The examiner's report also addresses at some length
in various sections, though, claims against individual partners
that are at least related to sales by Coudert of assets or
offices to other law firms.  However, the examiner's analysis
is limited, in keeping with the purpose of his report, to
whether these transactions might give rise to any breach of
fiduciary duty claims against individual partners, not
fraudulent transfer or unfinished business claims against the
transferee firms.  As stated at pages 7 and 8 of the report,
the examiner concluded that there were no such viable claims
against individual partners or, at least, that no adjustment in
the partner contribution plan for management partners was
warranted based on a breach of fiduciary duty theory relating
to such transactions (although the report notes a possible
exception with respect to the Dechert Paris transaction, but,
as discussed in section 3 of the report, the examiner proposed

31

no additional payments by partners on account of the Dechert
Paris transaction).  See examiner's report, footnote 17 on page
8.

        At pages 32 and 33 of the report, the examiner
discusses his conclusion regarding that nature of the fiduciary
duty of Coudert's partners owed to creditors of the
partnership, noting that, generally, the business judgment rule
would apply to those managing the firm's property after its
dissolution but that the business judgment standard would be
trumped by a duty of loyalty that could be implicated in regard
to certain sales of assets or offices to other law firms.  The
examiner concludes that the Dechert transaction was "arguably"
not reviewable under the business judgment standard because
that transaction relieved all former partners of the firm,
including the special situations committee member, Anthony
Williams, who approved the transaction, of potential liability
for the Paris office's debts.  Nonetheless, the examiner's
review indicated that as to all the transactions, including the
Paris sale, there were arm's length negotiations between the
debtor and the acquiring law firms.  Id. at 35.

        It's important to note again, however -- and, in
fact, the examiner's report does so note two paragraphs later -
- that the context of the examiner's review was to consider
whether there was a breach of the duty of loyalty by the
applicable partner.  It is with a focus on whether the relevant

32

managing partner was abusing a duty of loyalty that the
examiner states that the negotiations were at arm's length and
in good faith.  As I just noted, the examiner says at the
bottom of page 35, two paragraphs later, that from his analysis
of potential partner liability in connection the four asset
sale transactions that he has investigated, including the
Dechert transaction, he has determined that it was not
necessary to perform an independent valuation of the assets
transferred. Further, the examiner states at the top of page 36
that even absent any claims against the management partners
relating to the transactions, there may still be claims against
the purchasing firms for acquiring practices of greater value
than the consideration they paid while Coudert was insolvent.

        In addition to the plain import of that last
sentence, it should have been clear upon Dechert's review of
the examiner's report as a whole that a <u>constructive</u> fraudulent
transfer does not depend upon the bad faith or state of mind of
either party to the transaction (which was the examiner's
focus), but is premised, instead, on objective factors relating
to the value of the assets transferred and the consideration
received therefor, as well as the financial condition of the
transferor.  Therefore, it is clear from reviewing the
Disclosure Statement that the examiner's report was not opining
on and, in fact, noted the risk of avoidance of, the Dechert
transaction as a fraudulent transfer.  It's in that light, I

33

believe, that one would review the examiner's discussion on page
41 dealing with the Dechert transaction, in which the examiner
recommends that there be no additional upward adjustment to the
partner contribution plan matrix for Mr. Williams in connection
with Coudert's entry into the Dechert transaction, because Mr.
Williams acted in good faith when he approved the transaction
and, further, that "he may have been correct in the assessment"
(not that he was correct in the assessment).  Examiner's Report
at 41.

In addition, Coudert's plan and Disclosure Statement
quite clearly preserve the estate's unfinished business
doctrine claims as well as all other causes of action except as
specifically released, including, therefore, the fraudulent
transfer claims against Dechert.  See Disclosure Statement
pages 45 and 57.  Thus, the Disclosure Statement provided
sufficient warning to Dechert (and to the other defendants,
including Baker & McKenzie) that they were at risk as potential
targets of this litigation after confirmation of Coudert's
chapter 11 plan.  See In re I. Appell 300 B.R. at 571.

Consequently, I do not believe that in approving the
Disclosure Statement I adopted a position advocated by Coudert,
in whose shoes DSI now stands, that is clearly inconsistent
with the fraudulent transfer claim asserted against Dechert in
respect of the Paris office sale, or the unfinished business
claim against Dechert.  (The same may be said of the claims

34

against Baker & McKenzie to the extent Baker & McKenzie would rely upon judicial estoppel.)  Insofar as Dechert's motion seeks the dismissal of the fraudulent transfer and unfinished business claims on either Rule 8 grounds or judicial estoppel grounds, therefore, its motion is denied.

Now, turning to the commonly shared basis for the motions to dismiss, which is the assertion that the respective complaints fail to state a claim based on the "unfinished business doctrine," I should note, first, that this issue, given that Coudert is a New York partnership, is governed by New York law.

New York law is clear on certain aspects of the "unfinished business doctrine," but it is murky or requires more parsing with regard to certain important aspects of the doctrine, some of which relate to these motions.  Where New York law is unsettled, my obligation is to predict how the highest court of New York would resolve such uncertainty or ambiguity; and in making that prediction, I'm to give the fullest weight to pronouncements of the state's highest court, while giving proper regard to relevant rulings of the state's lower courts.  I also may consider decisions in other jurisdictions on the same or analogous issues.  See generally Santalucia v. Sebright Transp. Inc., 232 F.3d 293, 297 (2d Cir. 2000).

The New York Court of Appeals has not addressed the

35

unfinished business doctrine.  Instead, I must rely on a number

of decisions at the Appellate Division and lower court level,

as well as decisions of courts applying other states' laws

(which is particularly appropriate here, given the Uniform

Partnership Act underpinnings of the doctrine, applicable in

all states, like New York, that have adopted the Uniform

Partnership Act).  However, as will be evident from my ruling,

the doctrine as enunciated by the lower courts of New York and

as summarized by the Second Circuit in the <u>Santalucia</u> case is

not a model of clarity as it applies to the present complaints,

although most open issues do not need to be addressed at the

motion to dismiss stage.  Therefore, if I had the power, this

would be a case for certification to the New York Court of

Appeals; however, the New York Constitution precludes that

course except for requests by the Second Circuit.

It is clear from several cases in New York, as well

as the <u>Santalucia</u> court's discussion of certain of those cases,

that, because of the fiduciary duties owed by partners to each

other, a dissolved New York partnership retains an interest in

matters, cases, and representations taken from the dissolved

partnership by its former partners, including not only when the

former partners finish the matter on his or her own but also

when he or she joins a new partnership and finishes the matter

there.  Under the doctrine, the dissolved partnership's

interest in its "unfinished business" goes beyond accounts

36

receivable and work in process in existence at the time of the firm's dissolution, and the partner's exit, to include amounts generated from work performed on the unfinished matters thereafter.  The first case on a national level applying this doctrine to law partnerships, Jewel v. Boxer, 156 Cal.App.3d 171, 203 Cal. Rptr. 13 (Cal.App. 1st Dist. 1984), has been specifically recognized and followed by courts in New York. See Kirsch v. Leventhal, 181 A.D.2d 222, 586 N.Y.S.2d 330, 332 (App. Div. 3d Dep't. 1992), which cites the Jewel v. Boxer case and numerous non-New York cases following it that apply the doctrine.

        As noted, the basis for the unfinished business doctrine is found in the Uniform Partnership Act, more specifically in Section 43 of the New York Partnership Law, which states in Section 43.1 that "every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property." (The Kirsch court thus noted the appropriateness of considering such cases given that they were decided in states which, like New York, have adopted the Uniform Partnership Act, upon which the doctrine rests.  Id. at 332.)

        Also relevant to the doctrine is New York Partnership

37

Law Section 40.6, which states that "No partner is entitled to remuneration for acting in the partnership business except that a surviving partner is entitled to reasonable compensation for his services in winding up the partnership affairs."  As will become more evident in a moment, although Section 73 of the New York Partnership Law does not deal with the dissolution or liquidation of a partnership, unlike Sections 43.1 and 40.6, it is also relevant to the issues before the Court, primarily because it has been cited by so many decisions in New York relating to the rights of partners and the partnership in unfinished business that travels with a former partner to a new firm.  Section 73 states that "when any partner retires or dies and the business is continued under any of the conditions set forth in Section 72 or Section 69 without any settlement of accounts as between him or his estate and the person or partnership continuing the business, unless otherwise agreed, he or his legal representative as against such persons or partnership may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at his option or at the option of his legal representative, in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership; provided that the creditors of the dissolved partnership as against the separate

38

creditors, or the representative of the retired or deceased

partner, shall have priority on any claim arising under this

section."  NY CLS PARTN. § 73 (2009).

            It was originally argued by certain of the defendants

(before the Court directed additional briefing upon the

withdrawal of lead counsel for the defendants after its client

settled with DSI) that the unfinished business doctrine, to the

extent it applies at all in New York, applies only to

contingency fees and not to cases where the billing

relationship is on an hourly basis.  There is no decision in

New York that directly addresses this contention. However,

there is well-reasoned authority from other jurisdictions

applying the same underlying "unfinished business" theory to

hourly fee matters.  Based on those highly persuasive

precedents, I conclude that to the extent that DSI is seeking

to assert claims based on the unfinished business doctrine with

respect to hourly fee matters, in addition to contingency fee

matters or hybrids of the two billing methods, it may do so and

that the motions to dismiss on that basis should be denied.

See, among other authorities, Robinson v. Nussbaum, 11

F.Supp.2d (D.D.C. 1997); Ellerby v. Spiezer, 485 N.E.2d 413

(Ill. App. 1985); In re LaBrum & Doak LLP, 227 B.R. 391 (Bank.

E.D. Pa. 1998); and In re Brobeck, Phleger & Harrison LLP, 408

B.R. 318 (Bankr. N.D. Cal. 2009).

            I also believe that it is clear that the doctrine

39

applies not only to general partnerships but also to LLPs, such
as Coudert, premised upon the duties that the partners in
Coudert had to each other -- such inter-partner duties, again,
serving as the underlying basis for the rule.  See Santalucia
v. Sebright Transp., 232 F.3d at 299; see also Sufrin v.
Hosier, 896 F. Supp. 766, 767-68 (N.D. Ill. 1995) (unfinished
business doctrine applied to a professional corporation).

        In addition, the defendants have argued (as at it has
been frequently, though unsuccessfully, argued in opposition to
the unfinished business doctrine) that the rule improperly
impinges on or restricts the rights of clients to decide to
retain their chosen attorneys, and, thus, violates public
policy.  Clearly, law firms cannot sell clients, and lawyers
cannot prevent a client from switching counsel, or, more aptly,
switching firms to follow a lawyer when the lawyer leaves the
firm in which he or she was a partner.  However, every court
that has considered the public policy argument has concluded
that, given the underlying nature of the doctrine, which is,
again, based on the fiduciary duties as among partners, not on
the client's obligations to the dissolved firm, the rule does
not violate either public policy or applicable ethical rules.

        The public policy objection was first raised in the
Jewel case, itself and has been addressed favorably to DSI's
position, I believe, every time thereafter (or at least by the
great majority of cases) when the public policy argument has

40

been raised.  See generally In re LaBrum & Doak LLP, 272 B.R.

at 413-15; First Union Nat'l Bank v. Meyer Faller Weisman &

Rosenberg, P.C., 125 Md.App. 1, 723 A.2d 899 (Md. App. 1999);

and Sufrin v. Hosier, 896 F. Supp. at 768-69.  The doctrine

does not restrict the client's choice of counsel or firm; it

merely provides for the allocation of the former partner's fees

from the ongoing matter to the dissolved firm.  So, therefore,

I do not accept the public policy argument raised by the

motions to dismiss as a valid basis for dismissing the various

complaints' claims based on recovery of amounts owing in

respect of unfinished business.

        That still leaves two important issues, however.

First, DSI would have the unfinished business rule apply here

as it was applied by the Appellate Division in Rhein v. Peeso,

194 A.D. 274, 185 N.Y.S. 150 (App. Div. 1920), in which the

court held that after the dissolution of a dental partnership

the partner who subsequently did all the work making a new

bridge for the client of the former partnership had to share

all the proceeds of that work with his former partner who had

done nothing in respect to such post-dissolution work for the

former client.  In addition, the Appellate Division held that -

- consistent with New York Partnership Law Section 40.6 -- the

partner who did the work should not be compensated for such

work but should merely share the profits, if any, with his

former partner.  Id. at 276.  DSI argues that this means that

41

the partner who completes the work should not be compensated
the reasonable value of doing so.  On the other hand, even
Jewel v. Boxer acknowledged, as I believe I must, in keeping
with most of the cases that I have reviewed applying the
unfinished business doctrine outside of New York, that the
amount of unfinished business constituting property of the
dissolved partnership to be shared is the net profits on the
continuing matters, minus overhead.  See, for example, Judge
Montali's summary of the Jewel v. Boxer rule in In re Brobeck,
Phleger & Harrison, in which he states "[U]nder California law
the unfinished business of a law partnership is any business
covered by a retainer agreement between the firm and its
clients for the performance of partnership services that
existed at the time of dissolution. It includes matters in
progress but not completed when the firm is dissolved
regardless of whether the firm is retained to handle the
matters on an hourly or a contingency basis.  What constitutes
unfinished business must be determined on the date of
dissolution of the partnership, not based on events occurring
thereafter.  Absent an agreement to the contrary, a
partnership's assets include attorney's fees received by the
partnership for cases in progress at dissolution and such fees
minus overhead and reasonable compensation.  It is that amount
that must be shared among all partners in accordance with the
partnership interest of each regardless of which partner

42

performs the services for winding up purposes."  408 B.R. 318,
333 (Bankr. N.D. CA. 2009) (citing Jewel v. Boxer 156 Cal.
App.3d at 179) (emphasis added).  A similar view was taken by
the bankruptcy court in In re LaBrum & Doak LLP, in which the
court refers to the "net profits" of unfinished business being
property of the dissolved partnership's estate under the
unfinished business rule.  227 B.R. at 419-20.

        In addition, adding additional complexity to the
analysis, with respect to contingency fee cases involving
dissolved partnerships, New York courts, as summarized by the
Second Circuit in Santalucia, have described the unfinished
business doctrine as requiring that, absent an agreement to the
contrary, a dissolving law firm is entitled to the value of the
contingent fee at the time of dissolution with the important
caveat "that to the extent that a successful settlement of a
pending contingent fee case post dissolution is due to a
surviving partner's post dissolution efforts, skill and
diligence the dissolved firm has no cognizable property
interest in the fee.  Thus, in a case where a lawyer departs
from a dissolved partnership and takes with him a contingent
fee case which he then litigates to settlement, the dissolved
firm is entitled only to the value of the case at the date of
dissolution with interest.  Stated conversely, the lawyer must
remit to his former firm the settlement value less the amount
attributable to the lawyer's efforts after the firm's

43

dissolution."  232 F.3d at 297-98.

         The movants contend that the foregoing language, which accurately summarizes the doctrine as applied to contingency fees by numerous New York courts, both before and after <u>Santalucia</u>, substantially curtails the unfinished business doctrine and, indeed, when applied to hourly fee matters, essentially negates it.  The defendants thus argue that, although paying lip service to the doctrine, by stating that the dissolved firm has a property interest in the value of a pending matter <u>as of a dissolution date</u>, the courts in New York very clearly focus on the efforts of the partner who continues to work on the matter post-dissolution, and, if those efforts result in the successful settlement of the matter or if the successful conclusion of the matter is due to or attributable to that partner's efforts, skill and diligence, <u>all</u> of the post-dissolution value is entitled to be retained by that partner and is not property of the dissolving firm.

         The defendants argue, further, that the value of an hourly fee matter as of the date of dissolution must logically be limited to the hours worked on the matter before dissolution, because each hour is paid for pursuant to established hourly rates and the successful post-dissolution completion of the matter, as reflected in those rates, must be attributable solely to the hours billed post-dissolution.

         I do not believe, however, that this the right

44

interpretation of the formulation set forth in Santalucia and
the cases that it summarizes, including Kirsch v. Leventhal,
586 N.Y.S.2d at 330; Shandell v. Katz, 217 A.D.2d 472, 629
N.Y.S.2d 437 (App. Div. 1st Dep't 1995); and Murov v. Ades, 12
A.D.3d 654, 786 N.Y.S.2d 79 (App. Div. 2nd Dept. 2004).  I say
that for two primary reasons.  First, the movants' argument
essentially asks the Court to infer that the New York courts
have tacitly abrogated the unfinished business doctrine that
they nevertheless say applies in New York and that, in fact,
they have not only insisted on a bright line valuation of the
unfinished matters as of the firm's dissolution (which, after
all, is the rule under Jewel v. Boxer and all of the other
cases applying the doctrine), but would, in addition, subtract
from that value the value of any time billed or (in the case of
contingency fee matters) efforts expended post-dissolution.  If
that were the case, however, I do not believe that the New York
courts would have engaged in the inquiry that they have, but
would simply have said that there is no such rule as the
unfinished business doctrine in New York.  The foregoing
decisions do not even come close to acknowledging this,
however.

        Moreover, the Second Circuit in Santalucia, as well
as the First Department in Shandell, specifically concluded
that it would be improper to make such a bright line
distinction on a quantum meruit basis between pre-dissolution

45

and post-dissolution work and to divide up a post-dissolution
contingency fee on such a basis.  Shandell, 629 N.Y.S.2d at
438-39; Santalucia, 232 F.3d at 298.

    If the New York courts actually meant to impose such
a dividing line not only between the valuation of the matter as
of the partnership's dissolution but also a valuation of the
underlying services that would give rise to a post-dissolution
credit to the departing partner, they would have said so.
Moreover, the language that I have quoted, I believe, is easily
susceptible to an interpretation that does not follow the
defendants' approach.  That is, I believe one can view the
formulation that I quoted from Santalucia as stating that (a)
the court needs to value the matter as of the dissolution date;
however, (b) where the matter results in a settlement that is
attributable to a partner's post-dissolution effort, skill and
diligence resulting in a recovery in excess of the objective
valuation of the matter on the dissolution date, that excess
(over and above the objectively projected dissolution-date
value) should not be treated as property of the dissolved firm
but should, rather, be retained by the partner who created it.
Such an approach is particularly appropriate for contingency
fee cases, where, at times, the former partner's post-
dissolution work takes the case to a wholly different level of
value beyond how one would have normally valued it on the
dissolution date. See Shiboleth v. Yerushalmi, 58 A.D.3d 407,

46

408, 873 N.Y.S.2d 2 (App. Div. 1st Dept. 2009), in which the
court (a) stated that Shandell prohibited the special referee
from splitting the fee in proportion to this reckoning of pre-
and post-dissolution hours, and (b) remanded to the referee to
determine the value of the contingency matter on the
dissolution date and whether one partner enhanced that value
post-dissolution.  The court also remanded for a determination
whether the allocation of an hourly fee should be adjusted
because of extraordinary collection activity by one partner
where, at the dissolution date, the client was believed to be
insolvent and, therefore, compensation on the matter was
considered uncollectible.  Id.  Thus, each of Shiboleth's
foregoing holdings supports DSI's objection to the movants'
argument that the New York courts have effectively overturned
the unfinished business doctrine by allocating fees in simple
recognition of post-dissolution hours worked.

        It would seem to me that, contrary to the movants'
argument, and in keeping with the Shiboleth decision, most
matters, whether on contingency or billed on an hourly fee
basis, are capable of being valued as of a particular time
based on projections of profit, and that such value should be
the value that, in the normal instance, would be appropriately
viewed as property of the dissolved firm to be shared among the
partners (and, of course, distributable to creditors until
creditors are paid in full) under the unfinished business

47

doctrine.

As noted by the <u>Brobeck</u> and <u>LaBrum & Doak</u> cases, that value would be the <u>net</u> profit, subject to deductions for post-dissolution overhead, including the salaries and expenses of those other than former partners working on the unfinished matter, and that is, in fact, the approach that the <u>LaBrum</u> court apparently took in focusing on a valuation mechanic. 227 B.R. at 420-21.

This approach is also supported by two statements by the Second Circuit in the <u>Santalucia</u> case, in which the court observed, first, that to arrive at the dissolution-date value of unfinished partnership business, "a court must evaluate the efforts undertaken by the former law firm prior to the dissolution date or any other relevant evidence <u>to form a conclusion as to the value of these cases to the law firm on the dissolution date</u>.  The portion of the fee collected by the law firm would then be distributed to the members in accordance with their pro rata interest in the firm." 232 F.3d at 298 (emphasis added).

Second, the <u>Santalucia</u> court also noted that "although Section 73 of the New York Partnership Law supports the holding by the Appellate Division in <u>Shandell</u>, it is not necessary to that holding.  A close reading of <u>Shandell</u> and Section 73 reveals that Section 73 only provides a methodology for the accounting of a dissolved partnership.  Section 73 is

48

not the source of the duty of a lawyer to account to his former
partners.  The source of the duty is the fiduciary relationship
of trust and confidence that partners have from time immemorial
shared with one another."  Id. at 300.  The court could have
added that the source might also be found in Section 43 of the
New York Partnership Law, which articulates that fiduciary
duty.  Thus, contrary to the movants' contention, the Second
Circuit recognized that New York Partnership Law Section 73
does not superimpose an additional burden on the dissolved
partnership in collecting on unfinished business from former
partners.

DSI correctly points out that the process of
determining the value of Coudert's unfinished business as of
the firm's dissolution date is necessarily fact-specific and,
accordingly, is not properly the subject of a motion to
dismiss.  Nor is the calculation of "net profits" or deductible
"overhead;" nor is the issue of whether any partner's unusual
efforts in fact altered the unfinished matter's projected value
post-dissolution.

How one goes about determining the projected value of
a piece of unfinished legal business intended to be billed on
an hourly basis remains to be developed by both factual and,
perhaps, expert testimony.  Similarly, what credits one gives
to non-former partner "overhead," or to the cost of collection
also remains to be developed on a factual basis.  Uncertainty

49

over the appropriate valuation methodology should not justify

granting the defendants' motions to dismiss as long as DSI has

established, as it has, that it is entitled to establish such a

projected post-dissolution value as a legal matter.

Finally, the defendants argue that in implementing

the unfinished business doctrine the Court needs to evaluate or

determine the value of the matters that were pending on

Coudert's dissolution date taking into account not only their

value to a law firm like Coudert (i.e. taking into account, for

example, Coudert's historic cost and profit on similar matters

and the ongoing market for firms with Coudert's

characteristics), but also taking into account the particular

condition of Coudert at the time, which is that Coudert was in

dissolution and, <u>a fortiori</u>, could not continue the legal

representation.

I agree with the first element of that argument, as

did the court in <u>LaBrum & Doak</u>; that is, one should look to the

potential value of the unfinished representation to a firm with

Coudert's characteristics and not to, for example, a firm that

had materially lower or higher profit margins. On the other

hand, I don't agree with the movants' second contention, which

is that because Coudert was going out of business there could

not have been any value to the firm of its unfinished business

(rather, indeed, according to the movants, such unfinished

matters would have presented potential malpractice liability to

50

a firm that could not staff them).  That approach would again mean that the cases that have applied the unfinished business doctrine in the context of dissolved law firms were engaging in an exercise of pointless deliberation when, instead, they could have easily dismissed the claim on the basis that the firm was in dissolution and, therefore, that the matter could have had no value to it because the firm could not have served the client. But, of course, the unfinished business rule applies to firms in dissolution, in keeping with New York Partnership Law Section 43.1, which applies specifically to firms in liquidation.  Therefore, I do not believe that the fact that Coudert was in dissolution would justify granting the defendants' motion to dismiss DSI's unfinished business claim.

Rather, again, the ultimate determination will be a fact based analysis, perhaps assisted by expert testimony, as to the objective projected net present value of the pending unfinished matter on the firm's dissolution date, based on the hypothetical continuation of the matter to its reasonably anticipated completion by an ongoing firm with Coudert's characteristics.

So, for all of those reasons, I believe that the motions to dismiss premised upon the asserted inapplicability of the unfinished business doctrine to Coudert should be denied.

I believe it's clear from the record of oral argument

51

on this matter that the complaints seek recovery from the
various law firms for their receipt of the net profits from
unfinished business that would otherwise have gone to Coudert
under the unfinished business doctrine because of the
responsibilities of the former partners of Coudert who were
subsequently carrying through those matters at the various law
firms that they joined. I believe this claim, then, serves as
the predicate for DSI's claims against the respective law firm
defendants for turnover under Section 542 of the Bankruptcy
Code, or as the basis for a claim of unjust enrichment, or,
potentially, under Sections 544 or 548 and 550 of the
Bankruptcy Code insofar as DSI alleges that the defendant law
firms retained collections on any unfinished business that was
property of Coudert's estate for no consideration or less than
reasonably equivalent value provided to Coudert.  Thus,
assuming that DSI can establish a claim to unfinished business
for departing partners based upon the facts that would be set
forth at trial, DSI would have a right thereafter to seek
recovery from any firm that received such property and retained
it rather than providing the value of such property to Coudert.

        So, Mr. Adler, you can submit an order consistent
with my ruling.

        I know there have been informal requests by DSI to
amend the complaints and I will wait to see those as actually
filed before I'll deal with them.  Once they're filed, and if

52

there's to be any hearing on such a request, we can use that
also as a date for a conference.

        As I noted at the end of the oral argument on this
matter, it would seem to me that before the law firms and DSI
engage in or undertake significant litigation costs on this
matter it would be a good idea to try to get a better idea
about the amounts involved.  I think until that happens neither
DSI nor any of the defendants is really in much of a position
to consider a settlement. Now I'm talking about the unfinished
business that is the subject of most of the complaints,
primarily, rather than fraudulent transfer issues where that
data is pretty well known.

        So I would encourage the parties perhaps to stage how
they deal with discovery and try to focus on and clarify,
first, amounts that could be characterized as unfinished
business -- and, as you could tell from my ruling, there are
open factual issues as to what would be credited against those
amounts -- but at least try to narrow down what those amounts
are, focusing again on the case law and Section 43 -- focusing
on net profits or on profits.  And then that should, I would
think, enable the parties to discuss with some level of
appropriate knowledge how the matters can be addressed in a
settlement.

        Thank you.

                        * * * * *

53

54